**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: VISA DEBIT CARD ANTITRUST LITIGATION | Civil Action No.: 24-7435 (JGK) <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   CASE OVERVIEW ............................................................................................ 4

III.  JURISDICTION, VENUE, AND COMMERCE .................................................. 7

IV.   THE PARTIES .................................................................................................... 8

V.    DEBIT TRANSACTIONS AND DEBIT NETWORKS ....................................... 10

  i.   Debit Transactions ............................................................................................ 10

  ii.  Debit Networks .................................................................................................. 14

    A.   Debit Market Revenue Generation ................................................................ 15

    B.   Visa's Dominance and the Debit Market Evolution ...................................... 15

    C.   PIN Networks Cannot Meaningfully Compete for Debit Transactions ............ 18

    D.   Alternative Electronic Debit Networks .......................................................... 20

VI.   VISA USES EXCLUSIONARY AND ANTICOMPETITIVE CONDUCT TO DOMINATE
      DEBIT TRANSACTIONS IN THE UNITED STATES ....................................... 21

  i.   Visa Has Been the Largest, Most Powerful Debit Network for Over a Decade ..................... 21

  ii.  Visa Entered into a Web of Contracts with Merchants, Acquirers, and Issuers to Hinder PIN
       Networks from Competing ................................................................................. 23

    A.   Visa Imposes Conditions in Contracts with Merchants and Acquirers that Unlawfully
         Inhibit Competition and Stifle Innovation .................................................... 24

    B.   Visa's Contracts with Issuers Unlawfully Restrict the Growth of Its Debit Competitors ... 29

  iii. Visa's Response to the Durbin Amendment Successfully Protected Its Monopoly from
       Competition ....................................................................................................... 31

  iv.  Visa Uses Its Monopoly Power to Deprive Its Rivals of Scale ............................... 33

  v.   Visa Uses Its Monopoly Power to Stymie and Coopt Innovative Alternatives to Its Debit
       Network ............................................................................................................. 36

    A.   Visa Recognizes that Fintech Debit Networks Could Disintermediate Its Lucrative Debit

Business ............................................................................................................ 38

B.  Visa Leveraged Its Debit Monopoly to Prevent PayPal and Others from Disintermediating Visa with Staged Digital Wallets ................................................................................. 41

C.  Visa Uses Its Leverage Over Its Potential Debit Competitors, Including Apple, Paying Them Not to Create or Promote Competitive Products ........................................................ 45

D.  Visa Prevents Meaningful Competition from Next-Generation Fintech Competitors Like Plaid ................................................................................................. 47

VII.  ANTICOMPETITIVE EFFECTS ................................................................................ 52

VIII.NO PROCOMPETITIVE JUSTIFICATIONS ................................................................ 55

IX.  THE RELEVANT MARKETS ................................................................................... 55

i.   The United States Is a Relevant Geographic Market ............................................. 55

ii.  Relevant Product Markets ................................................................................. 56

A.  General Purpose Debit Network Services Are a Relevant Product Market ....................... 56

B.  General Purpose Card-Not-Present Debit Network Services Are a Relevant Product Market ................................................................................................. 59

X.   VISA HAS MONOPOLY POWER IN THE UNITED STATES DEBIT MARKETS .......... 59

XI.  PLAINTIFFS AND THE CLASS HAVE BEEN INJURED BY VISA'S CONDUCT ........... 62

XII.  EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS .................................... 64

XIII.CLASS ACTION ALLEGATIONS .............................................................................. 66

XIV. VIOLATIONS ALLEGED ......................................................................................... 69

XV.  REQUEST FOR RELIEF .......................................................................................... 141

XVI.JURY DEMAND ..................................................................................................... 143

All Wrapped Up Signs and Graphix, LLC; NDA Aesthetics, LLC; Warren Imports, LLC d/b/a Subaru World of Hackettstown; Yabla, Inc.; Broadway Grill, LLC; Ridgeline Roofing LLC; and R&N Productions LLC ("Plaintiffs"), on behalf of themselves and the Class defined below, bring this action under Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§ 1, 2, and 3), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and pursuant to the various state laws alleged herein, against Defendant Visa Inc. ("Visa") for the injuries sustained by Plaintiffs and other members of the Class from Visa's anticompetitive conduct in the markets for general purpose debit network services and card-not-present debit network services in the United States described herein and to enjoin Visa from engaging in further violations. Plaintiffs allege the following based on personal knowledge as to themselves and upon information and belief as to all others:

## I.    INTRODUCTION

1.      Plaintiffs, like millions of other United States merchants, depend on Visa's debit network to facilitate the connection between the consumer's bank and the merchant's bank for processing debit card transactions. Debit transactions account for over $4 billion per year in U.S. commerce. More than 60% of those transactions are processed through Visa's network, effectively forcing merchants to comply with Visa's business terms. This dominance enables Visa to collect over $7 billion annually in processing fees while maintaining operating margins as high as 83%.

2.      As an investigation and recent complaint filed by the Department of Justice confirmed, Visa has unlawfully entrenched its monopoly by using a multi-faceted exclusionary strategy to stifle competition and innovation in the United States debit market, resulting in enormous financial harms to merchants like Plaintiffs. These tactics include agreements to punish businesses that seek to use alternative networks or methods to process debit transactions

as well as contracts to pay off potential competitors so that they do not build new products or networks that would threaten Visa's debit network dominance. Visa's scheme directly targets merchants, who Visa knows have no choice but to bear the cost of Visa's fees.

3.      When a consumer uses a Visa debit card to purchase goods or services, Visa acts as an intermediary between a consumer's bank (the "issuing bank" or "issuer") and the merchant's bank ("acquiring bank" or "acquirer"). For the transaction to work, the issuing bank and the acquiring bank must be part of the same network. Issuers decide which networks to place on their debit cards, and merchants decide which networks they will accept.

4.      Merchants must accept Visa due to its widespread consumer adoption. Visa-branded cards represent a large portion of all United States debit cards, making it a necessity for merchants to accept Visa to avoid losing sales. This "must-have" status gives Visa significant leverage in negotiating contracts with merchants.

5.      Because of Visa's monopoly, Visa imposes supracompetitive fees on merchants through their acquiring banks, who process payments for merchants as their agents, pay Visa a fee for each transaction on its network as well as additional fees and costs, and then charge those fees through to merchants. These fees represent a substantial cost burden that merchants are obligated to bear when accepting debit card payments.

6.      Acquiring banks are captive and frequently have only one option for routing a debit transaction: the front-of-card network. And Visa is the front-of-card brand for over 70% of debit card payment volume in the United States. Those captive transactions give Visa the power to demand and enforce significant volume commitments from merchants' acquiring banks. Visa imposes those conditions on acquiring banks through loyalty contracts which they must accept or they and their merchant clientele face contractual penalties and punitively high network fees, known as "rack rates," which would be paid by merchants.

7.      Visa follows the same playbook when it contracts directly with certain high-volume merchants: requiring volume commitments and imposing "cliff pricing" structures. To secure discounts and avoid high rack rates, such merchants must agree to route a high percentage of their eligible debit transactions through Visa. Those agreements, as well as the restrictions on acquiring banks, effectively limit such merchants' ability to choose alternative networks, even if those networks offer lower fees or better terms.

8.      Those practices have stifled innovation and competition. By locking up the overwhelming majority of debit transactions, Visa hinders the growth of competing debit networks by depriving competitors of the scale they need to thrive. This lack of competition reduces the incentive for other networks to innovate and offer better services or lower prices.

9.      Beyond its exclusion of competing debit transaction networks, Visa also actively seeks to prevent competition from fintech companies that could result in Visa losing market share. Visa fears that fintech companies, with their existing relationships with consumers and merchants, could create alternative debit networks that bypass Visa entirely. To counter that threat, Visa offers incentives to potential competitors in exchange for agreements not to develop or support competing payment products. In at least one case, that of Plaid, Visa went a step further and attempted to buy out a potential competitor whose innovative new debit transaction-facilitating service threatened to erode Visa's share of the online debit network transactions market.

10.     All of that anticompetitive conduct has reduced choice and innovation in the market and enabled Visa to charge supracompetitive fees, imposing massively increased costs on merchants. Plaintiffs, therefore, bring this case on behalf of themselves and other Class members to stop Visa's unlawful conduct, redress past harms, and restore competition in the relevant debit network markets.

II.    CASE OVERVIEW

11.    Because merchants and issuers must be on the same network to facilitate a

transaction, debit networks face what Visa calls "a chicken-and-egg problem." For networks to

work, many issuers and acquirers must join the network. Few issuers are likely to join the debit

network if few merchants accept their debit cards. The inverse is also true: merchants are

unlikely to join the network unless a sufficient number of customers want to make purchases

using cards on that network. Visa recognizes this dynamic, stating: "build[ing] scale on both

sides. . . with consumers/payers and with merchants/payees" is "a herculean task." And thus,

these effects create "an enormous moat" around Visa's business.

12.    Merchants engage in billions of debit transactions for purchases at their

physical stores (card-present or CP transactions) and online (card-not-present or CNP

transactions) processed each year, and Visa dominates this market. Visa's payment network

processes over 60% of all United States debit transactions, and its dominance is even higher in

CNP transactions, where Visa's market share exceeds 65%. Its competitors are far behind:

Mastercard, the next-biggest network, processes less than 25% of all United States debit

transactions. "PIN networks," so-called because they originally facilitated ATM transactions that

required users to enter a PIN, are significantly smaller.

13.    Visa intentionally created the moat around its network because, as the great

recession receded, Visa recognized (1) legislation and (2) emerging technologies as the key

threats to its business. The scheme described herein demonstrates how Visa took steps to counter

both, to the detriment of Plaintiffs, the Class, and the market as a whole.

14.    Visa has been able to leverage its market dominance despite Congress's

explicit efforts to open the markets in which it operates. In 2010, Congress passed the Durbin

Amendment, which became law as part of the 2010 Dodd-Frank Wall Street Reform and

Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). The Durbin Amendment was enacted with the purpose of increasing competition among debit networks—by requiring issuing banks to include at least two debit networks on every debit card, one of which must be unaffiliated with the front of the card network, and authorizing the Federal Reserve to prescribe regulations for any interchange transaction fee an issuer may receive or charge. Notably, although the Durbin Amendment regulates interchange fees, it does not regulate network fees.

15.     Visa reacted to the Durbin Amendment by leveraging its control over huge numbers of non-contestable transactions—that is, those for which Visa has no competition—to coerce acquiring banks to enter into routing agreements or face high rack rates. That conduct effectively forecloses rival networks in contestable transactions and prevents them from gaining the necessary scale and network to compete. In all, Visa has effectively foreclosed competition in at least 45% of relevant debit markets for all debit transactions and over 55% of card-not-present transactions.

16.     Other debit networks are unable to compete for non-contestable transactions and often struggle to gain a significant share of transactions involving merchants bound by a Visa routing agreement. This disadvantages merchants who choose not to accept Visa's terms.

17.     According to the Department of Justice's investigation, in 2014, Visa informed its Board of Directors that these routing deals with the largest issuers and acquirers allowed Visa "to stabilize [its] volume." Visa's routing contracts encompass more than 180 of its largest merchants and acquirer banks, effectively insulating at least 75% of Visa's debit volume from competition. This means that Visa has foreclosed nearly half of the total United States debit volume. Internally, Visa highlights the success of its routing agreements in limiting competition. In 2022, Visa renewed many such agreements to further solidify its monopoly in the debit market for years to come.

5

18.    Visa also took deliberate action to prevent emerging technologies from contesting Visa's control over debit transactions. Visa recognized that digital platforms like Apple, PayPal, and Square have extensive networks connecting merchants and consumers, offering popular payment solutions. These platforms allow consumers to link their debit cards to services such as Apple Pay, PayPal, and Cash App, enabling convenient and efficient transactions.

19.    Visa feared these popular digital platforms may have "network ambitions" that would compete with Visa as an intermediary for debit transactions. Visa characterized this potential disruption as an "existential threat" to its debit business. To address this threat, Visa implemented a strategy to "partner with emerging players before they become disruptors." Visa achieves that goal by offering incentives, sometimes worth hundreds of millions of dollars annually, to these potential competitors conditioned upon their agreement not to compete with Visa. Indeed, Visa has entered into these types of agreements with at least Apple, PayPal, and Square.

20.    Finally, Visa has prevented competition from innovative companies by attempting to swallow completely at least one such company—Plaid. By planning to introduce its innovative "pay-by-bank" debit transaction-facilitating service to the marketplace, Plaid emerged as a likely competitor to Visa in the online segment of the domestic debit network markets. Visa first became aware of the competitive threat of Plaid and its next-generation technology in 2019. Visa grew so concerned about this existential threat that it decided the best course of action for its bottom line was to eliminate Plaid as a competitive threat by acquiring it—even at an amount its leadership conceded "does not hunt on financial grounds." After governmental opposition ultimately forced it to drop the planned acquisition, Visa resorted to its standard "partnership" playbook to sideline Plaid as an emerging threat.

21.    Visa's anticompetitive conduct has allowed it to leverage its monopoly power in non-contestable debit transactions to foreclose entry and competition in contestable debit transactions through, among other things, its volume commitment agreements with acquiring banks. That strategy has been successful.

22.    Leveraging its market power, Visa imposes high fees, limits choices, and stifles innovation, ultimately creating a system that favors Visa's profitability at the expense of merchants and consumers. Visa's conduct inflicts enormous harm on merchants in the form of higher fees and reduced innovation. Plaintiffs bring this suit to recover damages from Visa's conduct for themselves and the Class and to enjoin Visa from engaging in further anticompetitive conduct going forward.

## III.    JURISDICTION, VENUE, AND COMMERCE

23.    This Court has original subject-matter jurisdiction over Plaintiffs' federal law claims in this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as Sections 1, 2, and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-3. Plaintiffs seek to recover overcharges and treble damages for injuries suffered by them and the Class due to Visa's anticompetitive exclusionary conduct, which reinforced Visa's monopoly power in the relevant markets. Because Plaintiffs seek relief for violations of the Clayton Act and Sherman Antitrust Act, the Court also has original subject-matter jurisdiction over Plaintiffs federal law claims under 28 U.S.C. §§ 1331 and 1337(a). This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

24.    This Court also has original subject-matter jurisdiction over the state law claims in this action under 28 U.S.C. § 1332(d) because it is a class action involving common legal or factual questions, with the total amount in controversy exceeding $5,000,000, excluding interest and costs. The Class includes over one hundred members, and at least one Class member is a

citizen of a state different from that of the Defendant.

25.     Venue is proper in this Court pursuant to, among other statutes, § 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because Visa regularly transacts business within this District, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

26.     Visa engages in, and its activities substantially affect, interstate trade and commerce. Visa provides services that are marketed, distributed, and offered throughout the United States, including across state lines and in this District. Visa's actions are ongoing and are likely to continue or recur, including through other practices with the same purpose or effect.

## IV.    THE PARTIES

27.     Plaintiff All Wrapped Up Signs and Graphix, LLC has its principal place of business in Palm Beach County, Florida. It accepted debit payments routed on Visa's network starting in 2022. Accordingly, it has been forced to pay Visa's supra-competitive fees. It, therefore, has been injured in its business and property as a result of Visa's unlawful conduct.

28.     Plaintiff NDA Aesthetics, LLC has its principal place of business in Moorestown, New Jersey. It accepted debit payments routed on Visa's network starting in 2022. Accordingly, it has been forced to pay Visa's supra-competitive fees. It, therefore, has been injured in its business and property as a result of Visa's unlawful conduct.

29.     Plaintiff Warren Imports, LLC d/b/a Subaru World of Hackettstown has its principal place of business in Hackettstown, New Jersey. It accepted debit payments routed on Visa's network starting in 2021. Accordingly, it has been forced to pay Visa's supra-competitive fees. It, therefore, has been injured in its business and property as a result

of Visa's unlawful conduct.

30.    Plaintiff Yabla, Inc. has its principal place of business in Union City, New Jersey. Plaintiff Yabla, Inc. has its principal place of business in Union City, New Jersey. It accepted debit payments routed on Visa's network starting in 2005. Accordingly, it has been forced to pay Visa's supra-competitive fees. It, therefore, has been injured in its business and property as a result of Visa's unlawful conduct.

31.    Plaintiff Broadway Grill, LLC has its principal place of business in Burlingame, California. Broadway Grill was formed as an LLC on January 17, 2020 and began accepting Visa debit cards as payment from its customers on June 19, 2020. Accordingly, it has been forced to pay Visa's supra-competitive fees. It, therefore, has been injured in its business and property as a result of Visa's unlawful conduct.

32.    Plaintiff Ridgeline Roofing, LLC has its principal place of business in Vero Beach, Florida. It accepted debit payments routed on Visa's network starting in 2022. Accordingly, it has been forced to pay Visa's supra-competitive fees.  It, therefore, has been injured in its business and property as a result of Visa's unlawful conduct.

33.    Plaintiff R&N Productions LLC d/b/a SewRobQnE has its principal place of business in Montgomery County, Pennsylvania. It accepted debit payments routed on Visa's network starting in 2013. Accordingly, it has been forced to pay Visa's supra-competitive fees. It, therefore, has been injured in its business and property as a result of Visa's unlawful conduct.

34.    Collectively, All Wrapped Up Signs and Graphix, LLC, NDA Aesthetics, LLC, Warren Imports, LLC d/b/a Subaru World of Hackettstown, Yabla, Inc., Broadway Grill, LLC, Ridgeline Roofing, LLC, and R&N Productions LLC are referred to below as "Plaintiffs."

35.     Plaintiffs are five of the millions of merchants who accept debit payments routed on Visa's network. Accordingly, Plaintiffs have been forced to pay Visa's supra-competitive fees. Plaintiffs have, therefore, been injured in their business and property as a result of Visa's unlawful conduct.

36.     Visa Inc. ("Visa") is a Delaware company headquartered in San Francisco, California. Visa is a global payments company that operates the largest debit network in the United States, routing 57.6 billion debit transactions worth $2.8 trillion in 2023. Visa provides a platform that authorizes, clears, and settles debit transactions between merchants and consumers. Visa reported revenues of approximately $32.7 billion in fiscal year 2023, including $14 billion in the United States.

## V.     DEBIT TRANSACTIONS AND DEBIT NETWORKS

### i.     Debit Transactions

37.     Debit transactions are a widely used and essential payment method in the United States financial system. Originally designed for consumers to access their bank funds through ATMs, debit cards have been available in the United States since the 1960s. Eventually, these cards evolved to support retail purchases. By the 1990s, as more merchants accepted debit payments and consumers sought more convenient options than cash or checks, debit card usage surged. Tens of millions of Americans now use debit cards, and the cards are widely accepted by merchants nationwide.

38.     Debit transactions are more convenient and secure than cash or checks, and avoid many of the risks and costs associated with credit cards—such as debt accumulation, fees, and interest charges. They are a particularly useful option for consumers who cannot obtain credit cards or have limited credit access.

39.     In a debit transaction, unlike in many other financial transactions, funds are

moved promptly from a consumer's bank account to a merchant's account as payment for goods or services. These transactions can be used for in-store purchases or online bill payments.

40.     The most common type of debit card is a **general purpose debit card**, which can be accepted at numerous unrelated merchants. Visa does not issue general purpose debit cards directly to consumers. Rather, these cards are issued by "**issuing banks**" to account holders.[1] Merchants receive those payments through "**acquiring banks**."[2] When a card holder makes a purchase, the issuing bank connects to the **debit network**, which connects to the acquiring bank, in order to facilitate the transaction between the card holder and the merchant.

41.     Debit networks like Visa play a crucial role at several points of the debit transaction process.

42.     First, debit networks partner with issuing banks to offer debit cards to consumers and with acquiring banks to enable merchant acceptance.

43.     Second, debit networks provide among their products a debit credential or other account identifier unique to the consumer that can be accepted at all merchants that participate in the network, payment guarantees for the merchant, the ability for a consumer or her bank to dispute and chargeback the transaction, fraud protections to all parties, and the "rail" or methods by which the merchants' and consumers' banks communicate with each other to facilitate the transaction and the transfer of funds.

44.     Finally, debit networks facilitate interbank settlements by aggregating daily transactions, calculating net fees, and providing settlement reports. Banks then use these reports

---

[1] The issuing bank may work with an issuer processor to connect with the debit network. The processor may also provide services like managing card issuance, authorizing or declining transactions, and communicating with settlement entities. The use of the term, "issuer" in this Complaint means both issuing banks and issuer processors.

[2] As with issuing banks, acquiring banks may work with acquiring processors to send transaction data to the network. The use of the term, "acquirer" in this Complaint refers to both acquiring banks and acquirer processors.

to transfer funds, typically via a bank-exclusive wire service.

45.     Debit cards allow consumers to make purchases using funds from their bank accounts, either in-person or online, through a set of credentials including a 16-digit card number, expiration date, card verification value (CVV), EMV chip, and four-digit PIN. Cards display one primary network (front-of-card) and must display a secondary, unaffiliated network (back-of-card); they may but often do not display additional back-of-card networks.

**Figure 1**



46.     A debit transaction begins when a consumer presents her debit credentials to a merchant, which in turn triggers a request to the merchant's bank (the acquirer).

47.     Once the acquiring bank receives the request from the merchant, it sends the consumer's account and transaction information to a debit network like Visa to process the transaction for authorization, clearing, and settlement. Although acquirers, on behalf of merchants, theoretically can choose between the front-of-card network (usually Visa, which is the front-of-card brand for 70% of U.S. debit card volume) and a back-of-card network, because of Visa's exclusionary and anticompetitive agreements with merchants' acquiring banks, Visa's

network is typically programmed by the acquirer to be the default network if Visa's logo is on the front of the card.

48.    After the acquirer sends the transaction to a debit network (e.g., Visa), that network requests authorization from the consumer's bank (the issuer) to approve the transaction. If the consumer has sufficient funds and no fraud is detected, the issuer authorizes the transaction, holds the consumer's funds, and sends authorization to the debit network, which sends authorization back to the acquirer. But the debit network will authorize payment only of the funds requested minus the interchange fee, which is imposed by the network on the merchant and deducted by the issuer from the amount owed to the merchant.

49.    The acquirer then completes the transaction by sending the authorization response to the merchant.

50.    This process, for almost all debit card transactions, occurs in a matter of seconds.

**Figure 2**



51.    While the above paragraphs and figure explain the overall process for both in-person and online debit transactions, the precise mechanics of such transactions vary slightly based on whether the card is physically present. A **card-present transaction** occurs when the

debit card is used in person at a merchant. In contrast, a **card-not-present** transaction happens when the debit card is used online, in an app, or over the phone. Card-not-present transactions now account for about half of all debit spending, a significant increase since 2010. For card-not-present transactions, the customer can manually enter her debit credentials or can use debit credentials stored in a digital wallet, like Google Pay, Apple Pay, or PayPal. These transactions almost never require inputting a PIN, unlike card-present transactions, instead relying on other security features like multi-factor authentication. But even with these differences, the process described above for executing the transaction across various banks and the debit network remains the same.

####    ii.    Debit Networks

52.    As noted, in the United States, debit cards feature at least two networks: a primary "front-of-card" network displayed on the card and a secondary "back-of-card" network chosen by the issuer. Although the front-of-card network is generally displayed via its logo on the front of the card, the back of the card may or may not include the logo of the back-of-card network.

53.    Issuers—consumers' banks—select the front-of-card network and then choose which back-of-card networks to enable for a given debit card.

54.    Visa is the dominant front-of-card network, Mastercard is the distant second front-of-card network, and two much smaller players account for the remainder. Issuers seldom switch their front-of-card network due to high switching costs, such as reissuing debit cards. Visa holds long-term contracts with many issuers, limiting opportunities for Mastercard and other networks to contest Visa as the primary network.

55.    The Durbin Amendment requires all cards, including Visa-branded cards, to include at least one unaffiliated back-of-card network, such as Mastercard's Maestro or smaller

14

networks like STAR, NYCE, or Pulse (collectively "PIN networks").

56.     Because issuers control which back-of-card networks can process specific transactions, a debit card's inclusion of a back-of-card network does not ensure that the network can be used for every transaction involving the card. For instance, issuers may choose not to enable back-of-card networks for card-present transactions without a PIN. Back-of-card-exclusive networks such as PIN networks have struggled to gain significant market share.

## A. Debit Market Revenue Generation

57.     Networks like Visa generate revenue by charging fees for each debit transaction to entities on both sides of the platform.

58.     Visa imposes two main types of fees to provide debit acceptance services to merchants: per-transaction fees and fixed fees. First, Visa collects a network fee for each transaction run on the network, which varies depending on factors such as whether a PIN is used or if the transaction is card-present or card-not-present. Visa's network fees are generally much higher than those of PIN networks. Second, since 2012, Visa has also imposed a fixed monthly fee, the **Fixed Acquirer Network Fee** (**FANF**), based on the merchant's number of locations and transaction volume.

59.     Separate from the fees imposed by Visa, issuers collect a per-transaction interchange fee for their services. For large issuers (assets over $10 billion), this fee is capped by the Federal Reserve; for smaller issuers, debit networks like Visa set the fee.

60.     To obtain debit acceptance services, merchants pay these fees, typically through acquirers and sometimes facilitated by non-bank processors. These fees represent a substantial cost to merchants and are separate from the fees merchants pay acquirers for their services.

## B. Visa's Dominance and the Debit Market Evolution

61.     As explained, the first debit networks in the United States started as ATM networks in the 1960s. Banks issued ATM cards to their accountholders so they could easily withdraw funds from their accounts. To use these cards, accountholders could enter a 4-digit **PIN** number at an unattended ATM rather than having to provide a signature at a bank's counter.

62.     Merchants appreciated the possibility of eliminating checks and started installing PIN pads to enable more accountholders to use their ATM cards at the point of sale. Consumers also became more comfortable carrying a physical card for purchases. With increased enablement across cities and geographic regions, these ATM networks, including STAR, NYCE, and Pulse, evolved to become the PIN networks.

63.     Visa and Mastercard were dominant in credit card infrastructure before enabling debit networks. After the introduction of ATM cards, Visa and Mastercard began to build their front-of-card debit products off of their ubiquitous credit card infrastructure.

64.     As debit emerged, Visa and Mastercard were each joint ventures owned and controlled exclusively by their member banks, which comprised virtually all banks in the United States. Visa leveraged the scale afforded by its member banks to jump-start its debit business. When Visa launched its point-of-sale debit product, the Visa Check Card, in the 1990s, it was quickly able to scale among its member banks, which issued debit cards with the Visa logo. Unlike the PIN networks, Visa and Mastercard already had access to an existing base of merchants who accepted Visa and Mastercard credit cards. This eased the way for Visa and Mastercard to roll out widely usable debit cards, especially as Visa's network rules initially mandated merchants accept both its credit and debit cards.

65.     Visa's and Mastercard's relationships with their respective issuers were exclusive until the early 2000s, each prohibiting their issuers from issuing American Express or Discover-branded credit and debit cards, thereby impairing the growth of these smaller

networks. But in 2003, the Second Circuit affirmed a district court's injunction against those restrictions based on the antitrust laws. Shortly thereafter, Visa and Mastercard settled private litigation and agreed to allow merchants to accept their debit cards without accepting their credit cards, and vice versa. But Visa's dominance had already been cemented.

66.     Between 2006 and 2008, both Visa and Mastercard became independent public corporations, though banks continued to own significant stock in them. Although issuer banks were now free to choose to issue a mix of Visa-branded debit cards and other cards featuring different networks, most banks chose to issue only Visa-branded debit cards or only Mastercard-branded debit cards, with the two competing with each other for front-of-card placement. It was challenging for Visa or Mastercard to displace the other as a bank's chosen front-of-card network, due to the expense and difficulty of issuing new cards to all accountholders. It was also rare for any network other than Visa or Mastercard to win front-of-card placement because only those two companies had a large base of merchant acceptance.

67.     During this time, banks often chose to feature only one network—the front-of-card network—on debit cards they issued. As a result, merchants, through their acquirer, had no ability to choose the network for routing a particular transaction.

68.     That practice persisted until at least July 21, 2010, when Congress passed the Durbin Amendment requiring each debit card to support at least two networks. This meant that issuers had to enable at least one unaffiliated back-of-card debit network as a putative competitor to the front-of-card brand (i.e., Visa or Mastercard). This change was made with the goal of improving merchants' routing options for debit transactions.

69.     Notwithstanding the Durbin Amendment, Visa remains the largest debit card network in the United States today by far. In part, that is because the Durbin Amendment also set maximum limits on the interchange fees that merchants can be charged by **regulated issuers**

(banks with more than $10 billion in assets) for every debit transaction. The interchange cap has a no-evasion rule, which limits a network's ability to provide incentives to issuers by paying them more than the cap. These limits on incentives made it even more challenging for Mastercard or other networks to win front-of-card placement where Visa was the incumbent network because they often could not fully compensate the issuer for its switching costs. Mastercard has ultimately not been able to gain significant share from Visa or restrain Visa's monopoly.

70.     Today, Visa is the front-of-card brand for over 70% of the debit card payment volume in the United States. Mastercard, by contrast, is the front-of-card brand for around 25% of debit card payment volume, with American Express and Discover comprising the front-of-card brand on a much smaller number of debit cards. As Visa's former Head of Product North America has explained, Visa has "dominance on the front of card."

## C. PIN Networks Cannot Meaningfully Compete for Debit Transactions

71.     For a debit network to have a chance to win a transaction, the issuer must place it on the debit card it issues. But even if a network is on a card, it may be ineligible for certain transaction types unless each party to the transaction—the issuer, the acquirer, and the merchant itself—has enabled the debit network to process the particular transaction type.

72.     To compete effectively, a debit network needs sufficient scale on both the issuer and merchant sides of the debit market. The desirability and effectiveness of a debit network depends on the breadth of its acceptance and enablement by all network participants—consumers, issuers, acquirers, and merchants. For example, if more issuers place a network on a card, more consumers will present the debit network for payment, and it becomes more likely that merchants will accept the network. The converse is also true. This feedback loop is known as **network effects**.

18

73.      For smaller PIN networks and potential competitors, building scale on both sides of the market is—in the words of a Visa executive—a "herculean task."

74.      Undaunted, PIN networks have continued to innovate. While still referred to in the industry as "PIN" networks, they have developed capabilities to process debit transactions without requiring a consumer to enter a PIN (referred to as **PINless** debit transactions). While PIN networks by default require PIN entry after consumers swipe or tap their cards, PINless technology allows these networks to process card-not-present transactions, such as online purchases, and in-person transactions in which the consumer does not enter a PIN.

75.      But this innovation has run up against Visa's anticompetitive conduct. Specifically, Visa imposes contractual rules and terms in its merchant and acquirer agreements that, as a practical matter, require merchants to route the vast majority of their debit transactions to Visa, rather than back-of-card networks like PIN networks and Maestro. Visa's dominance, its exclusionary rules, and the small size of the PIN networks mean that each PIN network can compete for only a tiny fraction of all debit transactions. Put another way, Visa's merchant and acquirer contracts lock up a substantial portion of debit transaction volume, depriving Visa's rivals of scale and artificially limiting routing options.

76.      Visa is able to impose these contractual terms in part because some transactions are not subject to any competition by back-of-card networks. These transactions are referred to as "non-contestable." Back-of-card networks are not available for particular transaction types, such as transactions over a certain dollar amount or transactions that fail to meet particular encryption criteria. Card-present transactions may be non-contestable if the issuer does not allow the network to process card-present PINless transactions and the network's PIN option is unavailable because the merchant and/or its acquirer chooses not to prompt customers to enter a PIN. Moreover, acquirers may not enable smaller PIN networks. Card-not-

present transactions may be effectively non-contestable if they are tokenized, an encryption technology used to facilitate some Visa-branded debit card transactions initiated online, in a mobile app, or with a digital wallet. Indeed, only a tiny fraction of card-not-present tokenized transactions were routed over the unaffiliated network on the back of debit card in 2023. Additionally, issuers have historically not enabled card-not-present PINless transactions—at times at Visa's prompting—which had deterred merchants and acquirers from enabling card-not-present PINless acceptance.

77.     These non-contestable transactions comprise a significant percentage of Visa-branded debit card transactions.

78.     Merchants must accept Visa or they will lose a substantial number of sales and consumers. Because of the large number of consumers using Visa-branded cards, nearly all merchants must accept Visa, which in turn requires nearly all merchants to route at least the non-contestable transactions to Visa instead of the often less costly back-of-card networks.

### D.  Alternative Electronic Debit Networks

79.     Although debit cards are the most common way for a customer to promptly settle a transaction with a merchant without the extension of credit in the United States, other options exist, including debit networks developed by fintech firms (**fintech debit**).

80.     A fintech debit network can facilitate consumer-to-merchant payments by providing end-to-end functionality equivalent to debit card networks: it authorizes payment from a consumer's bank account, facilitates communications with the consumer's bank to authorize and clear the transaction, and provides settlement services by initiating a payment to the merchant's financial institution. Alternative debit networks can complete this final transfer of funds using money transfer services available to banks, such as the **Automated Clearing House (ACH)** or **Real Time Payment (RTP)** networks, which are lower-cost alternatives to Visa's

debit offering.

81.    Visa recognizes that accountholders may one day dislodge Visa from its privileged place as the dominant middleman between their bank account and the merchant. By combining real-time money transfers with additional services—such as a credential that can be used at merchants that are members of the network, payment guarantees, dispute capabilities, chargeback capability, and fraud protection—alternative debit networks could provide equivalent functionality to debit card networks like Visa's. Visa's internal documents make clear that Visa fears a world in which alternative debit networks mature and potentially take hold if fintech firms choose to pursue their "network ambitions."

## VI.    VISA USES EXCLUSIONARY AND ANTICOMPETITIVE CONDUCT TO DOMINATE DEBIT TRANSACTIONS IN THE UNITED STATES

### i.    Visa Has Been the Largest, Most Powerful Debit Network for Over a Decade

82.    Visa is one of the most profitable companies in the United States, with global operating income of $18.8 billion and an operating margin of 64% in 2022. North America is among Visa's most profitable regions, with 2022 operating margins of 83%.

83.    Visa's United States debit business is its largest source of revenue globally. Visa charges over $7 billion in network fees on United States debit volume annually, earning Visa $5.6 billion in net revenue. In 2022, Visa earned more revenue from its United States debit business than from its United States credit business, and more from its debit business in the United States than its debit business in any other region in the world.

84.    Visa's incremental cost of each additional transaction on the Visa network is "approximately zero." As Visa's former CFO put it, "the incremental transaction comes with little incremental cost." Moreover, Visa bears no financial risk for fraud. If someone uses a stolen debit card to run up fraudulent purchases, for example, the merchant, acquirer, or the issuer may bear the financial risk—never Visa.

21

85.     Despite regulatory changes, the rise of e-commerce and mobile payments, the introduction of new related technologies, and an underlying product that is "increasingly viewed as a commodity," Visa's high share of debit transactions has hardly budged in years. Visa's network still carries over 60% of all debit transactions and 65% of all card-not-present debit transactions in the United States, even while Visa has imposed supracompetitive fees, stabilized those fees, and depressed price competition.

86.     Visa preserves its debit monopoly by (1) preventing competitors from building a debit network to scale to rival Visa, and (2) preventing would-be competitors from getting to market.

87.     Visa is the front-of-card brand for over 70% of the debit card payment volume (by revenue) in the United States. It is nearly three times the size of Mastercard, its next biggest rival, which is the front-of-card brand for around 25% of debit card payment volume. No other competitor has more than a single-digit share of front-of-card debit card payment volume. As Visa's former Head of Product North America has explained, Visa has "dominance on the front of card."

88.     First, Visa maintains its monopoly in debit against smaller competitors like PIN networks preventing them from developing scale on both sides of the debit market: (1) merchants and their acquirers; and (2) account holders and their issuers. Visa locks up merchant debit volume with de facto exclusive deals that effectively require those merchants (or their acquirers) to route available transactions through Visa. Visa then locks up issuers by paying them to take actions that limit merchants and acquirers' ability to route payments to PIN networks, for instance by getting issuers to agree not to enable PINless routing. If merchants (or their acquirers) or issuers refuse these deals, they are subject to heightened fees. Unsurprisingly, they rarely refuse them (as further described below). Through these actions, Visa ensures that

22

more transactions are non-contestable, maintaining its leverage over both issuers and acquirers and preventing a tipping point at which PIN networks would be broadly enabled by merchants.

89.    Second, Visa requires or induces potential competitors, such as digital platforms that contract with Visa, to agree not to introduce or support innovative alternatives to Visa's traditional card-based debit network. If the would-be competitors refuse to agree to Visa's terms, they are subject to high penalties that reduce their ability to compete for merchants' financial processing business.

### ii.    Visa Entered into a Web of Contracts with Merchants, Acquirers, and Issuers to Hinder PIN Networks from Competing

90.    Visa's dominance today is the result of a meticulous strategy to lock up debit volume to prevent competition at the point-of-sale. It is not an accidental historical artifact of its large size or the result of competition on the merits, but instead the result of deliberate efforts. Visa's efforts effectively forestall competition from smaller debit networks (e.g., PIN networks) and thwart government regulation implemented over a decade ago, which Visa has seen as threats to its dominance.

91.    The Durbin Amendment, which took effect in late 2011, sought to facilitate a minimum level of competition in a debit system that had historically limited the choices of accountholders and merchants. The Durbin Amendment attempted to foster competition by requiring all debit cards to support at least one network unaffiliated with the front-of-card network—*i.e.*, each Visa-branded debit card must also support at least one non-Visa-affiliated network.

92.    In 2023, the Federal Reserve adopted **Regulation II**, clarifying the Durbin Amendment to require that issuers enable at least one back-of-card network that is unaffiliated with the front-of-card network for card-not-present transactions.

93.    In the years immediately following the passage of the Durbin Amendment,

23

Visa recognized that PIN networks, "outspoken merchants," and other industry participants would use the legislation to shift share away from Visa. According to its internal documents, Visa knew it needed to act "quic[k]ly and decisively." Visa responded to the Durbin Amendment not with compliance and competition but by exploiting others' dependence on Visa for certain transactions. Despite Congress's efforts to facilitate competition, Visa understood that not all debit transactions can be routed to the unaffiliated back-of-card network. Visa has estimated that roughly 45% of Visa card-present transactions are non-contestable. For card-not-present transactions, the numbers are even higher. Merchants and acquirers frequently have only one option for routing a debit transaction: the front-of-card network, which on over 70% of debit card payment volume means Visa. These captive transactions give Visa the power to demand and enforce significant volume commitments.

94.     That so many debit transactions must be run on Visa's network—even if another unaffiliated network is generally enabled on the back-of-card—allows Visa to demand significant volume commitments from merchants, acquirers, and issuers. Visa employs two reenforcing approaches to obtain these commitments, which require merchants and acquirers to run an overwhelming proportion of Visa-eligible transactions on Visa's debit network and ensure issuers act to facilitate the same. First, it shares its monopoly profits with acquirers and issuers to buy exclusivity. Second, Visa both charges punitively expensive rack rates (listed pricing for network fees and interchange), which are divorced from Visa's incremental costs, to merchants or acquirers that refuse to sign routing agreements and includes harsh penalties in its contracts with merchants and acquirers who do sign its agreements but fail to satisfy their volume commitments.

**A.  Visa Imposes Conditions in Contracts with Merchants and Acquirers that Unlawfully Inhibit Competition and Stifle Innovation**

24

95.     Most merchants face staggering financial penalties each year unless they route all or nearly all eligible debit transactions to Visa, hindering PIN networks' ability to compete and frustrating one of the objectives of the Durbin Amendment. Visa ensures that most merchants who route more than a small percentage of eligible debit transactions to alternative networks will face higher fees on the non-contestable transactions that they *must* route through Visa.

96.     Visa has signed routing contracts both (1) directly with many large merchants and (2) with acquirers that control the routing decisions for merchants that do not have a direct agreement with Visa. Visa pays for their near-exclusivity and imposes harsh penalties if they fall short.

97.     For instance, Visa sometimes structures its contracts with merchants as a bid for a top position on the routing table— a ranked list that determines which network a given debit transaction should be routed to, given the options available on the debit card used in the transaction. Absent a commitment to grant Visa the number one position or other high placement on the routing table, Visa threatens to charge the merchant high rack rates on *all* transactions routed to Visa (as a substantial percentage *must* be). This is effectively a cliff pricing structure, where meaningfully routing away from Visa is punished by the imposition of high rack rates. Unsurprisingly, to avoid those punitive rates, dozens of merchants representing hundreds of billions of dollars of 2023 debit payment volume have signed contracts to route 100% of their eligible debit volume to Visa. For example, in 2023, Visa paid one large merchant over $20 million for exclusivity. While Visa's contracts with merchants and acquirers include varying pricing terms, one almost universal constant is that the routing contracts contain significant volume commitments.

98.     Visa structures its routing contracts, in combination with its posted rack rates

(*i.e.*, list prices), to artificially increase the cost merchants and acquirers face if they route transactions to a Visa competitor. In addition, in many of Visa's routing contracts, failure to comply with Visa's volume requirements allows Visa to terminate the entire contract early and claw back as early termination fees incentives that Visa had previously paid the merchant. Terminating some of these contracts would impact debit *and* credit transactions for the merchant, because the network fees covered under the contract apply to both. Indeed, Visa sometimes uses credit interchange discounts to win debit routing.

99.     Visa's routing contracts artificially increase the cost merchants and acquirers face if they route transactions to a Visa competitor. Visa's volume requirements are structured as cliff pricing. **Cliff pricing** (sometimes called "all unit" pricing) grants the merchant or acquirer a lower price for every transaction routed to Visa so long as its total volume of transactions exceeds the committed threshold. If the merchant does not meet the commitment, Visa will impose its high rack rates on all transactions routed to Visa. Visa insists on cliff pricing to discourage merchants from routing contestable transactions to Visa's competitors, denying them scale. In other words, merchants and acquirers that make a routing commitment to Visa receive substantial network fee, interchange, and cash concessions, but *only if* they meet their volume commitments. Absent qualification under limited safe harbors, any shortfall, even one as small as 0.01% of a merchant's volume, gives Visa the right to impose significant monetary penalties on *all* the merchant's Visa debit transactions (not just the marginal transactions). Each penalty imposed by Visa thus provides an additional cost to the merchant for routing away from Visa. This pricing mechanism discourages merchants and acquirers from routing to Visa's competitors, denying those competitors the scale necessary to compete with Visa.

100.    Merchants and acquirers are willing to accept *de facto* exclusive deals with Visa because they have a substantial number of debit transactions that they cannot route to any

other network—these are non-contestable transactions. The merchant has only two choices: either (1) agree to exclusivity with Visa or (2) pay Visa's supracompetitive rack rates for non-contestable transactions and try to route its contestable transactions to Visa's competitors. Visa's rack rates are frequently higher than the PIN networks' rack rates. Yet if merchants want to secure better rates from Visa, they typically need to route all or almost all their Visa-eligible debit volume over Visa's network. Most of Visa's volume commitments are significant, with a minimum threshold of 90–100% of the merchant's or acquirer's eligible Visa volume. Thus, Visa leverages merchants' lack of choice for the non-contestable transactions to secure volume for additional transactions at higher rates than it would be able to secure in a competitive market.

101.    A hypothetical example demonstrates why Visa is able to do this. Imagine a merchant that commits to a cliff pricing agreement with Visa. Assume on a single day the merchant has one hundred customers that present Visa-branded debit cards, and they all have the same back-of-card network. Fifty of the customers order online—those card-not-present transactions may be contestable by the non-Visa network. But the other fifty customers present Visa-branded debit cards in person, their cards are not enabled for card-present PINless transactions, and they do not enter a PIN. These fifty in-person transactions are non-contestable because they cannot be routed to the back-of-card PIN network. So, they must be routed to Visa. And under the terms of Visa's routing agreement, the merchant can avoid high rack rates on those fifty non-contestable transactions only if it also routes the fifty contestable transactions to Visa.

102.    Even some acquirer processors that operate rival PIN networks have agreed to exclusive routing deals with Visa. To reach those agreements, Visa has provided monetary incentives in exchange for volume commitments from such acquirers. Visa's payments disincentivize these competitors from using their own networks to vigorously compete.

27

103.     As a result of Visa's cliff pricing, for a PIN network to win a meaningful set of transactions away from Visa, it must do two things. First, the PIN network must offer a better per-transaction price than Visa. Second, and more significantly, the PIN network must also compensate the merchant for the penalty Visa will impose on all the transactions the merchant still has to route to Visa, which is larger than the set of transactions for which the PIN network can compete. To compensate some merchants for the loss of Visa incentives on Visa-eligible debit transactions, the PIN network may have to offer zero or negative per-transaction prices. Visa's penalties reflect significant and cost-prohibitive barriers Visa has erected to bar the PIN networks from expanding.

104.     When discussing potentially lowering debit prices, one Visa executive advised against it, noting that Visa has such a large number of "uncontested" transactions that the "P&L would be hammered…And if you lower the price, there is nothing to put in a routing deal, merchant gets it by default with no commitment." Rather than competing on the merits for debit transactions, Visa chose to keep its penalty prices high so it could insulate its supracompetitive profits by creating a web of deals to foreclose rivals.

105.     Visa does not stop there. To secure even more debit routing dominance, Visa sometimes prices other products, such as credit, based on how much debit volume merchants route to Visa. In one instance, Visa offered credit incentives, among other things, to win routing from Google and to protect against PINless enablement. Similarly, Visa offered credit incentives to win debit routing from a health food supermarket chain.

106.     Describing one proposed credit and debit routing contract with a different large merchant, a Visa employee wrote, "We continue to believe that we made a very strong offer that they cannot replicate with our competitors. While they could recover some (but not all) of the value they receive from us for the debit routing, they will lose all credit value. Walking away

28

would not be a commercially reasonable decision for them." As Visa recognizes, while it can draw on its credit business to attract and lock up debit volume, PIN network competitors do not have credit businesses to raid to buy debit routing.

107.    Visa also has a history of introducing new fees that it can "waive" in exchange for exclusivity (or near exclusivity), making it difficult for merchants to route transactions to different networks. For example, Visa introduced the FANF in 2012 in response to threats of increased competition following the 2011 implementation of the Durbin Amendment. FANF changed the structure of Visa's merchant pricing by charging merchants (through their acquirers) a fixed monthly fee for accepting Visa debit transactions (on top of the per-transaction fees they already paid). Visa has raised FANF twice in subsequent years. Visa uses its willingness to "waive" the FANF as another mechanism to get merchants and acquirers to commit to *de facto* exclusive volume agreements.

### B. Visa's Contracts with Issuers Unlawfully Restrict the Growth of Its Debit Competitors

108.    Issuers choose the number and identity of debit networks included on their cards. While the Durbin Amendment requires that each Visa-branded card include at least one additional network not affiliated with Visa, an issuer could choose to enable additional networks, thereby increasing the choices available to merchants and driving competition. However, Visa uses its monopoly power to induce issuers to limit the enablement of rival networks on their Visa-branded debit cards and thereby limit the choices available to merchants.

109.    For example, Visa's issuing contract with JPMorgan Chase ("Chase") explicitly requires that 90% of Chase-issued Visa-branded debit cards enable only one unaffiliated PIN network. As another example, in 2023, Visa contracted with one of its largest debit-issuing fintech customers to require only a single non-Visa network on all debit cards issued through the customer's issuing banks.

110.     Visa's contracts with other large and small issuers achieve a similar effect through different means. Visa has nearly 1,000 issuing contracts that contain significant volume incentives, which strongly deter the issuer putting more debit networks on the back of the card. These contracts frequently contain standardized volume requirements whereby the issuer must maintain its annual growth of Visa debit transactions in line with Visa's overall debit growth in the United States, which helps ensure that Visa's share of the issuer's transactions does not decrease.

111.     Visa debit volume gives Visa the power to impose significant monetary costs. For example, if an issuer does not meet the system growth requirement, it could be required to pay an early termination fee comprised of a percentage of the benefits it has already earned plus a multimillion-dollar fixed fee.

112.     Visa debit volume targets incentivize issuers not to enable additional networks on their debit cards and not to enable existing networks for additional transaction types (*e.g.*, PINless routing). For example, in a 2020 issuing contract Visa included a minimum volume requirement that was designed to "mitigate a shift to PINless, RTP [Real Time Payment], etc." The language Visa obtained was viewed as "good enough" by senior Visa executives to "protect for PINless" because the only way the issuer could protect its volume was to "dump[] their debit network (Shazam) if it starts shifting volume." Similarly, Visa "signed incremental debit incentive deals" with a number of large issuers and, as a result, Visa thought they were "unlikely to enable PINless on F2F [face-to-face] transactions." Many smaller issuers also rely on their issuer processors to make network selections, and there too Visa enters into agreements that are designed to "[p]rotect and grow existing [payment volume] from small issuers and discourage PINless enablement."

113.     Likewise, Visa agreed to incremental debit incentive deals with several large

30

issuers to make it difficult for those issuers to enable PINless or face-to-face transactions.

Additionally, Visa enters agreements with issuer processors—which many smaller issuers rely

on to select networks—in order to dissuade those processors from selecting and enabling

PINless networks.

114.    Visa's issuer contracts reinforce the protections created by Visa's merchant and

acquirer routing contracts by creating artificial barriers to expansion and, in effect, expanding or

entrenching the transaction volume that is non-contestable. Regardless of a merchant's preferred

routing choice, only networks enabled on a Visa-branded debit card can compete for the

transaction. By virtue of being the dominant front-of-card network, Visa is enabled to process all

transactions on over 70% of debit card payment volume (by revenue) in the United States.

115.    Like Visa's routing contracts with merchants and acquirers, Visa's volume

requirements in issuing contracts are structured as cliff pricing. Any meaningful shortfall gives

Visa the right to impose significant monetary penalties across *all* Visa debit transactions (not just

the marginal transactions). If the issuer does not achieve the agreed level of exclusivity in any

given year and that failure is attributable to any affirmative actions by the issuer, including

enablement of any additional PIN networks, then Visa has the right to apply significant monetary

penalties or even an early termination penalty.

116.    Visa sometimes leverages discounts on other products, such as its Debit

Processing Services (DPS), to win issuer routing volume, similar to how it leverages discounts on

other products to win merchant routing volume. Visa has bundled card-brand issuance contracts

with its DPS processing services to win business from large banks.

### iii.    Visa's Response to the Durbin Amendment Successfully Protected Its Monopoly from Competition

117.    After the Durbin Amendment, Visa worried that competition from rival PIN

networks would threaten its monopoly position in the debit market. However, although the

Durbin Amendment had some initial success in allowing smaller PIN networks to gain market share from Visa, Visa took steps to entrench its dominance, and has recovered and increased its market share in the 14 years since the Durbin Amendment.

118.    Since the enactment of the Durbin Amendment, smaller networks have attempted to chip away at Visa's dominance. For example, in the early years following the Durbin Amendment, Mastercard launched a PINless program for Maestro targeted at Visa-branded debit cards. But any gains were short lived. Again and again, Visa leveraged its tremendous scale and sheer volume of non-contestable transactions to penalize disloyalty from merchants, acquirers, and issuers, at the expense of competitors, consumers, merchants, and other market participants. Visa, by its own recognition, continues to win despite PIN networks generally offering lower prices.

119.    The Dubin Amendment did not exempt Visa, other debit networks, and issuers from complying with the antitrust laws. Rather, the Dodd-Frank Act, 12 U.S.C. § 5303, which includes the Durbin Amendment, provides that it is complementary to the antitrust laws, including the Sherman Act, and that requirements imposed on companies are in addition to, not to the exclusion of, those provided by the antitrust laws. Accordingly, technical compliance with the Durbin Amendment does not exempt Visa or others from complying with antitrust law.

120.    In response to this new regulatory landscape, Visa has engaged in a relentless strategy of locking up the entities that control routing decisions and has now entered *de facto* exclusive routing contracts with over 180 of its largest merchant and acquirer customers. Visa's merchant and acquirer contracts cover over 75% of Visa's debit volume and result in the foreclosure of at least 45% of total United States debit volume.

121.    These contracts prevent would-be competitors from achieving the scale needed to compete; when merchants overwhelmingly route to Visa, issuers have a lesser

incentive to add additional networks to their debit cards. Visa's contracts with issuers magnify this problem. Visa uses its contracts with issuers to incentivize the issuers to make decisions—like choosing to disable card-present PINless or choosing not to enable it—that may make more transactions non-contestable, providing Visa with additional leverage over merchants and acquirers.

122.    Visa deployed a similar response strategy in reaction to the Federal Reserve's October 2022 clarification of the rules implementing the Durbin Amendment, known as Regulation II. In anticipation of the Regulation II clarification going into effect, Visa strategized to secure more volume under routing deals, to target merchant and acquirer deals with early termination fees for longer, firmer commitments of routing volume, and to renew issuing agreements. Visa then took steps to ensure volume was locked up prior to the regulation going into effect.

### iv.    Visa Uses Its Monopoly Power to Deprive Its Rivals of Scale

123.    When two-sided transaction platforms like Visa "achieve scale on the two sides, it's an enormous moat around their business, and far more powerful than a one-sided but still network effect businesses (e.g., Facebook, Microsoft Word, etc.)." Visa's separate contracts across both sides of the debit market—accountholders and issuers on one side and merchants and acquirers on the other—widen the moat around its business and prevent any other debit network from gaining a meaningful share of the debit market.

124.    On the issuer side of the market, Visa incentivizes its customer banks to enable fewer networks and fewer routing options on each non-Visa network. Because fewer issuers enable Visa's PIN-network competitors and all their features, merchants and acquirers on the other side of the market are less likely to take the time and expense to enable routing to PIN networks.

125.     As a result, rival networks cannot grow their networks to sufficient scale or improve their networks' features, which creates a negative feedback loop: Due to Visa's anticompetitive conduct, they lack enough usage and acceptance on either side of the market to effectively compete with Visa, and the lack of competition allows Visa to further entrench its monopoly position. This network effects phenomenon results from the difficulty in building scale on both sides of a two-sided market—as described before, a "herculean task."

126.     Visa uses its power to ensure control over non-contestable transactions and then leverages its control over those transactions to demand and enforce exclusivity. To overcome Visa's scale advantage, a PIN network must not only compete on the merits for transactions it seeks to route, but also compensate the merchants, acquirers, and issuers for the cost of penalties imposed by Visa on all non-contestable transactions that the PIN network is not eligible to route.

127.     Visa has made it nearly impossible for PIN networks to win additional share. Despite the increased placement of PIN debit networks on the back of cards after the implementation of the Durbin Amendment and the PIN debit networks' generally lower prices and development of new features to compete more closely with Visa and Mastercard, Visa has prevented PIN debit networks from gaining sufficient usage and acceptance on either side of the market to surmount these powerful network effects.

128.     Today—14 years after the Durbin Amendment went into effect—PIN networks *collectively* process 11% of all debit transactions in the United States, and only 5% of card-not-present transactions; no PIN network has more than a single-digit market share in the United States.

129.     In the years since the Durbin Amendment, these smaller networks have tried to win transactions from Visa through fair competition: by offering lower fees, innovating, and

adding new features and services. But the returns to these efforts were minimal, as Visa has used its immense size, large volume of non-contestable transactions, and anticompetitive conduct to stifle these attempts at competition.

130.    A lack of scale also inhibits smaller networks from offering fraud protections equivalent to or better than the market leaders' because networks need a critical mass of transaction data to reliably detect fraud. Visa claims internally that, absent sufficient transaction data, PIN networks are unable to match Visa's speed and accuracy at identifying fraud. Visa just "see[s] more" and, by its own recognition, continues to win despite PIN networks generally offering lower prices.

131.    Visa is aware of these market dynamics and exploits them to take further anticompetitive steps to entrench its position. In Spring 2023, one Visa executive observed that less than half of the debit volume in the United States was enabled by issuers to be processed as a card-present PINless transaction, and "[a]s a result, many merchants have not enabled CP [card-present] PINless." Acknowledging that issuer enablement influences merchants' enablement decisions, Visa feared that a large United States issuer enabling card-present PINless could "create a tipping point . . . for more [acquirer] processors and merchants enabling and routing CP [card-present] PINless." Visa thought growing card-present PINless enablement would lead to more competition from its debit network rivals.

132.    Visa has acted to prevent such a tipping point from occurring. One example involved JPMorgan Chase, which issued Visa-branded debit cards with Mastercard's Maestro as its back-of-card network. In 2023, Chase had Visa-branded debit cards with Mastercard's Maestro as the back-of-card network unaffiliated with Visa. Although Chase's contract with Visa prohibited it from adding a second back-of-card network, Chase requested a waiver of that contractual requirement to also add Discover's Pulse network to the back of its Visa-branded

debit cards to comply with Regulation II clarification announced in 2022. At the time, Maestro did not offer the card-not-present PINless functionality whereas Pulse offered both card-present and card-not-present PINless functionality.

133.    Visa executives feared that if Chase enabled Pulse on the back of its debit cards, "more than 60% of the CNP volume will be priced lower than Visa by the unaffiliated networks. As that happens, more merchants [] will adopt PINless, resulting in lower transaction win rates for Visa, as well as a decline in effective transaction clearing price." Visa executives were concerned that if Chase enabled Pulse's PINless functionality, it could create a tipping point for more processors and merchants to enable and route to PINless, driving an "additional 5-10% in merchant volume to be enabled for PINless." Fearing that, in open competition, a more affordable PIN network would win more widespread placement and enablement on both the issuer and merchant sides of the market, Visa granted only a short-term waiver of its back-of-card network restriction clause to allow Chase to temporarily add Pulse as a second unaffiliated network the back of its debit cards—and also required that Chase enter a debit routing agreement with Visa.

> **v.    Visa Uses Its Monopoly Power to Stymie and Coopt Innovative Alternatives to Its Debit Network**

134.    Debit cards are not the only way for consumers to pay directly with money in their bank accounts. For instance, consumers may also use an alternative debit network, such as those created by fintech companies. Fintech debit networks could remove Visa's role in the transaction entirely. Fintech debit networks use a consumer's bank account number, rather than a debit card credential, to make real-time purchases directly from the consumer's bank accounts. These potential debit competitors' networks may not require a traditional network like Visa's. In place of a physical or virtual card, fintech debit networks may store consumers' bank account credentials, allowing accountholders to purchase goods and services from merchants

that participate in their networks.

135.     Visa's CEO has recognized that these sorts of "disruptive innovations are happening elsewhere in the world." Visa fears that potential competitors would attempt to replicate such successes in the United States, which could pose an existential threat to Visa's business. Visa has responded with a yearslong campaign to use its market dominance to stymie and coopt these innovators, ultimately exacting concessions that prevent them from challenging Visa's monopoly.

136.     Alternative debit competitors can take several forms, including being embedded in different types of payment solutions, such as digital wallets and other fintech products. Well-known digital wallets include Apple Pay, Google Pay, and PayPal. Digital wallets are software-based systems, usually on a smartphone or computer, that store a consumer's payment credentials—including debit cards, credit cards, and, in some wallets, fintech debit networks—to fund consumer-to-merchant transactions.

137.     Recognizing the threat posed by these debit alternatives, Visa has adopted a different strategy than it uses to stymie its traditional rivals. Visa views these new potential competitors as companies that it can partner with to avoid competition, rather than as competitors.

138.     Visa's philosophy towards preserving its monopoly from attacks by new competitors can be boiled down to the words of its former CFO: "[E]verybody is a friend and partner. Nobody is a competitor." As Visa's former CFO went on to say, "The only issue is to figure out how to make it worth their while to partner with us. And so far, we've managed to do that, whether it's with wallets, whether it's with large tech companies, whether it's with large merchants. And as long as we keep doing that and keep our network valuable for everyone, things should be fine." This strategy has worked.

139.     Over the past decade, there has been a substantial increase in the number and

volume of debit transactions that occur online. The rise of mobile payments and the COVID-19 pandemic have fueled this significant change in the industry. This trend, however, has not seen a corresponding rise in the adoption of new payment methods. Despite the feasibility of alternatives to traditional debit payments—and the adoption of these alternatives in other countries—new and innovative technologies continue to run through Visa's network in the United States.

140.     These fintech companies' failure to develop viable payment alternatives is again the result not of competition on the merits but of Visa's deliberate strategy to wield and maintain its monopoly power. Since the emergence of these potential alternatives, Visa has remained vigilant to any technology that could threaten Visa's role as the intermediary for both sides of debit transactions. Visa has used its monopoly power in debit markets to stifle potential competitors, such as fintech debit networks, from creating or enhancing any payment methods that compete with Visa. Rather than compete with alternatives to its networks, Visa "seek[s] to partner with technology disruptors to mitigate threats whenever possible. . . . Identify and partner with emerging players before they become disruptors.

141.     At the heart of the strategy is a quid pro quo sharing of monopoly profits: Visa uses "custom incentives programs" to "target a small number of Visa's largest and most influential merchants for a custom incentive arrangement in return for disintermediation/non-discrimination protections, non-disparagement, and future commitments." These contracts amount to a horizontal product market division. As Visa describes it, "These are not routing deals, these are relationship give away deals that have nothing to do with routing." In some cases, Visa "make[s] less money than [they] would in a worst case do nothing" scenario.

### A.  Visa Recognizes that Fintech Debit Networks Could Disintermediate Its Lucrative Debit Business

142.     Since no later than 2013, Visa has been concerned that fintech debit networks

would displace Visa as an intermediary between the two sides of a debit transaction. A fintech debit network can facilitate consumer-to-merchant payments by providing end-to-end functionality equivalent to debit card networks: it authorizes payments from a consumer's bank account, facilitates communications with the consumer's bank to clear the transaction, and provides settlement services by initiating a payment to the merchant's financial institution. Fintech debit networks can provide the same guardrails as debit card networks offer, such as payment guarantee for merchants, dispute resolution and chargeback services, and fraud protections. In other words, fintech networks can provide every element of the debit card network services currently dominated by Visa.

143.    Visa's fear of disintermediation has been exacerbated by two developments: increasing availability of alternative payment networks that move money in real time, and a growing number of fintech firms that are able to build upon these payment networks to compete with Visa, particularly Visa's lucrative card-not-present debit business. Other participants in the payments ecosystem, such as payment processors, banks, and firms that have the ability to build the necessary connections between consumer bank accounts and merchants, also have the capability to offer fintech debit network services. As Visa recognized, real-time fintech payments "will become a viable merchant option: positioned and priced as a 'Substitute for Debit.'"

144.    Visa feared that its Big Tech "frenemies" would launch debit networks that compete with Visa by displacing card-based funding options with payments directly from consumers' bank accounts. This fear was heightened by new, non-card-based payment networks that created cheaper alternatives to Visa's network. For decades, payment networks have facilitated bank transfers via ACH, an interbank payment service which took several days to settle payment and even longer to make funds available in a consumer's bank account. However,

39

new alternatives have developed. Innovative fintech firms have sought to build new capabilities on ACH and even new infrastructure that provides a faster alternative to ACH (known as real-time payments or RTP). For example, The Clearing House launched RTP Network, a real-time-payments network that allows immediate clearance and settlement of transactions, and the Federal Reserve launched FedNow in 2023 to provide instant payment services between depository institutions. As faster payment alternatives emerge and banks begin to connect to them, they create the opportunity for making funds available in as close to real time as possible.

145.    To date, few digital wallets or other potential fintech debit networks have incorporated these new real-time payments networks. Digital wallets are financial transaction applications, usually stored in a smartphone or computer, that can be used to complete consumer-to-merchant transactions at more than one retailer using a stored payment credential. Digital wallets may enable consumers to pay for goods and services with funds in the wallet— these types of wallets are known as staged digital wallets or stored value wallets. Staged digital wallets may use funds preloaded in the wallet or may pull funds into the wallet from a linked bank account (such as a checking account, using either a debit card or a bank account number) to make transactions. In the United States, PayPal and Square's Cash App operate as staged digital wallets. A second type of digital wallet, called a pass-through wallet, transmits a consumer's payment credentials (such as a debit card account number) directly to a merchant's acquirer, which then uses those credentials to process the payment in a manner similar to a traditional debit transaction. Apple Pay and Google Pay are two popular examples of pass-through digital wallets.

146.    These digital wallets pose a particular threat to Visa's dominance because they are capable of achieving the necessary scale—on both sides of the market—to succeed as independent payment platforms. Just like with Visa's traditional debit card network, fintech

debit networks require two-sided buy-in: To succeed, a critical mass of consumers need to enroll in the fintech network, and a critical mass of merchants need to accept the service. And tech companies like Apple, PayPal, and Square had this critical mass, with millions of participating merchants and over one hundred million accountholders in the United States.

147.    Visa is well aware of the risk that such companies could pose to its debit dominance. For example, Visa understood that Apple Pay's broad merchant acceptance and popularity with consumers represented "an existential threat" to Visa's debit business. In fact, Visa knew Apple had engaged in discussions with a large issuer about building a new debit network without Visa or Mastercard. Visa knew that, if Apple—alone or with a partner entity— could build a viable debit network without using Visa's payment rails, its longstanding dominant market position could be in jeopardy.

### B. Visa Leveraged Its Debit Monopoly to Prevent PayPal and Others from Disintermediating Visa with Staged Digital Wallets

148.    PayPal, according to one Visa executive, successfully disintermediated Visa— the only major entity to do so. But this success was short-lived: In 2016, PayPal agreed to a massive deal with Visa to effectively cease competing with Visa's network. Visa achieved this agreement by using its trademark tactics—the carrot of big payouts and the stick of inflated fees—to bring PayPal's transaction volume back onto Visa's network.

149.    In the 2000s and early 2010s, many merchants started accepting PayPal as part of their expansion into e-commerce. Some of PayPal's customers used their Visa debit cards to pay for transactions at these merchants, including many online small- and mid-sized businesses. As a result, PayPal brought significant incremental volume to Visa, which Visa initially supported.

150.    However, in 2015, when PayPal was spun-off from its parent company, eBay, Visa's view of PayPal changed. Visa viewed the new company as an "innovative competitor

that will be more aggressive as standalone entity." In particular, Visa viewed the combination of PayPal's growing scale and its decision to encourage customers to pay directly through their bank accounts rather than debit or credit cards as a significant disintermediation threat.

151.    PayPal offered a staged digital wallet with an alternative debit credential: accountholders loaded funds into their PayPal wallet using their bank credentials and could make purchases using ACH. ACH transactions from PayPal's wallet included many of the same features as debit, such as fraud detection, fund guarantees, and the ability to dispute a transaction. Visa wanted to discourage staged digital wallets, such as PayPal, because it viewed them as an "increased disintermediation risk for issuers and Visa" which came with a "cannibalization risk." A Visa executive viewed having a commercial relationship with a company supporting a staged wallet model as a "line that must never be crossed."

152.    Visa had an ace up its sleeve in its negotiations with PayPal. Even with PayPal's new model encouraging consumers to pay directly with their bank accounts, a substantial number of its customers had continued to make payments through PayPal using their Visa-branded debit cards. To squash PayPal's use of ACH in the staged digital wallet model, Visa used the threat of exorbitant wallet fees and high rack rates on these Visa transactions to induce PayPal to enter into a new, expansive routing contract. PayPal risked losing customers who used Visa on its platform if it told them they could no longer use their Visa-branded cards, and so it had little choice but to take the deal.

153.    At this time, PayPal was also entering into new partnerships to bring its payments innovations to in-store merchants. Visa stymied these partnerships by imposing a restriction on ACH funding transactions when the PayPal customer had an existing Visa-branded card in their PayPal wallet. While Visa relaxed its restrictions in 2021, Visa mandated information sharing so that it could monitor PayPal's product success and to this day restricts

PayPal's in-store ACH funding transactions to a QR code model whereby a consumer must scan a merchant's QR code before connecting to PayPal to complete a transaction. Visa's continued restrictions on PayPal add frictions that limit the use of PayPal as an in-store alternative to Visa.

154.    Due to Visa's continued control of the debit market and its threat of crippling wallet fees and rack rates, PayPal still has little choice but to acquiesce to Visa's demands. In 2022, PayPal and Visa entered into a new 10-year contract that limits PayPal's incentives and ability to disrupt the debit market. This new agreement includes a debit routing commitment of 100% of PayPal's Visa-eligible volume from years four to ten, penalties for failing to convert its co-branded debit cards to Visa, a requirement to participate in certain Visa programs and services, and preservation of most of Visa's "customer choice" provisions, which preference Visa payment methods over other competitive alternatives.

155.    Since 2016, Visa has threatened to impose the staged digital wallet fee on other would-be competitors, but all have signed deals with Visa rather than pay it. Visa views the fee as "a behavioral fee to reflect the propensity of SDWOs [staged digital wallet operators] to disintermediate Visa," and waives the fee if the wallets behave as Visa demands. In other words, Visa offered the staged digital wallets a choice: agree not to compete with Visa or pay substantial targeted fees that make the alternative networks far less profitable to operate.

156.    Visa has also entered into a series of contracts with Square that have foreclosed Square from competing aggressively against Visa and prevented Square from developing a viable alternative for consumer-to-merchant payments.

157.    In 2013, Square launched a new service, Square Cash (later called Cash App) that enabled person-to-person payments. Square sought to avoid additional Visa fees for Square Cash so that it could facilitate such payments using debit cards. Visa worried that if it did not sign a contract for Square Cash, Square was "likely to build in an ACH option." An ACH routing

option (which requires a consumer to link their bank account credential) would pose a threat to Visa's debit payment volume because Square could use the bank account credentials from person-to-person transactions to launch a new consumer-to-merchant debit product.

158.    Visa chose to participate in Square Cash and offered not to charge high rack rates for transactions using Visa's debit network, but Visa required that, in return, it have the right to terminate for convenience, in case Square started to compete with Visa. Visa believed it got two main benefits from the deal: (1) the debit routing commitment; and (2) "non-disintermediation, of which the major concern is ACH."

159.    After signing the first contract with Square in 2014, a Visa executive stated, "we've got Square on a short leash and our deal structure was meant to protect against disintermediation."

160.    In 2016, Square innovated and announced a new product, called "Cash Drawer" that allowed users to store funds in their Square Cash account, similar to PayPal and its person-to-person payments platform, Venmo. Visa was concerned that the product was a "greater disintermediation threat" that had the potential to disrupt its (and its issuer clients') profitable debit rails.

161.    Visa acted quickly to prevent any disruption. Visa sent a letter of intent to terminate its contract with Square, reporting to Square that Cash Drawer was a "huge deal for us" and a "third rail" issue as "a staged wallet model was antithetical [to] what we worked so hard to develop together with Square Cash." Faced with the risk of paying higher fees and other penalties on its Visa debit transactions, Square quickly backed down and removed the feature; Visa did not terminate the contract.

162.    More recently, Square launched Cash App Pay, which enables consumers to use Cash App to make purchases from merchants. This new product would trigger Visa's

44

burdensome staged digital wallet fees, and Square asked Visa to waive those fees. Visa recognized that these threatened fees gave it "a significant lever in negotiation." As one Visa executive noted after the launch of Cash App Pay, "Square's approach is predictable and follows the disintermediation playbook to the letter." But in 2023, Visa used the leverage from the staged digital wallet fees to obtain commitments from Square that it would route 97% of its Cash App Pay transactions over Visa's rails, which would preference Visa in Cash App Pay signup flow and default settings, and would not steer customers to ACH in Cash App Pay.

> **C. Visa Uses Its Leverage Over Its Potential Debit Competitors, Including Apple, Paying Them Not to Create or Promote Competitive Products**

163.    Even for entities that do not operate staged digital wallets, Visa guards against the potential of being disintermediated. Many of Visa's potential competitors are also Visa customers. Visa uses its monopoly power, and the threat of imposing its high fees, rack rates, and other penalties, to induce potential competitors to sign contracts that preserve Visa's prime position in the payments ecosystem. Each year, Visa spends a portion of its supracompetitive profits to buy off potential competitors, ensuring Visa can continue to reap the financial benefits of its monopoly.

164.    Visa partners with Big Tech behemoths like Google and Apple to gain "total control of ecommerce acceptance and online payments flow in their ecosystems."

165.    For the most powerful players in Big Tech, Visa designs custom packages that trade incentive arrangements on Visa-eligible debit transactions for agreements not to disintermediate or compete with Visa, which amount to a form of horizontal product market division. As a Visa executive clarified, the incentive deals Visa has reached with Apple and Amazon, "are not routing deals, these are relationship give away deals that have nothing to do with routing." In some cases, Visa recognizes that its choice to enter into a routing deal might

not be as profitable absent an impact on competition, stating that Visa "make[s] less money than [it] would in a worst case do nothing" scenario. As a result, Visa dominates the debit acceptance and online transactions of Big Tech entities such as Google and Apple.

166.    For example, Visa has deals with Apple in which Apple agrees that it may not develop or deploy payment functionality with the aim of competing with Visa, such as creating payment functionality that relies primarily on non-Visa payment processes or payment products. Apple is also barred from providing incentives "with the intent of disintermediating Visa or inciting customers to cease using Visa Cards." In return, Visa shares its monopoly profits with Apple. Visa has also provided Apple with reduced merchant fees in exchange for Apple's commitment not to "build, support, or introduce payment technologies that disintermediate Visa" or steer customers to third party payment methods such as ACH. Visa payments to Apple amounted to hundreds of millions of dollars in 2023.

167.    Visa recognized internally that the benefit of Visa's arrangement with Apple was "volume staying on Visa." When Visa first entered its contract with Apple in 2012, Visa wanted the "right to terminate [the] deal if [a] competitor or competitive products emerge." As Visa noted: "Cooperation is preferred." Visa has continued to condition its participation on Apple maintaining its status as a non-competitor to Visa. In 2022, Visa worried that its relationship with Apple was at a "tipping point," as Apple created new inroads into the traditional debit and credit ecosystems. Visa viewed Apple as an "existential threat" that could negatively affect both Visa's yields and its transaction volumes. Visa's strategy has been to align its incentives with Apple, which Visa refers to as a "mutually assured destruction principle." Visa's key question for its Apple relationship: "Do we partner with Apple and if so, how?" Visa has always answered that question in the affirmative, with massive payments and financial incentives to Apple to ensure that Apple does not compete against it for debit network

transactions.

### D. Visa Prevents Meaningful Competition from Next-Generation Fintech Competitors Like Plaid

168.    Visa has made other attempts to buy off potential competitors and protect its debit network monopoly. A prominent recent example of this type of conduct is Visa's attempted acquisition of fintech company Plaid.

169.    Plaid was uniquely positioned to overcome the significant entry barriers in the debit network market that potential entrants have faced and pose a competitive threat to Visa in this market. Plaid powers many popular and innovative consumer-facing fintech apps, including as Venmo, Acorns, and Betterment. Its technology allows fintech apps to plug into consumers' financial accounts to aggregate spending data, look up balances, and verify other personal financial information. Plaid had already built connections to well over 10,000 U.S. financial institutions and hundreds of millions of consumer bank accounts in the United States. These established connections positioned Plaid as a potential threat to Visa.

170.    Plaid's existing technology did not compete directly with Visa. But Plaid planned to leverage its technology, combined with its existing relationships with financial institutions and consumers, to facilitate transactions between consumers and merchants—and thus compete with Visa. Like Visa's online debit services, Plaid's planned online debit service would have enabled consumers to pay for goods and services online with money debited from their bank accounts. Indeed, Plaid envisioned its new contemplated service to be "an end-to-end payments network that enable[d] instantly-guaranteed money movement" in a system "similar to Visa and Mastercard, but focused on bank-linked payments;" indeed, Plaid's planned online "pay-by-bank" debit service would have competed against Visa's online debit service. With this service, Plaid intended to "steal[] share" and become a "formidable competitor to Visa" in the debit market. Competition from Plaid stood to drive down prices for online debit transactions

and produce substantial savings to merchants and consumers in the process.

171.    Visa grew concerned about the competitive threat that Plaid and its new transaction-facilitating technology posed to Visa's debit business. Visa executives first learned of Plaid's intentions in the debit market through an initial investment that Visa made into the company in early 2019. In the ensuing weeks and months, these Visa executives came to learn that Plaid posed a substantial risk to Visa's debit business. In September 2019, one of Plaid's co-founders contacted Visa's President to tell him that Plaid was putting itself up for sale and that the price would be around $5 billion. Visa executives believed that it had to acquire Plaid or else risk the company falling into the hands of another company that could use it to meaningfully compete against Visa's debit network.

172.    In conducting due diligence related to a potential purchase offer for Plaid, Visa set out to learn more about Plaid's efforts to launch a competing debit service that could threaten Visa's market dominance. Visa executives grew increasingly alarmed with what they discovered. In an early November 2019 meeting attended by executives from both companies, Plaid's co-founder explained how its nascent technology would allow merchants to shift transactions easily from traditional forms of online debit, which Visa dominated, to Plaid's contemplated pay-by-bank debit service. This revelation prompted one Visa executive to report internally that Plaid's co-founder had "described the service with the joy of someone who forgot we had 70% share."

173.    Ultimately, Visa recognized that the best course of action for its own bottom line, if nothing else, was to eliminate Plaid as a competitive threat by acquiring it and removing it from the market as an independent firm. According to contemporaneous internal company documents, one Visa executive noted:

> ***The acquisition is in part defensive***, not just for Visa but also on
> behalf of our largest issuing [bank] clients, whom we believe have a

> lot to lose if [pay-by-bank transactions] accelerate as the result of
> Plaid landing in the wrong hands. It is in our collective interest to
> manage the evolution of these payment forms in a way that protects
> the commercial results we mutually realize through card-based
> payments.

174.    In assessing Plaid's attractiveness as a potential acquisition target in March 2019, Visa's Vice President of Corporate Development and Head of Strategic Opportunities conveyed his concerns to colleagues about the threat Plaid posed to Visa's debit business, stating that "I don't want to be IBM to their Microsoft." He analogized Plaid to an island "volcano" whose current capabilities are just "the tip showing above the water" and warned that "[w]hat lies beneath, though, is a massive opportunity – one that threatens Visa." He also illustrated Plaid's disruptive potential lurking beneath—including its "fraud tools & reporting," "identity matching," and "payments rails and delivery"—in the following island volcano sketch he previously analogized:



Visa's CEO concluded that Plaid was "clearly, on their own or owned by a competitor going to create some threat to our important US debit business." Based on this belief, the CEO then told Visa's CFO that buying Plaid would be "an insurance policy to protect our debit biz in the US."

175.    In seeking board approval for the desired purchase, Visa's senior executives estimated a "potential downside risk of $300-500M in our US debit business" by 2024 if Plaid

were to be acquired by one of Visa's debit network rivals. Visa's leadership understood such an event could create an "[e]xistential risk to our U.S. debit business" and that "Visa may be forced to accept lower margins or not have a competitive offering."

176.    Instead of competing on the merits, Visa agreed to acquire Plaid—even if the move did not otherwise make sense financially. On January 13, 2020, Visa announced that it would acquire Plaid for $5.3 billion, "an unprecedented revenue multiple of over 50X" and the second-largest acquisition in Visa's history. Admitting that the proposed deal had "cost dissynergies associated with it" and "does not hunt on financial grounds," Visa's CEO nonetheless justified the exorbitant sticker price as a "strategic, not financial" move because "[o]ur US debit business i[s] critical and we must always do what it takes to protect this business."

177.    Before Visa and Plaid could finalize the proposed transaction, however, the Department of Justice sued to block it, claiming that it violated Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 7 of the Clayton Act, 15 U.S.C. §18.

178.     The DOJ asserted that the proposed acquisition "would eliminate the nascent competitive threat that an independently owned Plaid poses to Visa's monopoly power and unlawfully maintain Visa's monopoly power in the online debit market."

179.    On January 12, 2021—little more than two months after the DOJ sued to block the acquisition—Visa and Plaid announced that they would abandon the proposed transaction.

180.    A January 12, 2021 press release that Visa and Plaid published on Visa's website announcing the acquisition's abandonment strongly suggests that Plaid indeed has met a similar fate as Visa's other forlorn competitors. Visa Chairman and CEO Al Kelly stated that "[w]e have great respect for Plaid and the business they have built and look forward to our

50

continued partnership." Plaid CEO and Co-Founder Zach Perret added:

> We made great strides last year, growing our customers by more than sixty percent and adding hundreds of banks to our platform. While Plaid and Visa would have been a great combination, *we have decided to instead work with Visa as an investor and partner* so we can fully focus on building the infrastructure to support fintech.

181.    An October 28, 2021 *The Financial Brand* article corroborates the "partnership" route that Visa has taken with Plaid. "More recently, however, Plaid has taken a more conciliatory tone towards traditional financial institutions, recently telling" the publication that "the company decided that there was a bigger opportunity out there by moving from 'cooperation when needed' to full-on collaboration." The article also noted that "Plaid's head of revenue Paul Williamson told the *Wall Street Journal* that the new payments move will complement existing card networks and that its customers were looking for 'more diversified payment capability.'" The article then stated that "[a]s part of the plan, Plaid is partnering with group of 50 payment partners in North America and Europe," one of which was Square. As noted above, Visa sidelined Square as a competitive threat by coercing it into exclusionary agreements both before and after Visa attempted to acquire Plaid.

182.    In sum, Plaid has not become the serious competitor in debit that Visa once had feared because Visa once again resorted to its standard play of making this competitive threat a "partner" that it could and would control to maintain its own market dominance. In hindsight, this development makes perfect sense and constitutes additional proof for how Visa has continued to wield its monopoly power in the domestic debit network market to squash meaningful competition.

183.    As discussed above, Visa has continued its campaign of exclusionary conduct in the debit network market since it abandoned its proposed acquisition of Plaid and subsequently enlisted Plaid as one of the various "partners" in its stable. Visa has continued

51

with its monopolistic scheme and engaged in additional anticompetitive acts following the DOJ's investigation of its proposed Plaid acquisition and corresponding discovery of similar episodes of Visa's exclusionary behavior in the debit network market.

## VII.    ANTICOMPETITIVE EFFECTS

184.    Visa has maintained its monopoly position in the debit market through years of anticompetitive conduct. By imposing exclusionary and anticompetitive contracts on issuers, acquirers, merchants, would-be competitors, and other industry participants, and by wielding the influence provided by its control over non-contestable transactions, Visa prevents competition for transactions that should be contested and stymies competition for presently non-contestable transactions before it can arise.

185.    If not for this network of anticompetitive contracts on both sides of the debit market, PIN networks such as Mastercard's Maestro and other back-of-card competitors would have the opportunity to achieve the necessary scale to compete with Visa's dominance, providing banks and merchants with multiple viable options. Similarly, if not for Visa's anticompetitive contracts with potential fintech competitors, those companies would be incentivized to compete with Visa and/or offer innovative alternatives, to which Visa would be incentivized to react with advancements or innovations of its own. The result would be more choices and superior features for consumers and businesses alike. This means that Visa's conduct had the effect of stifling competition from current and would-be competitors, leading to higher fees and inferior services.

186.    By using its two-sided dominance to foreclose would-be competitors from both the consumer/issuer and merchant/acquirer sides of the debit market, Visa ensures that its rivals cannot reach the scale necessary to meaningfully compete for market share. That circumvention of the competitive process prevents all market participants—banks, merchants,

and consumers—from achieving the benefits that competition provides.

187.     That conduct results in an anticompetitive feedback loop that further
entrenches Visa's monopoly. Visa's exclusionary agreements on both sides of the market
prevent rivals from reaching adequate scale to effectively compete. By securing debit volume
through agreements that restrict competition on both sides of the market, Visa denies rivals the
scale they need to present effective competition both now and in the future. As a result,
competing networks have limited ability to vie on price and quality (e.g., fraud detection) today.
Visa's agreements also restrict how much additional volume rival networks can gain if they
reduce prices or develop new benefits. That limitation reduces the incentive for PIN networks to
lower prices or invest in innovative features. Weakening its rivals not only protects Visa from
current competition for transactions that should be contested but also diminishes the likelihood
that these rivals can provide the features necessary to challenge Visa's dominance over non-
contestable transactions later, such as the further development of PINless routing.

188.     Visa's exclusionary and anti-competitive practices have also stifled beneficial
innovation. For over a decade, Visa has sought to delay or prevent the development of fintech
network services that could offer Americans new payment methods directly from their bank
accounts. Those efforts have likely slowed or blocked the introduction of features like staged
digital wallets, store credit or discount offers in digital wallets, and other functionalities that
would enhance convenience and security while fostering closer merchant-consumer
relationships. Visa's efforts have not only hampered innovation from other companies that
could benefit consumers and businesses today but also have reduced Visa's own motivation to
innovate: the company admitted that it has made no significant investments in innovation in the
past decade, aside from its tokenization efforts.

189.     Robust competition should act as a check on Visa's pricing, stimulate its

investments in innovation, and generate benefits for customers and American consumers.
However, this kind of vigorous competition is precisely what Visa has sought to avoid. Visa
insulates its debit transaction volume from competition whenever possible, sometimes by
preventing rivals from effectively competing for market share and other times by diminishing
incentives to compete through the imposition of fees or financial incentives. Visa's conduct
further suppresses the motivation of current and potential rivals—as well as its own—to
compete and innovate.

190.    It should be competition, not Visa, that determines how issuers, acquirers,
merchants, and consumers interact. Competition, not Visa, should set the fees paid by these
market participants to debit networks. Likewise, competition, not Visa, should drive the pace of
innovation from both its competitors and Visa itself, providing consumers, merchants, acquirers,
and issuers with valuable features and services in the market for debit transactions.

191.    Visa has effectively achieved its objective: to capture a substantial volume of
contestable transactions through anti-competitive means, maintain or expand the pool of non-
contestable transactions, thwart competitive threats from current and potential rivals, and benefit
from its resulting monopoly. Since the Durbin Amendment was enacted, PIN networks have
tried to challenge Visa's dominance. For instance, in the early years following the amendment,
Mastercard launched a PINless program for Maestro targeting Visa-branded debit cards.
However, those gains were short-lived. Visa consistently leveraged its massive scale and
substantial volume of non-contestable transactions to penalize disloyalty from merchants,
acquirers, and issuers, to the detriment of the competition generally, and merchants, specifically.
Visa, by its own admission, continues to prevail despite PIN networks generally offering lower
prices.

192.    But competition, not Visa, should control whether and how issuers, acquirers,

merchants, and consumers interact with each other. Competition, not Visa, should set the fees that merchants are assessed for access to Visa's network. And competition, not Visa, should set the pace of innovation—from both rivals and Visa itself—of features and services that benefit consumers, merchants, acquirers, and issuers in the market for debit transactions.

## VIII.  NO PROCOMPETITIVE JUSTIFICATIONS

193.    There are no valid, procompetitive benefits to Visa's exclusionary conduct, certainly none that outweigh its anticompetitive effects or cannot be obtained through less restrictive means. Visa's anticompetitive contract terms and related conduct are not reasonably necessary to protect Visa's technology, incentivize customer growth, prevent free-riding, or achieve any other claimed procompetitive benefit. To the extent they exist at all, Visa can achieve any legitimate, procompetitive objectives without imposing the anticompetitive terms challenged in this case; any such benefits could be achieved through less restrictive means.

## IX.     THE RELEVANT MARKETS

194.    Visa's anticompetitive conduct affects two relevant markets: (1) the United States market for general purpose debit network services; and (2) the United States market for card-not-present debit network services (a narrower product market included within the broader United States general purpose debit network services market).

### i.    The United States Is a Relevant Geographic Market

195.    The United States is a relevant geographic market. Federal laws and regulations that govern debit transactions, including card-not-present transactions, operate at the national level. Visa organizes its United States debit business at the national level, as demonstrated by its separate rules governing merchant acceptance in the United States and its separate pricing of debit network services, including card-not-present debit network services for merchants in the United States. The relevant parties to a debit transaction—consumers, issuers,

acquirers, and merchants—could not practicably turn to debit network services offered elsewhere as alternatives. Therefore, a firm that was the only seller of general purpose debit network services or general purpose card-not-present debit network services in the United States would be able to profitably maintain prices above the level that would prevail in a competitive market.

**ii.    Relevant Product Markets**

196.    Visa's conduct affects two relevant product markets: (1) general purpose debit network services; and (2) general purpose card-not-present debit network services.

**A.  General Purpose Debit Network Services Are a Relevant Product Market**

197.    General purpose debit network services facilitate direct withdrawals from a consumer's bank account using a credential or account number. Visa, like its competitors in the debit card network and fintech sectors, provides products and services that enable debit transactions. They compete to offer these network services on a broad scale, meaning their credentials can be used at numerous unrelated merchants. These networks simultaneously market their services to issuers and acquirers or, in the case of some alternative networks, to accountholders and merchants. Acting as intermediaries, they operate two-sided platforms, allowing transactions between merchants and accountholders. Collectively, these services represent a relevant product market.

198.    Debit networks, such as Visa, offer a suite of services essential for executing debit transactions, consumed jointly by merchants and accountholders (alongside acquirers and issuers). These offerings include the capacity for consumers or their banks to dispute and chargeback transactions, payment guarantees for merchants, fraud protection, and the network that facilitates communication between parties, promptly transferring funds from a consumer's bank to a merchant's bank. These fundamental attributes distinguish debit transactions from

other payment methods and are crucial for merchants, consumers, and banks alike.

199.    Debit networks function as two-sided platforms with high interdependence between accountholders and issuers on one side and merchants and acquirers on the other. The network becomes more valuable to accountholders and issuers as it connects with more merchants, and likewise, it becomes more beneficial to merchants and acquirers when it links to more accountholders.

200.    Under antitrust laws, general purpose debit network services form a relevant product market. Many consumers do not consider other payment options as suitable substitutes for debit. Recognizing their accountholders' preference for debit, issuers also do not see alternative payment services as viable replacements. Merchants value debit because they do not wish to lose sales by refusing to accept a widely preferred payment method. Acquirers, aware of their merchants' reliance on debit, similarly do not view alternative payment services as suitable substitutes. Therefore, there are no reasonable substitutes for general purpose debit network services, and a single firm dominating this market could profitably maintain prices above competitive levels.

201.    The market for general purpose debit network services encompasses offerings from both traditional debit card networks and fintech debit networks. These fintech networks are accepted by participating merchants, providing payment guarantees, dispute resolution, and fraud protection. In fintech-processed debit transactions, consumers do not possess a traditional "debit card," nor is there an "issuer" of a physical or virtual card. However, the functionalities provided by these fintech networks are equivalent for consumers and merchants. The market for general purpose debit network services includes services sold by debit networks other than traditional debit card networks. Fintech debit networks can be accepted at all merchants that participate in the network and provide payment guarantees, dispute resolution and chargeback

capabilities, and fraud protection services. In a debit transaction processed by a fintech network, the consumer does not have a "debit card" and there is no "issuer" of a physical or virtual debit card, however, the services provided by fintech debit networks provide the same functionality to consumers and merchants.

202.    General purpose credit card network services are not directly interchangeable with debit services, as debit payments draw directly from a consumer's bank account rather than a line of credit. Visa describes debit as a "pay now" product, while credit is characterized as "pay later." This distinction is well-acknowledged in the payments industry, and Visa, along with other networks, has separate pricing for credit and debit transactions. Additionally, regulations like the Durbin Amendment, which limits issuer fees, do not apply to credit. Many cardholders either do not qualify for credit cards or strongly prefer using their existing funds over incurring debt, making issuers unlikely to substitute credit for debit.

203.    Store cards and prepaid card network services do not serve as practical substitutes for debit network services. Visa itself views prepaid cards as complements to other card products. Since prepaid cards are not connected to a consumer's bank account, spending is limited to the preloaded amount. Visa terms prepaid as a "pay before" product in contrast to debit's "pay now" function, and it prices prepaid services differently.

204.    Basic ACH transfers provided by entities like The Clearing House or the Federal Reserve are commonly used for specific payments, such as payroll, interbank settlements, or recurring payments, but are not generally interchangeable with most debit transactions. Basic ACH transfers lack convenience, requiring consumers to input their bank details and verify their account for each merchant. Merchants also face delays and greater fraud risk with Basic ACH transfers. Moreover, these transfers do not include guaranteed payment or dispute resolution, unlike debit services. Newer instant payment services, such as FedNow,

would need additional services, including fraud detection, to be viable alternatives to debit.

205.    Cash and checks do not offer a reasonable substitute for debit network services. Merchants and accountholders alike do not view cash or check payments as equivalent to debit transactions due to the differences in processing procedures, payment risk, and costs.

## B. General Purpose Card-Not-Present Debit Network Services Are a Relevant Product Market

206.    While general purpose debit network services cover all debit transactions, industry participants, including Visa, identify narrower submarkets within this broader category. One such market is the general purpose card-not-present debit network services, which primarily caters to e-commerce.

207.    This narrower market includes both traditional debit card transactions and fintech debit transactions that enable consumers to pay various merchants directly from their bank accounts.

208.    General purpose card-not-present debit network services is a relevant product market under the antitrust laws. Market participants do not find other payment services to be a reasonable substitute for card-not-present debit. There are no reasonable substitutes for card-not-present debit. A firm that was the only seller of general purpose card-not-present debit network services could set and maintain prices above the level that would apply in a competitive market.

## X.    VISA HAS MONOPOLY POWER IN THE UNITED STATES DEBIT MARKETS

209.    Visa holds a monopolistic position in the markets for general purpose debit network services and general purpose card-not-present debit network services within the United States, with market shares exceeding 60% and 65%, respectively, based on payment transaction volume. Mastercard, the second-largest debit network in the country, processes less than 25% of

debit transactions in either of these markets. No other competitor holds more than a single-digit percentage of transactions in these markets.

210.    Visa's monopoly power in the relevant debit markets stems from its ability to manipulate prices and suppress competition.

211.    Visa has managed to maintain monopoly-level pricing, as evidenced by its exceptionally high profit margins. Its operating margin in North America is 83%, with the U.S. debit business being its most significant contributor. These North American margins far exceed Visa's already high global margins reported since it went public in 2007, and they are also substantially higher than those of most other publicly traded companies.

212.    Visa has effectively blocked competition in both relevant markets, as demonstrated by its consistently high market shares that have remained intact despite regulatory shifts. Following a brief adjustment period when the Durbin Amendment came into effect in 2011, Visa's market share has only grown over the past decade. Although Visa's share dropped from about 63% of debit payment volume in 2011 to roughly 56% in 2012 immediately after the Durbin Amendment's implementation, Visa had already begun countermeasures. In preparation for the amendment, Visa started signing contracts with merchants and acquirers, ensuring that almost all of their Visa eligible debit volume was routed to Visa. Within a few years, Visa not only recovered its former market share but also solidified it further. Visa has since continued to use similar tactics whenever faced with threats to its market dominance.

213.    Similarly, even with the recent clarification under Regulation II requiring issuers to enable at least one network unaffiliated with the front-of-card network for card-not-present transactions, Visa's market share remains unaffected.

214.     In addition to its high-profit margins and sustained market share, other factors further confirm Visa's monopoly power.

215.     Unlike the smaller PIN networks, Visa is accepted by virtually every U.S. merchant that processes debit payments, regardless of whether the majority of their revenue comes from card-present or card-not-present transactions. Merchants consider Visa indispensable, accepting the network to maximize sales opportunities.

216.     Merchants are more inclined to absorb the costs of enabling and complying with networks that handle a large enough volume to justify the expenditure. Similarly, issuers prefer to enable networks widely accepted by merchants. Visa recognizes that its smaller rivals lack the necessary scale—both wide enablement by issuers and acceptance by merchants. The market's two-sided nature makes it difficult to gain widespread enablement without already having broad acceptance, creating a feedback loop known as network effects, as explained above. This need for scale poses a significant barrier to both market entry and expansion.

217.      Banks generally issue debit cards associated with only one front-of-card network, typically signing long-term agreements with either Visa or Mastercard and rarely switching between the two due to the costs and consumer disruption involved. These switching costs further entrench Visa's dominance, limiting Mastercard's growth and hindering potential front-of-card competitors from entering or expanding in the market.

218.     Visa is aware of these barriers, including switching costs and network effects, and actively exploits them to fend off rival networks and potential competitors that might disrupt its grip on U.S. debit markets. For instance, in 2023, Visa warned issuers they could face financial penalties if they enabled new features from competing PIN networks that led to a reduction in Visa's debit network volume. Concerned that merchants and acquirers might finally adopt competitors' PINless capabilities, Visa began urging issuers to disable PINless functions for card-present transactions. The approved talking points included a reminder that enabling card-present PINless could result in higher fees and other penalties for the issuing partner.

These penalties would act as a price increase for issuers, one they could not easily avoid due to network-switching costs. This tactic allows Visa to expand its set of non-contestable transactions, which it then uses to reinforce its market power.

219.    Visa is able to set prices with little regard for its actual costs. It also practices price discrimination across different industry groups, with such pricing differences unrelated to the costs of providing services.

220.    Furthermore, Visa has been able to introduce new, less favorable pricing models without losing debit volume. In 2012, Visa rolled out FANF across all merchants. More recently, in October 2023, Visa implemented a mandatory Digital Commerce Service fee, which bundled several previously optional value-added services fees into one for card-not-present transactions. Visa projects nearly five times the net revenue from this new mandatory fee compared to the previously optional fees. Despite imposing this new charge on merchants through their acquirers, Visa was confident it would not lose transactions.

## XI.    PLAINTIFFS AND THE CLASS HAVE BEEN INJURED BY VISA'S CONDUCT

221.    Visa's anticompetitive conduct has caused injury to Plaintiffs and the Class. As a result of Visa's monopolization of general purpose debit network services and card-not-present debit network services, Class members have paid and continue to be charged supercompetitive rack rates and other fees for debit transactions. These injuries flow directly from the competitive harm inflicted by Visa's conduct, and the injuries to Plaintiffs and the class are inextricably intertwined with Visa's anticompetitive scheme, which specifically aims to inflict higher costs on merchant transactions.

222.    As a result of Visa's anticompetitive conduct, throughout the Class Period and until the present, Visa imposed higher fees on Class Members than it would have been able to in a competitive market. Each debit transaction routed through Visa thus constituted a new overt

act causing injury to the Class.

223.    Class members have also been affected by loss of innovation due to Visa's tactics, which have prevented the development of alternative services for routing debit transactions, resulting in an overall lack of competition in the provision of those services. This has prevented Class members from being able to choose between Visa and other potential payment providers.

224.    Members of the Class have had supercompetitive fees imposed on them by Visa for each transaction on Visa's network including both card present and not present transactions.

225.    During the Class Period, members of the Class also have been charged a fixed monthly fee by Visa, known as the Fixed Acquirer Network Fee (FANF), based on factors like the number of locations operated by the merchant and the volume of the merchant's card-not-present transactions. Due to Visa's anticompetitive conduct, this fee also exceeded the amount that Visa would have been able to charge in a competitive market.

226.    As the direct consumers of debit transaction routing and processing services, Plaintiffs and the members of the Class are the efficient enforcers to redress these injuries. Acquiring banks and other transaction facilitators do not pay most fees directly to Visa. Rather, when a member of the Class accepts a debit transaction, Visa receives and routes the transaction, directly withdrawing the money for its fees from the monies owed to the Class member. Acquiring banks and other transaction facilitators do not pay this money to Visa.

227.    Payment of overcharges by way of Visa's monopolistic fees represent precisely the type of injury the antitrust laws were intended to prevent, as Visa's ability to impose such monopoly overcharges flows directly from its monopolistic restraints on the general purpose debit network services and card-not-present debit network services markets.

Plaintiffs and Class members directly participate in those markets and suffer injury from the fees Visa withdraws from monies they are owed on debit transactions and fees taken directly from their accounts with acquiring banks. This harm can be easily and concretely measured based on the fees deducted from Class members' accounts.

228.     There is no risk of speculative or duplicative recovery, nor is there any need to apportion damages, for the only entities with overcharge injuries under federal antitrust law are the members of the Class. Importantly, moreover, many acquiring banks and payment processing platforms agreed to and participated in Visa's restraints, as alleged above, meaning fees paid through those entities represent fees paid to participants in Visa's unlawful conduct.

229.     Given that Class members are the targets of Visa's monopolistic conduct, they are the entities most directly and proximately injured by Visa.

## XII.   EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

230.     The Second Circuit has instructed that, when considering a complex anticompetitive scheme involving a variety of acts and tactics, courts must not "tightly compartmentaliz[e] the various factual components and wip[e] the slate clean after scrutiny of each." *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928–29 (2d Cir. 1981). Instead, the alleged acts must be considered together to determine "whether, qualitatively, there is a 'synergistic effect'" between the components of the alleged scheme. *Id.* at 929 (citation omitted). Accordingly, it is insufficient to focus on specific aspects of an overarching scheme— where individual components of the scheme may well be lawful, or appear innocuous in isolation—when considering whether there has been an equitable tolling of the statute of limitations.

231.     Plaintiffs had no knowledge of the Defendants' anticompetitive scheme alleged herein until, at the earliest, September 24, 2024, when the complaint was filed in *United*

*States of America, v. Visa, Inc.*, S.D.N.Y. Case Number 1:24-cv-07214 (the "DOJ Complaint"). Prior to that time, there was insufficient information available to Plaintiffs to suggest that Visa had engaged in a series of anticompetitive actions to enhance and maintain its debit network monopoly in the markets described above, and thus, they had no duty to inquire into the legality of Visa's conduct. Moreover, even if some duty of inquiry was required of Plaintiffs prior to September 24, 2024, Plaintiffs could not have discovered through the exercise of reasonable diligence, the existence of Visa's overarching anticompetitive scheme as alleged herein before that date.

232.    While the DOJ filed suit in *United States of America v. Visa, Inc. & Plaid Inc.*, No. 3:20-cv-07810 (N.D. Cal.) on November 5, 2020, to stop what it ultimately determined was an anticompetitive acquisition, Visa and Plaid affirmatively—and misleadingly—claimed that Visa's acquisition of Plaid was procompetitive as early as January 13, 2020, when the deal was reached. *See* https://usa.visa.com/about-visa/newsroom/press-releases.releaseId.16856.html ("Once closed, the combination of Visa and Plaid is expected to provide significant benefits to developers, financial institutions and consumers."). None of the information about Visa's anticompetitive motivation to acquire Plaid that became known to the DOJ during the subsequent confidential merger investigation was reasonably known or knowable to the public, including Plaintiffs, during this period. Shortly thereafter, on January 12, 2021, Visa and Plaid terminated their merger agreement, and the anticompetitive threat presented by the merger dissipated. Any duty to investigate Visa's acquisition of Plaid ended as of the date the merger was abandoned. And that proposed acquisition did not provide sufficient information to Plaintiffs to suggest that Visa had engaged in the long-running series of anticompetitive actions described above, and thus, Plaintiffs had no duty to inquire into the legality of Visa's conduct.

233.    The statutes of limitation on the claims asserted herein were tolled by Visa's

fraudulent concealment at least until the press reported on the filing of the DOJ Complaint because Visa's anticompetitive conduct was inherently self-concealing and also by virtue of Visa's affirmative acts of concealment.

234.    As described extensively herein, Visa affirmatively concealed its overarching anticompetitive scheme through the use of hundreds of confidential agreements with key market facilitators and potential competitors, including issuers, acquirers, and fintechs, all of which were designed to enhance and maintain Visa's position as the dominant debit network in the United States and its territories. *See, e.g.*, Section VI *supra*. As described in detail in Section VI(iii) and elsewhere, Visa's secret anticompetitive conduct commenced no later than the passage of the Durbin Amendment on July 21, 2010, which Visa deemed to be a threat to its lucrative debit network, and its anticompetitive conduct has continued to the present through renewals of its anticompetitive contracts with these key market participants. Visa's conduct as described herein, including the use of confidential contracts with key market facilitators and potential competitors masked the existence of an overarching anticompetitive scheme to enhance and maintain its dominant debit network, and thus Visa's scheme was inherently self-concealing.

235.    Plaintiffs' claims are timely under at least the following tolling doctrines: discovery rule tolling, the doctrine of fraudulent concealment, and the continuing violations doctrine. Each transaction across the Visa debit network in which Visa imposes supra-competitive network fees is a new overt act causing injury to Plaintiffs and members of the Class and subclasses. Visa's renewed agreements with other companies to stifle competition as detailed above are also new overt acts to Plaintiffs and class and subclass members.

## XIII.   CLASS ACTION ALLEGATIONS

236.    Plaintiffs bring this action on behalf of themselves and under Federal Rule of

Civil Procedure 23(a), (b)(2), and (b)(3) as representatives of a nationwide class defined as:

> All persons, businesses, and other entities in the United States and its territories that have incurred fees for debit routing services during the period from January 1, 2012, through the present, imposed by Visa. Excluded from the class are Visa; Visa's affiliates and subsidiaries; Visa's current or former employees, officers, directors, agents, and representatives; the district judge and any magistrate judge to whom this case is assigned, as well as those judges' immediate family members; counsel to Plaintiffs and the proposed classes, as well as counsel's employees; and all governmental entities.

237.     Plaintiffs also bring this action on behalf of themselves and under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) as representatives of a nationwide subclass under California law.

238.     The anticompetitive policies and conduct alleged herein emanated from Visa's headquarters in California and adversely affected Class members across the nation.

239.     Alternatively, Plaintiffs also bring this bring this action on behalf of themselves and under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) as representatives of a subclass under California law and/or the laws of the several state and territories set forth below for Class members with business operations in any of those states and territories (collectively, the "Repealer States").

240.     The Class is so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members, but the above-defined class is readily identifiable and is one for which records should exist in Visa's files. Plaintiffs believe that due to the nature of the product market, there are millions of members of the Class in the United States.

241.     Common questions of law and fact exist as to all members of the Class and all members were injured by Visa's anticompetitive conduct, and Visa's anticompetitive conduct is applicable to all members of the Class, and relief to the Class as a whole is appropriate.

242.     Common issues of fact and law include, among others, the following:

a.   Whether Visa has monopoly power in a relevant market;

b.   Whether Visa's conduct alleged herein unlawfully maintained Visa's monopoly power;

c.   Whether Visa's conduct alleged herein constitutes exclusionary or predatory behavior;

d.   Whether Visa specifically intended to monopolize a relevant market;

e.   Whether Visa had a dangerous probability of success in monopolizing a relevant market;

f.   Whether Visa's contracts and agreements unreasonably restrained trade in a relevant market;

g.   Whether Visa's conduct alleged herein caused injury to the business or property of the Plaintiffs and other members of the Class;

h.   The amount of class-wide damages.

243.    These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

244.    Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Visa's unlawful conduct in that they paid artificially inflated prices.

245.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

246.    Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

247.    Visa's anticompetitive conduct impacts members of the Class generally such that injunctive relief is appropriate for the Class as a whole.

248.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

249.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, include providing injured entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Visa.

250.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## XIV.  VIOLATIONS ALLEGED

251.    Plaintiffs, on behalf of themselves and members of the Class, plead various causes of action under federal and state law.

252.    Visa's conduct substantially affected the trade and commerce of the United States and of each State under which Plaintiffs bring a cause of action.

253.    Plaintiffs and class members have been injured in their business and property by reason of Visa's unlawful conduct by, *inter alia*, paying higher fees than they would have

69

absent Visa's anticompetitive actions. Members of the Class have been injured in each State under which Plaintiffs bring a cause of action.

254.    Plaintiffs have provided contemporaneous notice to the attorneys general of the following states in filing this complaint: Arizona, California, Connecticut, Hawaii, Illinois, Kansas, Massachusetts, Minnesota, Mississippi, Nevada, New York, Rhode Island, Utah, Vermont, West Virginia, and Wisconsin.

> **First Claim for Relief: Monopolization of the Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in the United States in Violation of Sherman Act §§ 2 & 3**

255.    Plaintiffs incorporate the allegations of all paragraphs above.

256.    Visa has monopolized, in violation of Sherman Act, 15 U.S.C. §§ 2 & 3, two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

257.    Visa has monopoly power in both relevant markets. Visa has willfully and unlawfully maintained its monopoly in each relevant market through an exclusionary course of conduct and anticompetitive acts described herein. Each of Visa's actions individually and collectively increased, maintained, or protected its monopoly in each relevant market.

258.    While each of Visa's acts is anticompetitive in its own right, Visa's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process in each relevant market, including, as compared to a more competitive environment, raising barriers to competition by other current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricting output or other services, and slowing innovation.

259.    Visa's exclusionary conduct lacks a procompetitive justification that offsets the

harm caused by Visa's anticompetitive and unlawful conduct.

260.    Visa's exclusionary conduct has caused harm to the Class in the form of higher fees paid to Visa and reduced innovation in the market. Those harms entitle the Class to damages and to an injunction to prevent further harm.

261.    Visa's violations of law were flagrant and willful.

**Second Claim for Relief: Attempted Monopolization of the Markets for General Purpose Debit Network Services and General Purpose Debit Card-Not-Present Debit Network Services in the United States in Violation of Sherman Act §§ 2 & 3**

262.    Plaintiffs incorporate the allegations of all paragraphs above.

263.    Visa has attempted to monopolize, in violation of the Sherman Act, 15 U.S.C. §§ 2 & 3, two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

264.    Visa has monopoly power, or alternatively has a dangerous probability of obtaining monopoly power, in both relevant markets.

265.    Visa has attempted to monopolize each relevant market through an exclusionary course of conduct and anticompetitive acts described herein. While each of Visa's acts is anticompetitive in its own right, Visa's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process in each relevant market, including, as compared to a more competitive environment, raising barriers to competition by other current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricting output or other services, and slowing innovation.

266.    In undertaking this course of conduct, Visa has acted with specific intent to monopolize each relevant market in the United States. Each of Visa's actions individually and

collectively were specifically intended to monopolize each relevant market in the United States by destroying effective competition in those markets through the acts alleged herein. There is a dangerous probability that, unless restrained, Visa will succeed in monopolizing each market in the United States in violation of Sections 2 and 3 of the Sherman Act.

267.    Visa's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Visa's anticompetitive and unlawful conduct.

268.    Visa's exclusionary conduct has caused harm to the Class in the form of higher fees paid to Visa and reduced innovation in the market. Those harms entitle the Class to damages and to an injunction to prevent further harm.

269.    Visa's violations of law were flagrant and willful.

**Third Claim for Relief: Unlawful Agreements Not to Compete in Violation of Sherman Act §§ 1 & 3**

270.    Plaintiffs incorporate the allegations of all paragraphs above.

271.    Visa's agreements with competitors and potential competitors not to compete unreasonably restrain competition, in violation of the Sherman Act, 15 U.S.C. §§ 1 & 3, in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

272.    Visa has market power in both relevant markets.

273.    Visa's agreements pay competitors not to compete in each relevant market and pay potential competitors not to develop alternatives to debit card networks or adopt new technologies that may disintermediate traditional debit card networks. Those agreements reduce or eliminate competition from existing or potential rivals who would challenge Visa's dominance and thus impede competition and unreasonably restrain trade in each relevant market. Compared to a more competitive environment, the effects of those agreements include

raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricting output or other services, and slowing innovation.

274.    Those agreements are not reasonably necessary to accomplish any procompetitive goals. Any procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Visa would be able to reasonably achieve any procompetitive goals.

275.    Visa's anticompetitive agreements have caused harm to the Class in the form of higher fees paid to Visa and reduced innovation in the market. Those harms entitle the Class to damages and to an injunction to prevent further harm.

276.    Visa's violations of law were flagrant and willful.

**Fourth Claim for Relief: Unlawful Agreements that Restrain Trade in Violation of Sherman Act §§ 1 & 3**

277.    Plaintiffs incorporate the allegations of all paragraphs above.

278.    Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade, in violation of the Sherman Act, 15 U.S.C. §§ 1 & 3, in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

279.    Visa has market power in both relevant markets.

280.    These agreements contain penalties, cliff pricing terms, volume commitments, and other terms that unreasonably restrain competition, including by foreclosing a substantial share of each relevant market. Those agreements make it difficult for competition from existing or potential rivals to challenge Visa's dominance and thus impede competition and unreasonably restrain trade in each relevant market. The effects of those agreements include

raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, reducing output or other services, and slowing innovation.

281.    Those agreements are not reasonably necessary to accomplish any procompetitive goals. Any procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Visa would be able to reasonably achieve any procompetitive goals.

282.    Visa's anticompetitive agreements have caused harm to the Class in the form of higher fees paid to Visa and reduced innovation in the market. Those harms entitle the Class to damages and to an injunction to prevent further harm.

283.    Visa's violations of law were flagrant and willful.

**Fifth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq*. (with respect to Class Members' Purchases in Arizona)**

284.    Plaintiffs incorporate the allegations of all paragraphs above.

285.    In violation of Ariz. Rev. Stat. § 44-1403, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

286.    Visa's violations of Arizona law were flagrant and willful.

287.    The Class has been injured in its business or property in Arizona by Visa' violations of Ariz. Rev. Stat. § 44-1403.

**Sixth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq*. (with respect to Class**

Members' Purchases in Arizona)

288.     Plaintiffs incorporate the allegations of all paragraphs above.

289.     In violation of Ariz. Rev. Stat. § 44-1403, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

290.     Visa's violations of Arizona law were flagrant and willful.

291.     The Class has been injured in its business or property in Arizona by Visa's violations of Ariz. Rev. Stat. § 44-1403.

**Seventh Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.* (with respect to Class Members' Purchases in Arizona)**

292.     Plaintiffs incorporate the allegations of all paragraphs above.

293.     In violation of Ariz. Rev. Stat. § 44-1402, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

294.     Visa's violations of Arizona law were flagrant and willful.

295.     The Class has been injured in its business or property in Arizona by Visa's violations of Ariz. Rev. Stat. § 44-1402.

**Eighth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-**

**1401,** *et seq.* **(with respect to Class Members' Purchases in Arizona)**

296.     Plaintiffs incorporate the allegations of all paragraphs above.

297.     In violation of Ariz. Rev. Stat. § 44-1402, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

298.     Visa's violations of Arizona law were flagrant and willful.

299.     The Class has been injured in its business or property in Arizona by Visa's violations of Ariz. Rev. Stat. § 44-1402.

**Ninth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700,** *et seq.***, and §§ 17200,** *et seq.* **(with respect to Class Members' Purchases in California)**

300.     Plaintiffs incorporate the allegations of all paragraphs above.

301.     Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, which constitute illegal "trusts" within the meaning of Cal. Bus. & Prof. Code § 16720. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

302.     Visa's violations of California law were flagrant and willful.

303.     The Class has been injured in its business or property in California by Visa's violations of Cal. Bus. & Prof. Code § 16720.

**Tenth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700,** *et seq.***, and §§17200,** *et seq.* **(with respect to Class Members' Purchases in California)**

304.     Plaintiffs incorporate the allegations of all paragraphs above.

305.     Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, which constitute illegal "trusts" within the meaning of Cal. Bus. & Prof. Code § 16720. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

306.     Visa's violations of California law were flagrant and willful.

307.     The Class has been injured in its business or property in California by Visa's violations of Cal. Bus. & Prof. Code § 16720.

**Eleventh Claim for Relief: Unlawful Agreements Not to Compete in Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and §§ 17200, *et seq.* (with respect to Class Members' Purchases in California)**

308.     Plaintiffs incorporate the allegations of all paragraphs above.

309.     Visa entered into agreements that are illegal "trusts," within the meaning of Cal. Bus. & Prof. Code § 16720, by agreeing with its competitors and potential competitors Apple, PayPal, and Square not to compete in the relevant markets. Those agreements constitute unreasonable restraints of trade and "combination[s] of capital, skill or acts by two or more persons" in order to: "create or carry out restrictions in trade or commerce" (§16720(a)); "prevent competition in [the] sale or purchase of merchandise" (§ 16720(c)); and "fix [a] standard or figure, whereby [the] price" of credit and charge card network services "shall be…controlled or established" (§16720(d)).

310.     Visa's violations of California law were flagrant and willful.

311.     The Class has been injured in its business or property in California by Visa's violations of Cal. Bus. & Prof. Code § 16720.

**Twelfth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq*., and §§ 17200, *et seq*. (with respect to Class Members' Purchases in California)**

312.     Plaintiffs incorporate the allegations of all paragraphs above.

313.     Visa entered into agreements with merchants, acquirers, and issuers that are illegal "trusts," within the meaning of Cal. Bus. & Prof. Code § 16720. Those agreements constitute unreasonable restraints of trade and "combination[s] of capital, skill or acts by two or more persons" in order to: "create or carry out restrictions in trade or commerce" (§16720(a)); "prevent competition in [the] sale or purchase of merchandise" (§ 16720(c)); and "fix [a] standard or figure, whereby [the] price" of credit and charge card network services "shall be controlled or established" (§16720(d)).

314.     Visa's violations of California law were flagrant and willful.

315.     The Class has been injured in its business or property in California by Visa's violations of Cal. Bus. & Prof. Code § 16720.

**Thirteenth Claim for Relief: Violation of California's Unfair Competition Law**

316.     Plaintiffs incorporate the allegations of all paragraphs above.

317.     Visa's conduct described above constitutes unfair, unlawful, or fraudulent business acts or practices as proscribed by California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. (the "UCL").

318.     Visa's conduct is unethical, unscrupulous, against public policy, and violates fundamental rules of honesty and fair dealing.

319.     Visa's conduct is unfair because it violates Sections 1 and 2 of the Sherman

Act, and the California public policy against monopoly.

320.    Visa's conduct is unlawful, as it violates the spirit and letter of Sections 1 and 2 of the Sherman Act, and California's common law prohibition on monopolies.

321.    Plaintiffs and members of the Class lost money because they paid inflated prices for Visa-processed debit transactions, and they seek the full extent of restitution available under the UCL.

**Fourteenth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-104, *et seq*. (with respect to Class Members' Purchases in Colorado)**

322.    Plaintiffs incorporate the allegations of all paragraphs above.

323.    In violation of Colo. Rev. Stat. § 6-4-105, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained or protected its monopoly in both relevant markets.

324.    Visa's violations of Colorado law were flagrant and willful.

325.    The Class has been injured in its business or property in Colorado by Visa's violations of Colo. Rev. Stat. § 6-4-105.

**Fifteenth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-104, *et seq*. (with respect to Class Members' Purchases in Colorado)**

326.    Plaintiffs incorporate the allegations of all paragraphs above.

327.    In violation of Colo. Rev. Stat. § 6-4-105, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's

actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

328.    Visa's violations of Colorado law were flagrant and willful.

329.    The Class has been injured in its business or property in Colorado by Visa's violations of Colo. Rev. Stat. § 6-4-105.

**Sixteenth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-104, *et seq.* (with respect to Class Members' Purchases in Colorado)**

330.    Plaintiffs incorporate the allegations of all paragraphs above.

331.    In violation of Colo. Rev. Stat. § 6-4-104, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

332.    Visa's violations of Colorado law were flagrant and willful.

333.    The Class has been injured in its business or property in Colorado by Visa's violations of Colo. Rev. Stat. § 6-4-104.

**Seventeenth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4- 104, *et seq.* (with respect to Class Members' Purchases in Colorado)**

334.    Plaintiffs incorporate the allegations of all paragraphs above.

335.    In violation of Colo. Rev. Stat. § 6-4-104, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and

(2) the market for general purpose card-not-present debit network services.

336.    Visa's violations of Colorado law were flagrant and willful.

337.    The Class has been injured in its business or property in Colorado by Visa's violations of Colo. Rev. Stat. § 6-4-104.

**Eighteenth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, *et seq.* (with respect to Class Members' Purchases in Connecticut)**

338.    Plaintiffs incorporate the allegations of all paragraphs above.

339.    In violation of Conn. Gen. Stat. §§ 35-27, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

340.    Visa's violations of Connecticut law were flagrant and willful.

341.    The Class has been injured in its business or property in Connecticut by Visa's violations of Conn. Gen. Stat. §§ 35-27.

**Nineteenth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, *et seq.* (with respect to Class Members' Purchases in Connecticut)**

342.    Plaintiffs incorporate the allegations of all paragraphs above.

343.    In violation of Conn. Gen. Stat. §§ 35-27, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive

prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

344.    Visa's violations of Connecticut law were flagrant and willful.

345.    The Class has been injured in its business or property in Connecticut by Visa's violations of Conn. Gen. Stat. §§ 35-27.

**Twentieth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, *et seq.* (with respect to Class Members' Purchases in Connecticut)**

346.    Plaintiffs incorporate the allegations of all paragraphs above.

347.    In violation of Conn. Gen. Stat. §§ 35-26, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

348.    Visa's violations of Connecticut law were flagrant and willful.

349.    The Class has been injured in its business or property in Connecticut by Visa's violations of Conn. Gen. Stat. §§ 35-26.

**Twenty-First Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, *et seq.* (with respect to Class Members' Purchases in Connecticut)**

350.    Plaintiffs incorporate the allegations of all paragraphs above.

351.    In violation of Conn. Gen. Stat. §§ 35-26, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

352.    Visa's violations of Connecticut law were flagrant and willful.

353.    The Class has been injured in its business or property in Connecticut by Visa's violations of Conn. Gen. Stat. §§ 35-26.

**Twenty-Second Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.* (with respect to Class Members' Purchases in the District of Columbia)**

354.    Plaintiffs incorporate the allegations of all paragraphs above.

355.    In violation of D.C. Code §§ 28-4503, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

356.    Visa's violations of District of Columbia law were flagrant and willful.

357.    The Class has been injured in its business or property in the District of Columbia by Visa's violations of D.C. Code §§ 28-4503.

**Twenty-Third Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.* (with respect to Class Members' Purchases in the District of Columbia)**

358.    Plaintiffs incorporate the allegations of all paragraphs above.

359.    In violation of D.C. Code §§ 28-4503, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

360.    Visa's violations of District of Columbia law were flagrant and willful.

361.    The Class has been injured in its business or property in the District of
Columbia by Visa's violations of D.C. Code §§ 28-4503.

**Twenty-Fourth Claim for Relief: Unlawful Agreements Not to Compete in
Violation of the District of Columbia Antitrust Act, D.C. Code §§ 28- 4501, *et
seq.* (with respect to Class Members' Purchases in the District of Columbia)**

362.    Plaintiffs incorporate the allegations of all paragraphs above.

363.    In violation of D.C. Code §§ 28-4502, Visa agreed with competitors and
potential competitors Apple, PayPal, and Square not to compete. Those agreements
unreasonably restrain competition in two relevant markets related to debit transactions in the
United States: (1) the market for general purpose debit network services; and (2) the market for
general purpose card-not-present debit network services.

364.    Visa's violations of District of Columbia law were flagrant and willful.

365.    The Class has been injured in its business or property in the District of
Columbia by Visa's violations of D.C. Code §§ 28-4502.

**Twenty-Fifth Claim for Relief: Unlawful Agreements That Restrain Trade in
Violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et
seq.* (with respect to Class Members' Purchases in the District of Columbia)**

366.    Plaintiffs incorporate the allegations of all paragraphs above.

367.    In violation of D.C. Code §§ 28-4502, Visa's agreements with merchants,
issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit
transactions in the United States: (1) the market for general purpose debit network services; and
(2) the market for general purpose card-not-present debit network services.

368.    Visa's violations of District of Columbia law were flagrant and willful.

369.    The Class has been injured in its business or property in the District of
Columbia by Visa's violations of Conn. Gen. Stat. §§ 35-26.

**Twenty-Sixth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* (with respect to Class Members' Purchases in Florida)**

370.    Plaintiffs incorporate the allegations of all paragraphs above.

371.    In violation of Fla. Stat. § 501.204, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

372.    Visa's violations of Florida law were flagrant and willful.

373.    The Class has been injured in its business or property in Florida by Visa's violations of Fla. Stat. § 501.204.

**Twenty-Seventh Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* (with respect to Class Members' Purchases in Florida)**

374.    Plaintiffs incorporate the allegations of all paragraphs above.

375.    In violation of Fla. Stat. § 501.204, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

376.    Visa's violations of Florida law were flagrant and willful.

377.    The Class has been injured in its business or property in Florida by Visa's

violations of Fla. Stat. § 501.204.

**Twenty-Eighth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* (with respect to Class Members' Purchases in Florida)**

378.     Plaintiffs incorporate the allegations of all paragraphs above.

379.     In violation of Fla. Stat. § 501.204, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

380.     Visa's violations of Florida law were flagrant and willful.

381.     The Class has been injured in its business or property in Florida by Visa's violations of Fla. Stat. § 501.204.

**Twenty-Ninth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* (with respect to Class Members' Purchases in Florida)**

382.     Plaintiffs incorporate the allegations of all paragraphs above.

383.     In violation of Fla. Stat. § 501.204, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

384.     Visa's violations of Florida law were flagrant and willful.

385.     The Class has been injured in its business or property in Florida by Visa's violations of Fla. Stat. § 501.204.

**Thirtieth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. §§ 480-1, *et seq.* (with respect to Class Members' Purchases in**

**Hawaii)**

386.     Plaintiffs incorporate the allegations of all paragraphs above.

387.     In violation of Haw. Rev. Stat. § 480-9, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

388.     Visa's violations of Hawaii law were flagrant and willful.

389.     The Class has been injured in its business or property in Hawaii by Visa's violations of Haw. Rev. Stat. § 480-9.

> **Thirty-First Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. §§ 480-1, *et seq.* (with respect to Class Members' Purchases in Hawaii)**

390.     Plaintiffs incorporate the allegations of all paragraphs above.

391.     In violation of Haw. Rev. Stat. § 480-9, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

392.     Visa's violations of Hawaii law were flagrant and willful.

393.     The Class has been injured in its business or property in Hawaii by Visa's violations of Haw. Rev. Stat. § 480-9.

> **Thirty-Second Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. §§ 480-1, *et seq.* (with**

respect to Class Members' Purchases in Hawaii)

394.    Plaintiffs incorporate the allegations of all paragraphs above.

395.    In violation of Haw. Rev. Stat. § 480-4, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

396.    Visa's violations of Hawaii law were flagrant and willful.

397.    The Class has been injured in its business or property in Hawaii by Visa's violations of Haw. Rev. Stat. § 480-4.

**Thirty-Third Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. §§ 480-1, *et seq.* (with respect to Class Members' Purchases in Hawaii)**

398.    Plaintiffs incorporate the allegations of all paragraphs above.

399.    In violation of Haw. Rev. Stat. § 480-4, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

400.    Visa's violations of Hawaii law were flagrant and willful.

401.    The Class has been injured in its business or property in Hawaii by Visa's violations of Haw. Rev. Stat. § 480-4.

**Thirty-Fourth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, et seq. (with respect to Class Members' Purchases in Illinois)**

402.    Plaintiffs incorporate the allegations of all paragraphs above.

403.    In violation of 740 Ill. Comp. Stat. 10/3, Visa has willfully and unlawfully

maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets. Visa maintained monopoly power over a substantial part of trade or commerce of Illinois for the purpose of excluding competition and controlling, fixing, or maintaining prices in such trade or commerce.

404.    Visa's violations of Illinois law were flagrant and willful.

405.    The Class has been injured in its business or property in Illinois by Visa's violations of 740 Ill. Comp. Stat. 10/3.

**Thirty-Fifth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq*. (with respect to Class Members' Purchases in Illinois)**

406.    Plaintiffs incorporate the allegations of all paragraphs above.

407.    In violation of 740 Ill. Comp. Stat. 10/3, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation. Visa attempted to monopolize a substantial part of trade or commerce of Illinois for the purpose of excluding competition and controlling, fixing, or maintaining prices in such trade or commerce.

408.    Visa's violations of Illinois law were flagrant and willful.

409.    The Class has been injured in its business or property in Illinois by Visa's violations of 740 Ill. Comp. Stat. 10/3.

**Thirty-Sixth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.* (with respect to Class Members' Purchases in Illinois)**

410.     Plaintiffs incorporate the allegations of all paragraphs above.

411.     In violation of 740 Ill. Comp. Stat. 10/3, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

412.     Visa made contracts with, or engaged in combinations or conspiracies with, other persons who are, or but for a prior agreement would be, a competitor of such person for the purpose or with the effect of fixing, controlling or maintaining the price or rate charged for any fee charged or paid for debit network services performed by the parties thereto in Illinois.

413.     Visa fixed, controlled or maintained the sale or supply of debit network services, for the purpose or with the effect of fixing, controlling or maintaining the price or rate charged or paid for debit network services in Illinois.

414.     By contract, combination or conspiracy, Visa unreasonably restrained trade or commerce for debit network services in Illinois.

415.     Visa's violations of Illinois law were flagrant and willful.

416.     The Class has been injured in its business or property in Illinois by Visa's violations of 740 Ill. Comp. Stat. 10/3.

**Thirty-Seventh Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.* (with respect to Class Members' Purchases in Illinois)**

417.     Plaintiffs incorporate the allegations of all paragraphs above.

418.     In violation of 740 Ill. Comp. Stat. 10/3, Visa's agreements with merchants,

90

issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

419.    Visa made contracts with, or engaged in combinations or conspiracies with, other persons who are, or but for a prior agreement would be, a competitor of such person for the purpose or with the effect of fixing, controlling or maintaining the price or rate charged for any fee charged or paid for debit network services performed by the parties thereto in Illinois.

420.    Visa fixed, controlled or maintained the sale or supply of debit network services, for the purpose or with the effect of fixing, controlling or maintaining the price or rate charged or paid for debit network services in Illinois.

421.    By contract, combination or conspiracy, Visa unreasonably restrained trade or commerce for debit network services in Illinois.

422.    Visa's violations of Illinois law were flagrant and willful.

423.    The Class has been injured in its business or property in Illinois by Visa's violations of 740 Ill. Comp. Stat. 10/3.

### Thirty-Eighth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Iowa Competition Law, Iowa Code §§ 553.1, *et seq.* (with respect to Class Members' Purchases in Iowa)

424.    Plaintiffs incorporate the allegations of all paragraphs above.

425.    In violation of Iowa Code §§ 553.5, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

426.    Visa's violations of Iowa law were flagrant and willful.

427.    The Class has been injured in its business or property in Iowa by Visa's

violations of Iowa Code §§ 553.5.

**Thirty-Ninth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Iowa Competition Law, Iowa Code §§ 553.1,** *et seq.* **(with respect to Class Members' Purchases in Iowa)**

428.    Plaintiffs incorporate the allegations of all paragraphs above.

429.    In violation of Iowa Code §§ 553.5, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

430.    Visa's violations of Iowa law were flagrant and willful.

431.    The Class has been injured in its business or property in Iowa by Visa's violations of Iowa Code §§ 553.5.

**Fortieth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Iowa Competition Law, Iowa Code §§ 553.1,** *et seq.* **(with respect to Class Members' Purchases in Iowa)**

432.    Plaintiffs incorporate the allegations of all paragraphs above.

433.    In violation of Iowa Code §§ 553.4, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services. Visa entered into contracts, combinations and conspiracies with others that unreasonably restrained trade or commerce in

the market for debit network services in Iowa.

434.    Visa's violations of Iowa law were flagrant and willful.

435.    The Class has been injured in its business or property in Iowa by Visa's violations of Iowa Code §§ 553.4.

### Forty-First Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Iowa Competition Law, Iowa Code §§ 553.1, *et seq.* (with respect to Class Members' Purchases in Iowa)

436.    Plaintiffs incorporate the allegations of all paragraphs above.

437.    In violation of Iowa Code §§ 553.4, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services. Visa entered into contracts, combinations and conspiracies with others that unreasonably restrained trade or commerce in the market for debit network services in Iowa.

438.    Visa's violations of Iowa law were flagrant and willful.

439.    The Class has been injured in its business or property in Iowa by Visa's violations of Iowa Code §§ 553.4.

### Forty-Second Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.* (with respect to Class Members' Purchases in Kansas)

440.    Plaintiffs incorporate the allegations of all paragraphs above.

441.    In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets. Visa entered into

arrangements, contracts, agreements, trust or combinations between others made with a view toward preventing or which tend to prevent full and free competition for the provision of debit network services in Kansas.

442.    Visa's violations of Kansas law were flagrant and willful.

443.    The Class has been injured in its business or property in Kansas by Visa's violations of Kan. Stat. Ann. §§ 50-101, *et seq.*

**Forty-Third Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.* (with respect to Class Members' Purchases in Kansas)**

444.    Plaintiffs incorporate the allegations of all paragraphs above.

445.    In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation. Visa entered into arrangements, contracts, agreements, trust or combinations between others made with a view toward preventing or which tend to prevent full and free competition for the provision of debit network services in Kansas.

446.    Visa's violations of Kansas law were flagrant and willful.

447.    The Class has been injured in its business or property in Kansas by Visa's violations of Kan. Stat. Ann. §§ 50-101, *et seq.*

**Forty-Fourth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50- 101, *et***

*seq.* **(with respect to Class Members' Purchases in Kansas)**

448.     Plaintiffs incorporate the allegations of all paragraphs above.

449.     In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services. Visa entered into arrangements, contracts, agreements, trust or combinations between others made with a view toward preventing or which tend to prevent full and free competition for the provision of debit network services in Kansas.

450.     Visa's violations of Kansas law were flagrant and willful.

451.     The Class has been injured in its business or property in Kansas by Visa's violations of Kan. Stat. Ann. §§ 50-101, *et seq.*

**Forty-Fifth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50- 101, *et seq.* (with respect to Class Members' Purchases in Kansas)**

452.     Plaintiffs incorporate the allegations of all paragraphs above.

453.     In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services. Visa entered into contracts, combinations and conspiracies with others that unreasonably restrained trade or commerce in the market for debit network services in Iowa. Visa entered into arrangements, contracts, agreements, trust or combinations between others made with a view toward preventing or which tend to prevent full and free competition for the provision of debit

network services in Kansas.

454.    Visa's violations of Kansas law were flagrant and willful.

455.    The Class has been injured in its business or property in Kansas by Visa

violations of Kan. Stat. Ann. §§ 50-101, *et seq.*

> **Forty-Sixth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.* (with respect to Class Members' Purchases in Maine)**

456.    Plaintiffs incorporate the allegations of all paragraphs above.

457.    In violation of Me. Rev. Stat. Ann. tit. 10, § 1102, Visa has willfully and

unlawfully maintained its monopoly in the relevant markets through the exclusionary course of

conduct and anticompetitive acts described herein. Visa's acts, individually and collectively,

increased, maintained, or protected its monopoly in both relevant markets.

458.    Visa's violations of Maine law were flagrant and willful.

459.    The Class has been injured in its business or property in Maine by Visa's

violations of Me. Rev. Stat. Ann. tit. 10, § 1102.

> **Forty-Seventh Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.* (with respect to Class Members' Purchases in Maine)**

460.    Plaintiffs incorporate the allegations of all paragraphs above.

461.    In violation of Me. Rev. Stat. Ann. tit. 10, § 1102, Visa has attempted to

monopolize each of the relevant markets through the exclusionary course of conduct and

anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right.

Collectively, Visa's actions have a cumulative effect that has harmed competition in each

relevant market, including raising barriers to competition by current and potential competitors,

imposing supracompetitive prices, stabilizing those prices, limiting price competition,

restricting output and other services, and limiting innovation.

462.    Visa's violations of Maine law were flagrant and willful.

463.    The Class has been injured in its business or property in Maine by Visa's

violations of Me. Rev. Stat. Ann. tit. 10, § 1102.

### Forty-Eighth Claim for Relief: Unlawful Agreements Not to Compete in Violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.* (with respect to Class Members' Purchases in Maine)

464.    Plaintiffs incorporate the allegations of all paragraphs above.

465.    In violation of Me. Rev. Stat. Ann. tit. 10, § 1101, Visa agreed with

competitors and potential competitors Apple, PayPal, and Square not to compete. Those

agreements unreasonably restrain competition in two relevant markets related to debit

transactions in the United States: (1) the market for general purpose debit network services; and

(2) the market for general purpose card-not-present debit network services.

466.    Visa's violations of Maine law were flagrant and willful.

467.    The Class has been injured in its business or property in Maine by Visa's

violations of Me. Rev. Stat. Ann. tit. 10, § 1101.

### Forty-Ninth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.* (with respect to Class Members' Purchases in Maine)

468.    Plaintiffs incorporate the allegations of all paragraphs above.

469.    In violation of Me. Rev. Stat. Ann. tit. 10, § 1101, Visa's agreements with

merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to

debit transactions in the United States: (1) the market for general purpose debit network

services; and (2) the market for general purpose card-not-present debit network services.

470.    Visa's violations of Maine law were flagrant and willful.

471.    The Class has been injured in its business or property in Maine by Visa's violations of Me. Rev. Stat. Ann. tit. 10, § 1101.

**Fiftieth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Maryland Antitrust Act, Md. Code Com. Law §§ 11-201, *et seq*. (with respect to Class Members' Purchases in Maryland)**

472.    Plaintiffs incorporate the allegations of all paragraphs above.

473.    In violation of Md. Code Com. Law § 11-204, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets. Visa has monopolized part of the trade or commerce within Maryland, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

474.    Visa's violations of Maryland law were flagrant and willful.

475.    The Class has been injured in its business or property in Maryland by Visa's violations of Md. Code Com. Law § 11-204

**Fifty-First Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Maryland Antitrust Act, Md. Code Com. Law §§ 11-201, *et seq.* (with respect to Class Members' Purchases in Maryland)**

476.    Plaintiffs incorporate the allegations of all paragraphs above.

477.    In violation of Md. Code Com. Law § 11-204, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition,

restricting output and other services, and

478.        limiting innovation. Visa has attempted to monopolize part of the trade or

commerce within Maryland, for the purpose of excluding competition or of controlling, fixing,

or maintaining prices in trade or commerce.

479.        Visa's violations of Maryland law were flagrant and willful.

480.        The Class has been injured in its business or property in Maryland by Visa's

violations of Md. Code Com. Law § 11-204.

> **Fifty-Second Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Maryland Antitrust Act, Md. Code Com. Law §§ 11-201, *et seq.* (with respect to Class Members' Purchases in Maryland)**

481.        Plaintiffs incorporate the allegations of all paragraphs above.

482.        In violation of Md. Code Com. Law § 11-204, Visa agreed with competitors

and potential competitors Apple, PayPal, and Square not to compete. Those agreements

unreasonably restrain competition in two relevant markets related to debit transactions in the

United States: (1) the market for general purpose debit network services; and (2) the market for

general purpose card-not-present debit network services.

483.        Visa's violations of Maryland law were flagrant and willful.

484.        The Class has been injured in its business or property in Maryland by Visa's

violations of Md. Code Com. Law § 11-204.

> **Fifty-Third Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Maryland Antitrust Act, Md. Code Com. Law §§ 11-201, *et seq.* (with respect to Class Members' Purchases in Maryland)**

485.        Plaintiffs incorporate the allegations of all paragraphs above.

486.        In violation of Md. Code Com. Law § 11-204, Visa's agreements with

merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to

debit transactions in the United States: (1) the market for general purpose debit network

services; and (2) the market for general purpose card-not-present debit network services.

487.    Visa's violations of Maryland law were flagrant and willful.

488.    The Class has been injured in its business or property in Maryland by Visa's violations of Md. Code Com. Law § 11-204.

**Fifty-Fourth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A §§ 1,** *et seq.* **(with respect to Class Members' Purchases in Massachusetts)**

489.    Plaintiffs incorporate the allegations of all paragraphs above.

490.    In violation of Mass. Gen. Laws. Ch. 93A § 2, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets. Visa has monopolized part of the trade or commerce within Massachusetts, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

491.    Visa's violations of Massachusetts law were flagrant and willful.

492.    The Class has been injured in its business or property in Massachusetts by Visa's violations of Mass. Gen. Laws. Ch. 93A § 2.

**Fifty-Fifth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A §§ 1,** *et seq.* **(with respect to Class Members' Purchases in Massachusetts)**

493.    Plaintiffs incorporate the allegations of all paragraphs above.

494.    In violation of Mass. Gen. Laws. Ch. 93A § 2, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right.

Collectively, Visa's actions have a cumulative effect that has harmed competition in each

relevant market, including raising barriers to competition by current and potential competitors,

imposing supracompetitive prices, stabilizing those prices, limiting price competition,

restricting output and other services, and limiting innovation. Visa has attempted to monopolize

part of the trade or commerce within Massachusetts, for the purpose of excluding competition or

of controlling, fixing, or maintaining prices in trade or commerce.

495.    Visa's violations of Massachusetts law were flagrant and willful.

496.    The Class has been injured in its business or property in Massachusetts by

Visa's violations of Mass. Gen. Laws. Ch. 93A § 2.

### Fifty-Sixth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A §§ 1, *et seq.* (with respect to Class Members' Purchases in Massachusetts)

497.    Plaintiffs incorporate the allegations of all paragraphs above.

498.    In violation of Mass. Gen. Laws. Ch. 93A § 2, Visa agreed with competitors

and potential competitors Apple, PayPal, and Square not to compete. Those agreements

unreasonably restrain competition in two relevant markets related to debit transactions in the

United States: (1) the market for general purpose debit network services; and (2) the market for

general purpose card-not-present debit network services.

499.    Visa's violations of Massachusetts law were flagrant and willful.

500.    The Class has been injured in its business or property in Massachusetts by

Visa's violations of Mass. Gen. Laws. Ch. 93A § 2.

### Fifty-Seventh Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A §§ 1, *et seq.* (with respect to Class Members' Purchases in Massachusetts)

501.    Plaintiffs incorporate the allegations of all paragraphs above.

502.    In violation of Mass. Gen. Laws. Ch. 93A § 2, Visa's agreements with

merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

503.    Visa's violations of Massachusetts law were flagrant and willful.

504.    The Class has been injured in its business or property in Massachusetts by Visa's violations of Mass. Gen. Laws. Ch. 93A § 2.

**Fifty-Eighth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771, *et seq.* (with respect to Class Members' Purchases in Michigan)**

505.    Plaintiffs incorporate the allegations of all paragraphs above.

506.    In violation of Mich. Comp. Laws Ann. § 445.773, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

507.    Visa's violations of Michigan law were flagrant and willful.

508.    The Class has been injured in its business or property in Michigan by Visa's violations of Mich. Comp. Laws Ann. § 445.773.

**Fifty-Ninth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771, *et seq.* (with respect to Class Members' Purchases in Michigan)**

509.    Plaintiffs incorporate the allegations of all paragraphs above.

510.    In violation of Mich. Comp. Laws Ann. § 445.773, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right.

Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

511.    Visa's violations of Michigan law were flagrant and willful.

512.    The Class has been injured in its business or property in Michigan by Visa's violations of Mich. Comp. Laws Ann. § 445.773.

**Sixtieth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771, *et seq.* (with respect to Class Members' Purchases in Michigan)**

513.    Plaintiffs incorporate the allegations of all paragraphs above.

514.    In violation of Mich. Comp. Laws Ann. § 445.772, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

515.    Visa's violations of Michigan law were flagrant and willful.

516.    The Class has been injured in its business or property in Michigan by Visa's violations of Mich. Comp. Laws Ann. § 445.772.

**Sixty-First Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771, *et seq.* (with respect to Class Members' Purchases in Michigan)**

517.    Plaintiffs incorporate the allegations of all paragraphs above.

518.    In violation of Mich. Comp. Laws Ann. § 445.772, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network

services; and (2) the market for general purpose card-not-present debit network services.

519.     Visa's violations of Michigan law were flagrant and willful.

520.     The Class has been injured in its business or property in Michigan by Visa's

violations of Mich. Comp. Laws Ann. § 445.772.

> **Sixty-Second Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Minnesota Antitrust Law, Minn. Stat. Ann. §§ 325D.49,** *et seq.* **(with respect to Class Members' Purchases in Minnesota)**

521.     Plaintiffs incorporate the allegations of all paragraphs above.

522.     In violation of Minn. Stat. Ann. § 325D.52, Visa has willfully and unlawfully

maintained its monopoly in the relevant markets through the exclusionary course of conduct and

anticompetitive acts described herein. Visa's acts, individually and collectively, increased,

maintained, or protected its monopoly in both relevant markets.

523.     Visa's violations of Minnesota law were flagrant and willful.

524.     The Class has been injured in its business or property in Minnesota by Visa's

violations of Minn. Stat. Ann. § 325D.52.

> **Sixty-Third Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Minnesota Antitrust Law, Minn. Stat. Ann. §§ 325D.49,** *et seq.* **(with respect to Class Members' Purchases in Minnesota)**

525.     Plaintiffs incorporate the allegations of all paragraphs above.

526.     In violation of Minn. Stat. Ann. § 325D.52, Visa has attempted to monopolize

each of the relevant markets through the exclusionary course of conduct and anticompetitive

acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's

actions have a cumulative effect that has harmed competition in each relevant market, including

raising barriers to competition by current and potential competitors, imposing supracompetitive

prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

527.    Visa's violations of Minnesota law were flagrant and willful.

528.    The Class has been injured in its business or property in Minnesota by Visa's violations of Minn. Stat. Ann. § 325D.5.

**Sixty-Fourth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Minnesota Antitrust Law, Minn. Stat. Ann. §§ 325D.49, *et seq.* (with respect to Class Members' Purchases in Minnesota)**

529.    Plaintiffs incorporate the allegations of all paragraphs above.

530.    In violation of Minn. Stat. Ann. § 325D.51, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

531.    Visa's violations of Minnesota law were flagrant and willful.

532.    The Class has been injured in its business or property in Minnesota by Visa's violations of Minn. Stat. Ann. § 325D.51.

**Sixty-Fifth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Minnesota Antitrust Law, Minn. Stat. Ann. §§ 325D.49, *et seq.* (with respect to Class Members' Purchases in Minnesota)**

533.    Plaintiffs incorporate the allegations of all paragraphs above.

534.    In violation of Minn. Stat. Ann. § 325D.51, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

535.    Visa's violations of Minnesota law were flagrant and willful.

536.     The Class has been injured in its business or property in Minnesota by Visa's violations of Minn. Stat. Ann. § 325D.51.

**Sixty-Sixth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-3, *et seq.* (with respect to Class Members' Purchases in Mississippi)**

537.     Plaintiffs incorporate the allegations of all paragraphs above.

538.     In violation of Miss. Code Ann. § 75-21-1, et. seq., Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

539.     Visa's violations of Mississippi law were flagrant and willful.

540.     The Class has been injured in its business or property in Mississippi by Visa's violations of Miss. Code Ann. § 75-21-1, *et. seq.*

**Sixty-Seventh Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-3, *et seq.* (with respect to Class Members' Purchases in Mississippi)**

541.     Plaintiffs incorporate the allegations of all paragraphs above.

542.     In violation of Miss. Code Ann. § 75-21-1, et. seq., Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

543.     Visa's violations of Mississippi law were flagrant and willful.

544.     The Class has been injured in its business or property in Mississippi by Visa's

violations of Miss. Code Ann. § 75-21-1, *et. seq.*

**Sixty-Eighth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-3, *et seq.* (with respect to Class Members' Purchases in Mississippi)**

545.     Plaintiffs incorporate the allegations of all paragraphs above.

546.     In violation of Miss. Code Ann. § 75-21-1, *et. seq.*, Visa agreed with

competitors and potential competitors Apple, PayPal, and Square not to compete. Those

agreements unreasonably restrain competition in two relevant markets related to debit

transactions in the United States: (1) the market for general purpose debit network services; and

(2) the market for general purpose card-not-present debit network services.

547.     Visa's violations of Mississippi law were flagrant and willful.

548.     The Class has been injured in its business or property in Mississippi by Visa's

violations of Miss. Code Ann. § 75-21-1, *et. seq.*

**Sixty-Ninth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75- 21-3, *et seq.* (with respect to Class Members' Purchases in Mississippi)**

549.     Plaintiffs incorporate the allegations of all paragraphs above.

550.     In violation of Miss. Code Ann. § 75-21-1, et. seq., Visa's agreements with

merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to

debit transactions in the United States: (1) the market for general purpose debit network

services; and (2) the market for general purpose card-not-present debit network services.

551.     Visa's violations of Mississippi law were flagrant and willful.

552.     The Class has been injured in its business or property in Mississippi by

violations of Miss. Code Ann. § 75-21-1, *et. seq.*

**Seventieth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Nebraska Junkin Act, Neb. Code Ann. §§ 59-801, *et seq.* (with respect to Class Members' Purchases in Nebraska)**

553.    Plaintiffs incorporate the allegations of all paragraphs above.

554.    In violation of Neb. Code Ann. § 59-802, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

555.    Visa's violations of Nebraska law were flagrant and willful.

556.    The Class has been injured in its business or property in Nebraska by Visa's violations of Neb. Code Ann. § 59-802.

**Seventy-First Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Nebraska Junkin Act, Neb. Code Ann. §§ 59-801, *et seq.* (with respect to Class Members' Purchases in Nebraska)**

557.    Plaintiffs incorporate the allegations of all paragraphs above.

558.    In violation of Neb. Code Ann. § 59-802, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

559.    Visa's violations of Nebraska law were flagrant and willful.

560.    The Class has been injured in its business or property in Nebraska by Visa's

violations of Neb. Code Ann. § 59-802.

**Seventy-Second Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Nebraska Junkin Act, Neb. Code Ann. §§ 59-801,** *et seq.* **(with respect to Class Members' Purchases in Nebraska)**

561.    Plaintiffs incorporate the allegations of all paragraphs above.

562.    In violation of Neb. Code Ann. § 59-801, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

563.    Visa's violations of Nebraska law were flagrant and willful.

564.    The Class has been injured in its business or property in Nebraska by Visa's violations of Neb. Code Ann. § 59-801.

**Seventy-Third Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Nebraska Junkin Act, Neb. Code Ann. §§ 59- 801,** *et seq.* **(with respect to Class Members' Purchases in Nebraska)**

565.    Plaintiffs incorporate the allegations of all paragraphs above.

566.    In violation of Neb. Code Ann. § 59-801, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

567.    Visa's violations of Nebraska law were flagrant and willful.

568.    The Class has been injured in its business or property in Nebraska by Visa's violations of Neb. Code Ann. § 59-802.

**Seventy-Fourth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010,** *et seq.* **(with respect to Class**

Members' Purchases in Nevada)

569.     Plaintiffs incorporate the allegations of all paragraphs above.

570.     In violation of Nev. Rev. Stat. Ann. § 598A.060, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in Nevada. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

571.     Visa's violations of Nevada law were flagrant and willful.

572.     The Class has been injured in its business or property in Nevada by Visa's violations of Nev. Rev. Stat. Ann. § 598A.060.

**Seventy-Fifth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.* (with respect to Class Members' Purchases in Nevada)**

573.     Plaintiffs incorporate the allegations of all paragraphs above.

574.     In violation of Nev. Rev. Stat. Ann. § 598A.060, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in Nevada. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

575.     Visa's violations of Nevada law were flagrant and willful.

576.     The Class has been injured in its business or property in Nevada by Visa's violations of Nev. Rev. Stat. Ann. § 598A.060.

**Seventy-Sixth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.* (with respect to Class Members' Purchases in Nevada)**

577.    Plaintiffs incorporate the allegations of all paragraphs above.

578.    In violation of Nev. Rev. Stat. Ann. § 598A.060, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete, including in Nevada. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

579.    Visa's violations of Nevada law were flagrant and willful.

580.    The Class has been injured in its business or property in Nevada by Visa's violations of Nev. Rev. Stat. Ann. § 598A.060.

**Seventy-Seventh Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.* (with respect to Class Members' Purchases in Nevada)**

581.    Plaintiffs incorporate the allegations of all paragraphs above.

582.    In violation of Nev. Rev. Stat. Ann. § 598A.060, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services. Visa's agreements unreasonably restrain trade in Nevada.

583.    Visa's violations of Nevada law were flagrant and willful.

584.    The Class has been injured in its business or property in Nevada by Visa's violations of Nev. Rev. Stat. Ann. § 598A.060.

**Seventy-Eighth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Hampshire Antitrust Statute, N.H. Rev Stat. Ann. §§ 356.1, *et seq.* (with respect to Class Members'**

Purchases in New Hampshire)

585.    Plaintiffs incorporate the allegations of all paragraphs above.

586.    In violation of N.H. Rev Stat. Ann. § 356.3, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

587.    Visa's violations of New Hampshire law were flagrant and willful.

588.    The Class has been injured in its business or property in New Hampshire by Visa's violations of N.H. Rev Stat. Ann. § 356.3.

**Seventy-Ninth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Hampshire Antitrust Statute, N.H. Rev Stat. Ann. §§ 356.1, *et seq.* (with respect to Class Members' Purchases in New Hampshire)**

589.    Plaintiffs incorporate the allegations of all paragraphs above.

590.    In violation of N.H. Rev Stat. Ann. § 356.3, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

591.    Visa's violations of New Hampshire law were flagrant and willful.

592.    The Class has been injured in its business or property in New Hampshire by Visa's violations of N.H. Rev Stat. Ann. § 356.3.

**Eightieth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the New Hampshire Antitrust Statute, N.H. Rev Stat. Ann. §§ 356.1, *et seq.***

**(with respect to Class Members' Purchases in New Hampshire)**

593.     Plaintiffs incorporate the allegations of all paragraphs above.

594.     In violation of N.H. Rev Stat. Ann. § 356.2, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

595.     Visa's violations of New Hampshire law were flagrant and willful.

596.     The Class has been injured in its business or property in New Hampshire by Visa's violations of N.H. Rev Stat. Ann. § 356.2.

**Eighty-First Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the New Hampshire Antitrust Statute, N.H. Rev Stat. Ann. §§ 356.1, *et seq*. (with respect to Class Members' Purchases in New Hampshire)**

597.     Plaintiffs incorporate the allegations of all paragraphs above.

598.     In violation of N.H. Rev Stat. Ann. § 356.2, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

599.     Visa's violations of New Hampshire law were flagrant and willful.

600.     The Class has been injured in its business or property in New Hampshire by Visa's violations of N.H. Rev Stat. Ann. § 356.2.

**Eighty-Second Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-4(a) (with respect to Class Members' Purchases in New Jersey)**

601.     Plaintiffs incorporate the allegations of all paragraphs above.

602.    In violation of N.J. Stat. Ann. § 56:9-4(a), Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in New Jersey. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

603.    Visa's violations of New Jersey law were flagrant and willful.

604.    The Class has been injured in its business or property in New Jersey by Visa's violations of N.J. Stat. Ann. § 56:9-4(a).

**Eighty-Third Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-4(a) (with respect to Class Members' Purchases in New Jersey)**

605.    Plaintiffs incorporate the allegations of all paragraphs above.

606.    In violation of N.J. Stat. Ann. § 56:9-4(a), Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in New Jersey. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

607.    Visa's violations of New Jersey law were flagrant and willful.

608.    The Class has been injured in its business or property in New Jersey by Visa's violations of N.J. Stat. Ann. § 56:9-4(a).

**Eighty-Fourth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the New Jersey Antitrust Act, New Jersey Antitrust Act, N.J. Stat. § 56:9-3 (with respect to Class Members' Purchases in New Jersey)**

609.    Plaintiffs incorporate the allegations of all paragraphs above.

610.     In violation of N.J. Stat. § 56:9-3, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete, including in New Jersey. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

611.     Visa's violations of New Jersey law were flagrant and willful.

612.     The Class has been injured in its business or property in New Jersey by Visa's violations of N.J. Stat. § 56:9-3.

**Eighty-Fifth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the New Jersey Antitrust Act, N.J. Stat. § 56:9-3 (with respect to Class Members' Purchases in New Jersey)**

613.     Plaintiffs incorporate the allegations of all paragraphs above.

614.     In violation of N.J. Stat. § 56:9-3, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services. Visa's agreements unreasonably restrained trade in New Jersey.

615.     Visa's violations of New Jersey law were flagrant and willful.

616.     The Class has been injured in its business or property in New Jersey by Visa's violations of N.J. Stat. § 56:9-3.

**Eighty-Sixth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.* (with respect to Class Members' Purchases in New Mexico**

617.     Plaintiffs incorporate the allegations of all paragraphs above.

618.     In violation of N.M. Stat. Ann. § 57-1-2, Visa has willfully and unlawfully

maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in New Mexico. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

619.     Visa's violations of New Mexico law were flagrant and willful.

620.     The Class has been injured in its business or property in New Mexico by Visa's violations of N.M. Stat. Ann. § 57-1-2.

> **Eighty-Seventh Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq*. (with respect to Class Members' Purchases in New Mexico)**

621.     Plaintiffs incorporate the allegations of all paragraphs above.

622.     In violation of N.M. Stat. Ann. § 57-1-2, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in New Mexico. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

623.     Visa's violations of New Mexico law were flagrant and willful.

624.     The Class has been injured in its business or property in New Mexico by Visa's violations of N.M. Stat. Ann. § 57-1-2.

> **Eighty-Eighth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq*. (with respect to Class Members' Purchases in New Mexico)**

625.     Plaintiffs incorporate the allegations of all paragraphs above.

626.     In violation of N.M. Stat. Ann. § 57-1-1, Visa agreed with competitors and

potential competitors Apple, PayPal, and Square not to compete, including in New Mexico. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

627.    Visa's violations of New Mexico law were flagrant and willful.

628.    The Class has been injured in its business or property in New Mexico by Visa's violations of N.M. Stat. Ann. § 57-1-1.

**Eighty-Ninth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.* (with respect to Class Members' Purchases in New Mexico)**

629.    Plaintiffs incorporate the allegations of all paragraphs above.

630.    In violation of N.M. Stat. Ann. § 57-1-1, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services. Visa's agreements unreasonably restrained trade in New Mexico.

631.    Visa's violations of New Mexico law were flagrant and willful.

632.    The Class has been injured in its business or property in New Mexico by Visa's violations of N.M. Stat. Ann. § 57-1-1.

**Ninetieth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.* (with respect to Class Members' Purchases in New York)**

633.    Plaintiffs incorporate the allegations of all paragraphs above.

634.    In violation of N.Y. Gen. Bus. Law § 340, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through contracts, agreements, arrangement, or combination, including in New York. Visa's acts, individually and collectively, increased,

117

maintained, or protected its monopoly in both relevant markets.

635.     Visa's violations of New York law were flagrant and willful.

636.     The Class has been injured in its business or property in New York by Visa's violations of N.Y. Gen. Bus. Law § 340.

**Ninety-First Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq*. (with respect to Class Members' Purchases in New York)**

637.     Plaintiffs incorporate the allegations of all paragraphs above.

638.     In violation of N.Y. Gen. Bus. Law § 340, Visa has attempted to monopolize each of the relevant markets through contracts, agreements, arrangement, or combination, including in New York. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

639.     Visa's violations of New York law were flagrant and willful.

640.     The Class has been injured in its business or property in New York by Visa's violations of N.Y. Gen. Bus. Law § 340.

**Ninety-Second Claim for Relief: Unlawful Agreements Not to Compete in Violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq*. (with respect to Class Members' Purchases in New York)**

641.     Plaintiffs incorporate the allegations of all paragraphs above.

642.     In violation of N.Y. Gen. Bus. Law § 340, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Visa entered into contracts, agreements, arrangements, or combinations that have unreasonably restrained competition in

New York and in two relevant markets related to debit transactions in the United States: (1) the

market for general purpose debit network services; and (2) the market for general purpose card-

not-present debit network services.

643.    Visa's violations of New York law were flagrant and willful.

644.    The Class has been injured in its business or property in New York by Visa's

violations of N.Y. Gen. Bus. Law § 340.

> **Ninety-Third Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.* (with respect to Class Members' Purchases in New York)**

645.    Plaintiffs incorporate the allegations of all paragraphs above.

646.    In violation of N.Y. Gen. Bus. Law § 340, Visa's agreements with merchants,

issuers, and acquirers unreasonably restrain trade in New York and in two relevant markets

related to debit transactions in the United States: (1) the market for general purpose card-not-

present debit network services, and (2) the market for general purpose debit network services.

647.    Visa's violations of New York law were flagrant and willful.

648.    The Class has been injured in its business or property in New York by Visa's

violations of N.Y. Gen. Bus. Law § 340.

> **Ninety-Fourth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq.* (with respect to Class Members' Purchases in North Carolina)**

649.    Plaintiffs incorporate the allegations of all paragraphs above.

650.    In violation of N.C. Gen. Stat. Ann. § 75-2.1, Visa has willfully and

unlawfully maintained its monopoly in the relevant markets through the exclusionary course of

conduct and anticompetitive acts described herein, including in North Carolina. Visa's acts,

individually and collectively, increased, maintained, or protected its monopoly in both relevant

markets.

651.    Visa's violations of North Carolina law were flagrant and willful.

652.    The Class has been injured in its business or property in North Carolina by

Visa' violations of N.C. Gen. Stat. Ann. § 75-2.1.

**Ninety-Fifth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq*. (with respect to Class Members' Purchases in North Carolina)**

653.    Plaintiffs incorporate the allegations of all paragraphs above.

654.    In violation of N.C. Gen. Stat. Ann. § 75-2.1, Visa has attempted to

monopolize each of the relevant markets through the exclusionary course of conduct and

anticompetitive acts described, including in North Carolina. Each of Visa's acts is

anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has

harmed competition in each relevant market, including raising barriers to competition by current

and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting

price competition, restricting output and other services, and limiting innovation.

655.    Visa's violations of North Carolina law were flagrant and willful.

656.    The Class has been injured in its business or property in North Carolina by

Visa's violations of N.C. Gen. Stat. Ann. § 75-2.1.

**Ninety-Sixth Claim for Relief: Unlawful Agreements Not to Compete in Violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq*. (with respect to Class Members' Purchases in North Carolina)**

657.    Plaintiffs incorporate the allegations of all paragraphs above.

658.    In violation of N.C. Gen. Stat. Ann. § 75-2.1, Visa has attempted to

monopolize each of the relevant markets through the exclusionary course of conduct and

anticompetitive acts described, including in North Carolina. Each of Visa's acts is

anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

659.     Visa's violations of North Carolina law were flagrant and willful.

660.     The Class has been injured in its business or property in North Carolina by Visa's violations of N.C. Gen. Stat. Ann. § 75-2.1.

**Ninety-Seventh Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq.* (with respect to Class Members' Purchases in North Carolina)**

661.     Plaintiffs incorporate the allegations of all paragraphs above.

662.     In violation of N.C. Gen. Stat. Ann. § 75-1, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services, and in North Carolina.

663.     Visa's violations of North Carolina law were flagrant and willful.

664.     The Class has been injured in its business or property in North Carolina by Visa's violations of N.C. Gen. Stat. Ann. § 75-1.

**Ninety-Eighth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.* (with respect to Class Members' Purchases in North Dakota)**

665.     Plaintiffs incorporate the allegations of all paragraphs above.

666.     In violation of N.D. Cent. Code § 51-08.1-03, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of

conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

667.    Visa's violations of North Dakota law were flagrant and willful.

668.    The Class has been injured in its business or property in North Dakota by Visa's violations of N.D. Cent. Code § 51-08.1-03.

**Ninety-Nineth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.* (with respect to Class Members' Purchases in North Dakota)**

669.    Plaintiffs incorporate the allegations of all paragraphs above.

670.    In violation of N.D. Cent. Code § 51-08.1-03, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

671.    Visa's violations of North Dakota law were flagrant and willful.

672.    The Class has been injured in its business or property in North Dakota by Visa's violations of N.D. Cent. Code § 51-08.1-03.

**One Hundredth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.* (with respect to Class Members' Purchases in North Dakota)**

673.    Plaintiffs incorporate the allegations of all paragraphs above.

674.    In violation of N.D. Cent. Code § 51-08.1-02, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements

unreasonably restrain competition in two relevant markets related to debit transactions in the

United States: (1) the market for general purpose debit network services; and (2) the market for

general purpose card-not-present debit network services.

675.    Visa's violations of North Dakota law were flagrant and willful.

676.    The Class has been injured in its business or property in North Dakota by

Visa's violations of N.D. Cent. Code § 51-08.1-02.

> **One Hundred and First Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.* (with respect to Class Members' Purchases in North Dakota)**

677.    Plaintiffs incorporate the allegations of all paragraphs above.

678.    In violation of N.D. Cent. Code § 51-08.1-02, Visa's agreements with

merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to

debit transactions in the United States: (1) the market for general purpose debit network

services; and (2) the market for general purpose card-not-present debit network services.

679.    Visa's violations of North Dakota law were flagrant and willful.

680.    The Class has been injured in its business or property in North Dakota by

Visa's violations of N.D. Cent. Code § 51-08.1-02.

> **One Hundred and Second Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq.* (with respect to Class Members' Purchases in Oregon)**

681.    Plaintiffs incorporate the allegations of all paragraphs above.

682.    In violation of Or. Rev. Stat. § 646.730, Visa has willfully and unlawfully

maintained its monopoly in the relevant markets through the exclusionary course of conduct and

anticompetitive acts described herein. Visa's acts, individually and collectively, increased,

maintained, or protected its monopoly in both relevant markets.

683.     Visa's violations of Oregon law were flagrant and willful.

684.     The Class has been injured in its business or property in Oregon by Visa's

violations of Or. Rev. Stat. § 646.730.

> **One Hundred and Third Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq.* (with respect to Class Members' Purchases in Oregon)**

685.     Plaintiffs incorporate the allegations of all paragraphs above.

686.     In violation of Or. Rev. Stat. § 646.730, Visa has attempted to monopolize

each of the relevant markets through the exclusionary course of conduct and anticompetitive

acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's

actions have a cumulative effect that has harmed competition in each relevant market, including

raising barriers to competition by current and potential competitors, imposing supracompetitive

prices, stabilizing those prices, limiting price competition, restricting output and other services,

and limiting innovation.

687.     Visa's violations of Oregon law were flagrant and willful.

688.     The Class has been injured in its business or property in Oregon by Visa's

violations of Or. Rev. Stat. § 646.730.

> **One Hundred and Fourth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq.* (with respect to Class Members' Purchases in Oregon)**

689.     Plaintiffs incorporate the allegations of all paragraphs above.

690.     In violation of Or. Rev. Stat. § 646.725, Visa agreed with competitors and

potential competitors Apple, PayPal, and Square not to compete. Those agreements

unreasonably restrain competition in two relevant markets related to debit transactions in the

United States: (1) the market for general purpose debit network services; and (2) the market for

general purpose card-not-present debit network services.

691.      Visa's violations of Oregon law were flagrant and willful.

692.      The Class has been injured in its business or property in Oregon by Visa's

violations of Or. Rev. Stat. § 646.725.

### One Hundred and Fifth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq.* (with respect to Class Members' Purchases in Oregon)

693.      Plaintiffs incorporate the allegations of all paragraphs above.

694.      In violation of Or. Rev. Stat. § 646.725, Visa's agreements with merchants,

issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit

transactions in the United States: (1) the market for general purpose debit network services; and

(2) the market for general purpose card-not-present debit network services.

695.      Visa's violations of Oregon law were flagrant and willful.

696.      The Class has been injured in its business or property in Oregon by Visa's

violations of Or. Rev. Stat. § 646.725.

### One Hundred and Sixth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Laws of Puerto Rico, P.R. Laws Ann. tit. 10, ch. 13, §§ 257 *et seq.* (with respect to Class Members' Purchases in Puerto Rico)

697.      Plaintiffs incorporate the allegations of all paragraphs above.

698.      In violation of P.R. Laws tit. 10, ch. 13, § 260, Visa has willfully and

unlawfully maintained its monopoly in the relevant markets through the exclusionary course of

conduct and anticompetitive acts described herein. Visa's acts, individually and collectively,

increased, maintained, or protected its monopoly in both relevant markets.

699.      Visa's violations of Puerto Rico law were flagrant and willful.

700.      The Class has been injured in its business or property in Puerto Rico by Visa's

violations of P.R. Laws tit. 10, ch. 13, § 260.

**One Hundred and Seventh Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Laws of Puerto Rico, P.R. Laws Ann. tit. 10, ch. 13, §§ 257 *et seq.* (with respect to Class Members' Purchases in Puerto Rico)**

701.    Plaintiffs incorporate the allegations of all paragraphs above.

702.    In violation of P.R. Laws tit. 10, ch. 13, § 260, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

703.    Visa's violations of Puerto Rico law were flagrant and willful.

704.    The Class has been injured in its business or property in Puerto Rico by Visa's violations of P.R. Laws tit. 10, ch. 13, § 260.

**One Hundred and Eighth Claim for Relief: Unlawful Agreements Not to Compete in Violation of in Violation of the Laws of Puerto Rico, P.R. Laws Ann. tit. 10, ch. 13, §§ 257 *et seq.* (with respect to Class Members' Purchases in Puerto Rico)**

705.    Plaintiffs incorporate the allegations of all paragraphs above.

706.    In violation of P.R. Laws tit. 10, ch. 13, § 258, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

707.    Visa's violations of Puerto Rico law were flagrant and willful.

708.    The Class has been injured in its business or property in Puerto Rico by Visa's violations of P.R. Laws tit. 10, ch. 13, § 258.

**One Hundred and Ninth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of in Violation of the Laws of Puerto Rico, P.R. Laws Ann. tit. 10, ch. 13, §§ 257** *et seq.* **(with respect to Class Members' Purchases in Puerto Rico)**

709.    Plaintiffs incorporate the allegations of all paragraphs above.

710.    In violation of P.R. Laws tit. 10, ch. 13, § 258, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

711.    Visa's violations of Puerto Rico law were flagrant and willful.

712.    The Class has been injured in its business or property in Puerto Rico by Visa's violations of P.R. Laws tit. 10, ch. 13, § 258.

**One Hundred and Tenth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1,** *et seq.* **(with respect to Class Members' Purchases in Rhode Island)**

713.    Plaintiffs incorporate the allegations of all paragraphs above.

714.    In violation of R.I. Gen. Laws § 6-36-5, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

715.    Visa's violations of Rhode Island law were flagrant and willful.

716.    The Class has been injured in its business or property in Rhode Island by Visa's violations of R.I. Gen. Laws § 6-36-5.

**One Hundred and Eleventh Claim for Relief: Attempted Monopolization of the**

**Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq.* (with respect to Class Members' Purchases in Rhode Island)**

717.    Plaintiffs incorporate the allegations of all paragraphs above.

718.    In violation of R.I. Gen. Laws § 6-36-5, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

719.    Visa's violations of Rhode Island law were flagrant and willful.

720.    The Class has been injured in its business or property in Rhode Island by Visa's violations of R.I. Gen. Laws § 6-36-5.

**One Hundred and Twelfth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq.* (with respect to Class Members' Purchases in Rhode Island)**

721.    Plaintiffs incorporate the allegations of all paragraphs above.

722.    In violation of R.I. Gen. Laws § 6-36-4, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

723.    Visa's violations of Rhode Island law were flagrant and willful.

724.    The Class has been injured in its business or property in Rhode Island by Visa's violations of R.I. Gen. Laws § 6-36-4.

**One Hundred and Thirteenth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq*. (with respect to Class Members' Purchases in Rhode Island)**

725.    Plaintiffs incorporate the allegations of all paragraphs above.

726.    In violation of R.I. Gen. Laws § 6-36-4, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

727.    Visa's violations of Rhode Island law were flagrant and willful.

728.    The Class has been injured in its business or property in Rhode Island by Visa's violations of R.I. Gen. Laws § 6-36-4.

**One Hundred and Fourteenth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq.* (with respect to Class Members' Purchases in South Dakota)**

729.    Plaintiffs incorporate the allegations of all paragraphs above.

730.    In violation of S.D. Codified Laws §§ 37-1-3.1 *et seq.*, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in South Dakota. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

731.    Visa's violations of South Dakota law were flagrant and willful.

732.    The Class has been injured in its business or property in South Dakota by Visa's violations of S.D. Codified Laws §§ 37-1-3.1 *et seq*.

**One Hundred and Fifteenth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq.* (with respect**

**to Class Members' Purchases in South Dakota)**

733.    Plaintiffs incorporate the allegations of all paragraphs above.

734.    In violation of S.D. Codified Laws §§ 37-1-3.1 *et seq.*, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in South Dakota. Each of Visa's acts is anticompetitive in its own right.

735.    Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

736.    Visa's violations of South Dakota law were flagrant and willful.

737.    The Class has been injured in its business or property in South Dakota by Visa's violations of S.D. Codified Laws §§ 37-1-3.1 *et seq*.

**One Hundred and Sixteenth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq.* (with respect to Class Members' Purchases in South Dakota)**

738.    Plaintiffs incorporate the allegations of all paragraphs above.

739.    In violation of S.D. Codified Laws §§ 37-1-3.1 *et seq.*, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete, including in South Dakota.

740.    Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

741.    Visa's violations of South Dakota law were flagrant and willful.

742.    The Class has been injured in its business or property in South Dakota by

Visa's violations of S.D. Codified Laws §§ 37-1-3.1 *et seq*.

**One Hundred and Seventeenth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq*. (with respect to Class Members' Purchases in South Dakota)**

743.    Plaintiffs incorporate the allegations of all paragraphs above.

744.    Plaintiffs incorporate the allegations of all paragraphs above.

745.    In violation of S.D. Codified Laws §§ 37-1-3.1 *et seq*., Visa's agreements with merchants, issuers, and acquirers, including in South Dakota, unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

746.    Visa's violations of South Dakota law were flagrant and willful.

747.    The Class has been injured in its business or property in South Dakota by Visa's violations of S.D. Codified Laws §§ 37-1-3.1 *et seq*.

**One Hundred and Eighteenth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq*. (with respect to Class Members' Purchases in Tennessee)**

748.    Plaintiffs incorporate the allegations of all paragraphs above.

749.    In violation of Tenn. Code Ann. § 47-25-102, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

750.    Visa's violations of Tennessee law were flagrant and willful.

751.    The Class has been injured in its business or property Tennessee by Visa's violations of Tenn. Code Ann. § 47-25-102.

131

**One Hundred and Nineteenth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.* (with respect to Class Members' Purchases in Tennessee)**

752.     Plaintiffs incorporate the allegations of all paragraphs above.

753.     In violation of Tenn. Code Ann. § 47-25-102, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

754.     Visa's violations of Tennessee law were flagrant and willful.

755.     The Class has been injured in its business or property in Tennessee by Visa's violations of Tenn. Code Ann. § 47-25-102.

**One Hundred and Twentieth Claim for Relief: Unlawful Agreements Not to Compete in Violation of Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.* (with respect to Class Members' Purchases in Tennessee)**

756.     Plaintiffs incorporate the allegations of all paragraphs above.

757.     In violation of Tenn. Code Ann. § 47-25-101, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

758.     Visa's violations of Tennessee law were flagrant and willful.

759.     The Class has been injured in its business or property in Tennessee by Visa's

132

violations of Tenn. Code Ann. § 47-25-101.

**One Hundred and Twenty-First Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq*. (with respect to Class Members' Purchases in Tennessee)**

760.    Plaintiffs incorporate the allegations of all paragraphs above.

761.    In violation of Tenn. Code Ann. § 47-25-101, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

762.    Visa's violations of Tennessee law were flagrant and willful.

763.    The Class has been injured in its business or property in Tennessee by Visa's violations of Tenn. Code Ann. § 47-25-101.

**One Hundred and Twenty-Second Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq*. (with respect to Class Members' Purchases in Utah)**

764.    Plaintiffs incorporate the allegations of all paragraphs above.

765.    In violation of Utah Code Ann. § 76-10-3104, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

766.    Visa's violations of Utah law were flagrant and willful.

767.    The Class has been injured in its business or property Utah by Visa's violations of Utah Code Ann. § 76-10-3104.

**One Hundred and Twenty-Third Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the**

**Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq.* (with respect to Class Members' Purchases in Utah)**

768.    Plaintiffs incorporate the allegations of all paragraphs above.

769.    In violation of Utah Code Ann. § 76-10-3104, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

770.    Visa's violations of Utah law were flagrant and willful.

771.    The Class has been injured in its business or property in Utah by Visa's violations of Utah Code Ann. § 76-10-3104.

**One Hundred and Twenty-Fourth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq.* (with respect to Class Members' Purchases in Utah)**

772.    Plaintiffs incorporate the allegations of all paragraphs above.

773.    In violation of Utah Code Ann. § 76-10-3104, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

774.    Visa's violations of Utah law were flagrant and willful.

775.    The Class has been injured in its business or property in Utah by Visa's violations of Utah Code Ann. § 76-10-3104.

**One Hundred and Twenty-Fifth Claim for Relief: Unlawful Agreements That**

**Restrain Trade in Violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101,** *et seq. (***with respect to Class Members' Purchases in Utah)**

776.     Plaintiffs incorporate the allegations of all paragraphs above.

777.     In violation of Utah Code Ann. § 76-10-3104, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

778.     Visa's violations of Utah law were flagrant and willful.

779.     The Class has been injured in its business or property in Utah by Visa's violations of Utah Code Ann. § 76-10-3104.

**One Hundred and Twenty-Sixth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451,** *et seq.* **(with respect to Class Members' Purchases in Vermont)**

780.     Plaintiffs incorporate the allegations of all paragraphs above.

781.     In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

782.     Visa's violations of Vermont law were flagrant and willful.

783.     The Class has been injured in its business or property Vermont by Visa's violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

**One Hundred and Twenty-Seventh Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451,** *et seq.* **(with respect to Class Members' Purchases in Vermont)**

784.     Plaintiffs incorporate the allegations of all paragraphs above.

785.     In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right.

786.     Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

787.     Visa's violations of Vermont law were flagrant and willful.

788.     The Class has been injured in its business or property in Vermont by Visa's violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

**One Hundred and Twenty-Eighth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451,** *et seq.* **(with respect to Class Members' Purchases in Vermont)**

789.     Plaintiffs incorporate the allegations of all paragraphs above.

790.     In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

791.     Visa's violations of Vermont law were flagrant and willful.

792.     The Class has been injured in its business or property in Vermont by Visa's violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

**One Hundred and Twenty-Ninth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451,** *et seq.* **(with respect to Class Members' Purchases in Vermont)**

793.     Plaintiffs incorporate the allegations of all paragraphs above.

136

794.    In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

795.    Visa's violations of Vermont law were flagrant and willful.

796.    The Class has been injured in its business or property in Vermont by Visa's violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

### One Hundred and Thirtieth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq*. (with respect to Class Members' Purchases in West Virginia)

797.    Plaintiffs incorporate the allegations of all paragraphs above.

798.    In violation of W.Va. Code § 47-18-4, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in West Virginia. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

799.    Visa's violations of West Virginia law were flagrant and willful.

800.    The Class has been injured in its business or property West Virginia by Visa's violations of W.Va. Code § 47-18-4.

### One Hundred and Thirty-First Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.* (with respect to Class Members' Purchases in West Virginia)

801.    Plaintiffs incorporate the allegations of all paragraphs above.

802.    In violation of W.Va. Code § 47-18-4, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts

137

described herein, including in West Virginia. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

803.     Visa's violations of West Virginia law were flagrant and willful.

804.     The Class has been injured in its business or property in West Virginia by Visa's violations of W.Va. Code § 47-18-4.

> **One Hundred and Thirty-Second Claim for Relief: Unlawful Agreements Not to Compete in Violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.* (with respect to Class Members' Purchases in West Virginia)**

805.     Plaintiffs incorporate the allegations of all paragraphs above.

806.     In violation of W.Va. Code § 47-18-3, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete, including in West Virginia. Those agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services.

807.     Visa's violations of West Virginia law were flagrant and willful.

808.     The Class has been injured in its business or property in West Virginia by Visa's violations of W.Va. Code § 47-18-3.

> **One Hundred and Thirty-Third Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.* (with respect to Class Members' Purchases in West Virginia)**

809.     Plaintiffs incorporate the allegations of all paragraphs above.

810.     In violation of W.Va. Code § 47-18-3, Visa's agreements with merchants, issuers, and acquirers, including in West Virginia, unreasonably restrain trade in two relevant

markets related to debit transactions in the United States: (1) the market for general purpose

card-not- present debit network services, and (2) the market for general purpose debit network

services.

811.    Visa's violations of West Virginia law were flagrant and willful.

812.    The Class has been injured in its business or property in West Virginia by

Visa's violations of W.Va. Code § 47-18-3.

> **One Hundred and Thirty-Fourth for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.* (with respect to Class Members' Purchases in Wisconsin)**

813.    Plaintiffs incorporate the allegations of all paragraphs above.

814.    In violation of Wis. Stat. § 133.03, Visa has willfully and unlawfully

maintained its monopoly in the relevant markets through the exclusionary course of conduct and

anticompetitive acts described herein. Visa's acts, individually and collectively, increased,

maintained, or protected its monopoly in both relevant markets.

815.    Visa's violations of Wisconsin law were flagrant and willful.

816.    The Class has been injured in its business or property Wisconsin by Visa's

violations of Wis. Stat. § 133.03.

> **One Hundred and Thirty-Fifth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.* (with respect to Class Members' Purchases in Wisconsin)**

817.    Plaintiffs incorporate the allegations of all paragraphs above.

818.    In violation of Wis. Stat. § 133.03, Visa has attempted to monopolize each of

the relevant markets through the exclusionary course of conduct and anticompetitive acts

described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions

have a cumulative effect that has harmed competition in each relevant market, including raising

barriers to competition by current and potential competitors, imposing supracompetitive prices,

stabilizing those prices, limiting price competition, restricting output and other services, and

limiting innovation.

819.    Visa's violations of Wisconsin law were flagrant and willful.

820.    The Class has been injured in its business or property in Wisconsin by Visa's

violations of Wis. Stat. § 133.03.

**One Hundred and Thirty-Sixth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.* (with respect to Class Members' Purchases in Wisconsin)**

821.    Plaintiffs incorporate the allegations of all paragraphs above.

822.    In violation of Wis. Stat. § 133.03, Visa agreed with competitors and potential

competitors Apple, PayPal, and Square not to compete. Those agreements unreasonably restrain

competition in two relevant markets related to debit transactions in the United States: (1) the

market for general purpose debit network services; and (2) the market for general purpose card-

not-present debit network services.

823.    Visa's violations of Wisconsin law were flagrant and willful.

824.    The Class has been injured in its business or property in Wisconsin by Visa's

violations of Wis. Stat. § 133.03.

**One Hundred and Thirty-Seventh Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.* (with respect to Class Members' Purchases in Wisconsin)**

825.    Plaintiffs incorporate the allegations of all paragraphs above.

826.    In violation of Wis. Stat. § 133.03, Visa's agreements with merchants, issuers,

and acquirers unreasonably restrain trade in two relevant markets related to debit transactions

inthe United States: (1) the market for general purpose debit network services; and (2) the market

for general purpose card-not-present debit network services.

827.    Visa's violations of Wisconsin law were flagrant and willful.

828.    The Class has been injured in its business or property in Vermont by Visa's violations of Wis. Stat. § 133.03.

## XV.    REQUEST FOR RELIEF

829.    To remedy these illegal acts, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and the Class against Visa and:

a.    Adjudge and decree that this matter may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3);

b.    Adjudge and decree that Visa has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the market for general purpose card-not-present debit network services in the United States in violation of the Sherman Act, 15 U.S.C. §§ 2, 3;

c.    Adjudge and decree that Visa has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the market for general purpose debit network services in the United States in violation of the Sherman Act, 15 U.S.C. §§ 2, 3;

d.    Adjudge and decree that Visa has acted unlawfully to contract or conspire to restrain trade in the market for general purpose card-not-present debit network services in the United States in violation of the Sherman Act, 15 U.S.C. §§ 1, 3;

e.    Adjudge and decree that Visa has acted unlawfully to contract or conspire to restrain trade in the market for general purpose debit network services in the United States in violation of the Sherman Act, 15 U.S.C. §§ 1, 3;

f.      Award Plaintiffs and the Class three times their damages (or other exemplary amount authorized by state law) sustained due to Visa's challenged conduct pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15 and any equivalent state law, in an amount to be determined at trial;

g.      Enjoin Visa from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with the same purpose or effect as the challenged practices, including, but not limited to:

    i.   bundling credit services or credit incentives with debit network services or debit volume;

    ii.  imposing pricing or incentive structures, such as cliff pricing, that discourage or eliminate competition from rivals, potential rivals, or customers;

    iii. referencing rivals for Visa debit transactions, implicitly or explicitly, in Visa's contracts;

    iv.  imposing fees on debit transactions routed over non-Visa networks; and

    v.   limiting, by contract or other means, the number of back-of-card networks on Visa-branded cards;

h.      Enjoin Visa from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with the same purpose or effect as the challenged practices, including but not limited to:

    i.   agreeing, implicitly or explicitly, not to compete;

    ii.  imposing contractual limitations on the use of payment methods and payment networks (e.g., ACH, RTP, fintech debit, or alternative debit networks) that may compete with general purpose card-not-

142

present debit network services or general purpose debit network services; and imposing contractual limitations on the ability of customers to offer their own payment networks or methods, or adopt new technologies that may disintermediate Visa;

i.      Enter such relief as needed to cure the anticompetitive harm from all of Visa's unlawful actions;

j.      Enter any other preliminary or permanent relief necessary and appropriate to restore competitive conditions in the markets affected by Visa's unlawful conduct;

k.      Enter any other relief necessary and appropriate to prevent evasion of the Court's preliminary or permanent injunction(s);

l.      Award Plaintiffs and the Class an amount equal to its costs, including reasonable attorneys' fees, incurred in bringing this action; and

m.      Award such other relief as the Court may deem just and proper.

## XVI.  JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

143

Dated: December 16, 2024        Respectfully submitted,

*/s/ Brent W. Johnson*
Brent W. Johnson (Attorney Bar Code 4955745)
Benjamin D. Brown (*pro hac vice*)
Daniel McCuaig (*pro hac vice*)
Zachary Krowitz (*pro hac vice*)
Alex Bodaken (*pro hac vice forthcoming*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
bjohnson@cohenmilstein.com
bbrown@cohenmilstein.com
dmccuaig@cohenmilstein.com
zkrowitz@cohenmilstein.com
abodaken@cohenmilstein.com

Manuel J. Dominguez (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
2925 PGA Blvd. ● Suite 200
Palm Beach Gardens, FL 33410
(561) 515-2604
jdominguez@cohenmilstein.com

*/s/ Daniel P. Weick*
Scott Martin
Daniel P. Weick
**HAUSFELD LLP**
33 Whitehall Street 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com
dweick@hausfeld.com

Brian A. Ratner (*pro hac vice*)
Jane Shin (*pro hac vice*)
Camila Ringeling (*pro hac vice*)
**HAUSFELD LLP**
888 16th Street, NW Suite 300
Tel: (202) 540-7200
Fax: (202) 540-7201
bratner@hausfeld.com
jshin@hausfeld.com
cringeling@hausfeld.com

Christopher L. Lebsock (*pro hac vice*)

**HAUSFELD LLP**
600 Montgomery Street
Suite 3200
San Francisco, CA 94111 Tel: (415) 633-1908
Fax: (415) 633-4980
clebsock@hausfeld.com

*Co-Lead Counsel for Plaintiffs and the Proposed
Class*

Joshua H. Grabar, Esq.
**Grabar Law Office**
One Liberty Place 1650 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: 267-507-6085
Cell: 215-840-7112
jgrabar@grabarlaw.com
www.GrabarLaw.com

*/s/ Matthew Tripolitsiotis*
Matthew Tripolitsiotis (Attorney Bar Code MT9413)
**BURNS CHAREST LLP**
757 Third Ave., 20th Floor
New York, NY 10017
Tel:  (469) 895-5269
mtripolitsiotis@burnscharest.com

Christopher J. Cormier (*pro hac vice forthcoming*)
Spencer Cox (*pro hac vice forthcoming*)
Matt Strauser (*pro hac vice forthcoming*)
Ian Baize (*pro hac vice forthcoming*)
**BURNS CHAREST LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Tel: (202) 577-3977
ccormier@burnscharest.com
scox@burnscharest.com
mstrauser@burnscharest.com
ibaize@burnscharest.com

Warren T. Burns (*pro hac vice forthcoming*)
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550
wburns@burnscharest.com

*/s/ Brian Danitz*
Joseph W. Cotchett
Brian Danitz
Adam J. Zapala (*pro hac vice forthcoming*)
Gia Jung (*pro hac vice forthcoming*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
40 Worth Street
Suite 602
New York, NY 10013
Telephone: (212) 381-6373
Facsimile: (917) 398-7753
jcotchett@cpmlegal.com
bdanitz@cpmlegal.com
azapala@cpmlegal.com
gjung@cpmlegal.com

Karin B. Swope (*pro hac vice forthcoming*)
Thomas E. Loeser (*pro hac vice forthcoming*)
Vara Lyons
**COTCHETT, PITRE & McCARTHY, LLP**
999 N. Northlake Way
Suite 215
Seattle, WA 98103
Telephone: (206) 802.1272
Facsimile: (650) 697.0577
tloeser@cpmlegal.com
kswope@cpmlegal.com
vlyons@cpmlegal.com

*Additional Counsel for Plaintiffs and the Proposed Class*