# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: VISA DEBIT CARD ANTITRUST LITIGATION | **Civil Action No.: 24-cv-7435 (JGK)** |

# THIRD AMENDED CONSOLIDATED CARDHOLDER COMPLAINT

## TABLE OF CONTENTS

Nature of the Case ....................1

Jurisdiction, Venue, and Commerce ....................3

Parties ....................4

Factual Background for Claims ....................19

I. Debit Transactions ....................19

A. How Debit Card Payment Processing Works ....................26

B. Debit Networks ....................31

C. Debit Network Fees ....................32

D. How Visa Came to Dominate the Debit Network Market ....................33

E. Visa Faces No Meaningful Competition from PIN Networks ....................35

F. Alternative Debit Networks ....................38

II. Visa Engages in Exclusionary, Anticompetitive, and Unlawful Conduct to Dominate Debit Transactions in the United States at the Expense of Consumers ....................38

A. Visa Contracts with Banks and Merchants to Squelch Competition ....................40

1. Visa Imposes Anticompetitive Contracts on Merchants and Acquiring Banks ....................41

2. Visa Leverages Anticompetitive Contracts on Issuing Banks ....................44

3. Visa Successfully Undermined the Purpose of the Durbin Amendment and Maintained its Monopoly Power ....................46

4. Visa Forecloses Competition by Creating Artificial Barriers to Entry ....................48

B. Visa Leverages its Monopoly Power to Foreclose Innovative Alternative Networks ........................................................................................50

1. Fintech Networks Threaten to Disintermediate Visa's Debit Network ........................................................................................51

2. Visa Leveraged its Monopoly Power to Prevent Disintermediation with Staged Digital Wallets ........................................................................................54

3. Visa Pay-Off Potential Competitors with Monopoly Profits to Prevent Competition ........................................................................................57

4. Visa Prevents Competition from Next-Generation Fintech Competitors ........................................................................................59

III. Anticompetitive Effects ........................................................................................60

IV. No Countervailing Factors ........................................................................................63

V. Relevant U.S. Debit Markets ........................................................................................63

A. The United States is a Relevant Geographic Market ....................................64

B. Relevant Product Markets ........................................................................................64

1. General Purpose Debit Network Services Market ....................................65

2. General Purpose Card-Not-Present Network Services Market .............69

VI. Visa Has Monopoly Power in the U.S. Debit Markets........................................69

VII. Equitable Tolling of the Statute of Limitations ....................................................73

VIII. Class Allegations ........................................................................................74

Causes of Action ........................................................................................77

Count I: Violations of the Sherman Act, 15 U.S.C. §§ 1,2 (On Behalf of the Nationwide Injunctive Relief Class) ........................................................................................77

Count II: Monopolization, Attempted Monopolization, and/or Conspiracy to Monopolize in Violation of State Antitrust Laws (On Behalf of the State Law Antitrust Damages Class) ....78

Count III: Unlawful Agreements Not to Compete in Violation of State Antitrust Laws (On Behalf of State Law Antitrust Damages Class) ....81

Count IV: Unlawful Agreements That Restrain Trade in Violation of State Antitrust Laws (On Behalf of State Law Antitrust Damages Class) ....86

Relief Sought ....89

Demand for Jury Trial ....90

Plaintiffs Dianne Fletcher, Lindy Griffith, Antoinette Jenkins, and Soniya Dhillon, on behalf of themselves and all those similarly situated, for their Complaint against defendant Visa Inc. ("Visa"), allege:

## NATURE OF THE CASE

1. Consumers across the United States rely on debit cards to purchase goods and services from brick-and-mortar (**"card-present" transactions**) and online (**"card-not-present" transactions**) merchants. Since at least 2015, debit cards have been the primary "noncash" payment type used in the United States, accounting for over $4 trillion in purchases in 2021. This transaction volume is growing rapidly, having almost doubled since 2015. Visa controls over 60% of all debit transactions and collects more than $7 billion in annual fees from those transactions.

2. To process a debit transaction and transfer the funds from a consumer's bank to a merchant's bank, the parties to the transaction use a debit network.

3. A debit network in its simplest form is the technological infrastructure that enables buyers and sellers of goods and services to conduct secure, real-time payment transactions. Network providers, typically Visa, impose fees on merchants to process these transactions. These fees are such a material cost of doing business for merchants that merchants must find ways to pass this cost on to ultimately be borne by consumers such as Plaintiffs.

4. Visa is the largest debit network provider in the United States and has long enjoyed monopoly power in providing debit network services. Among the most fundamental results in antitrust economics is that the profits of a monopolist greatly exceed the *sum* of the profits of firms in a competitive market. Following from this is the almost equally fundamental result that a monopolist can induce a would-be competitor not to compete by paying them more than they would have made under competition, and still retain much higher profits than if competition had occurred. The same is true for monopolists paying off parties that would otherwise have facilitated the success of the would-be competitor, such as large customers.

5. Visa has engaged and continues to engage in unlawful and anticompetitive conduct to thwart competition, which has maintained its debit network fees at supracompetitive levels. This conduct includes, but is not limited to, leveraging its monopoly power to suppress competition by incentivizing merchants not to use alternative networks, thereby denying them minimum viable scale and preventing the development of substitute networks, and entering into contracts to pay off potential competitors.

6. Visa engages in these anticompetitive practices to maintain its market power over debit networks and continue to reap monopoly profits fueled by supracompetitive fees.

7. Plaintiffs bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and various state laws to put a stop to Visa's unlawful and anticompetitive conduct and remedy the harm Visa has caused.

## JURISDICTION, VENUE, AND COMMERCE

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of the class; and at least one member of the class is a citizen of a state different from that of Visa.

9. The Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) because this action asserts claims over which this Court has original jurisdiction and because Plaintiffs seek injunctive relief under the Clayton Act, 15 U.S.C. § 26. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

10. This Court has personal jurisdiction over Visa because it has purposefully directed its business activities towards this jurisdiction, had substantial contacts with this jurisdiction, and Plaintiffs' and the Class members' claims for relief arise from and relate to illegal acts committed within this jurisdiction.

11. Visa's activities are within the flow of and are intended to and have had a substantial effect on the interstate commerce of the United States. Visa's services were and are sold in the flow of interstate commerce. By reason of the unlawful activities alleged herein, Visa's unlawful activities have substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class members. Visa, directly and through its agents, has engaged in activities affecting commerce in each of the States in which the proposed Class members reside.

12. Venue is proper in this District under 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d) because at all times relevant to the Complaint: (a) Visa transacted business, was found, or acted through subsidiaries or agents present in this District; (b) a substantial part of the events giving rise to Plaintiffs' and the Class members' claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce has been carried out in this District. Among other conduct, Visa has provided network services for transactions conducted in, entered into agreements with merchants in, and/or acquired banks in this District.

## PARTIES

13. Plaintiff Dianne Fletcher is a citizen of Kansas City, Missouri. Since at least 2012 and continuing to the present, Ms. Fletcher has used a debit card to pay for goods and services for personal, family, and/or household purposes. Since approximately 2017, Ms. Fletcher has used a debit card issued by U.S. Bank that designates Visa as the front-of-card network. Before that, Ms. Fletcher had a debit card issued by Bank of America that, to the best of her recollection, also designated Visa as the front-of-card network. Ms. Fletcher has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she has bought with her debit card.

14. Plaintiff Lindy Griffith is a citizen of Kansas City, Missouri. Since at least 2009 and continuing to the present, Ms. Griffith has used a debit card to pay for goods and services for personal, family, and/or household purposes. Since approximately 1990, Ms. Griffith

has banked exclusively with Commerce Bank and has used a debit card issued by Commerce Bank that designates Visa as the front-of-card network since approximately 2009. Ms. Griffith has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for the goods and services she has bought with her debit card.

15. Plaintiff Antoinette Jenkins is a citizen of California. For at least the past five years, Ms. Jenkins used debit cards issued by Chase Bank and Chime that designated Visa as the front-of-card network to pay for goods and services. Ms. Jenkins has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought with her debit card at brick-and-mortar and online merchants.

16. Plaintiff Soniya Dhillon is a citizen of California. Since at least 2012 through the present, Ms. Dhillon has used a debit card issued by Wells Fargo Bank that designates Visa as the front-of-card network to pay for goods and services. Ms. Dhillon has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she has bought with her debit card.

17. Plaintiff Matthew Vaughan is a citizen of Arizona. For at least 20 years and to the present, Mr. Vaughan has used a debit card issued by Axos that designates Visa as the front-of-card network to pay for goods and services. Mr. Vaughan has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

18. Plaintiff Trena Bento is a citizen of Arizona. For at least 25 years to the present, Ms. Bento has used a debit card issued by Bank of America that designates Visa as the front-of-card network to pay for goods and services. Ms. Bento has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

19. Plaintiff Diane Veloso is a citizen of Colorado. For at least 12 years and to the present, Ms. Veloso has used a debit card issued by Wells Fargo, and for at least 15 years to the present, has used a debit card issued by Chime, each of which designates Visa as the front-of-card network to pay for goods and services. Ms. Veloso has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

20. Intentionally left blank

21. Plaintiff Robert Taylor is a citizen of Connecticut. Since at least 2022 and through the present, Mr. Taylor has used a debit card issued by TD Bank that designates Visa as the front-of-card network to pay for goods and services. Mr. Taylor has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

22. Intentionally left blank.

23. Intentionally left blank.

24. Plaintiff Lenina Bland is a citizen of Washington, D.C. Since at least 2021 and through the present, Ms. Bland has used a debit card issued by JPMorgan Chase Bank that designates Visa as the front-of-card network to pay for goods and services. Ms. Bland has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

25. Intentionally left blank.

26. Plaintiff Sylvia Barajas is a citizen of Hawaii. For at least 3 years and to the present, Ms. Barajas has used a debit card issued by Go2 Bank, and for at least 5 years and to the present, has used a debit card issued by Sutton Bank, each of which designates Visa as the front-of-card network to pay for goods and services. Ms. Barajas has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

27. Plaintiff Royal Alan Belshe is a citizen of Hawaii. For at least 10 years and to the present, Mr. Belshe has used a debit card issued by Bank of Hawaii which designates Visa as the front-of-card network to pay for goods and services. Mr. Belshe has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

28. Plaintiff Gavin Jablonski is a citizen of Iowa. For at least 9 years and to the present, Mr. Jablonski has used a debit card issued by Wells Fargo that designates Visa as the front-of-card network to pay for goods and services. Mr. Jablonski has suffered an

economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants

29. Intentionally left blank.

30. Plaintiff Thanisorn Louviere is a citizen of Kansas. For at least 13 years and to the present, Mr. Louviere has used a debit card issued by Arvest Bank which designates Visa as the front-of-card network to pay for goods and services. Mr. Louviere has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants

31. Intentionally left blank.

32. Intentionally left blank.

33. Plaintiff Nicholas Whitmore is a citizen of Maine. Since at least 2008 through the present, Mr. Whitmore has used a debit card issued by USAA Federal Savings Bank that designates Visa as front-of-card network to pay for goods and services. Mr. Whitmore has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

34. Plaintiff Karen O'Donoghue is a citizen of Maryland. Since at least 2014 through the present, Ms. O'Donoghue has used a debit card issued by Bank of America Corporation that designates Visa as the front-of-card network to pay for goods and services. Ms. O'Donoghue has suffered an economic injury as a result of Visa's unlawful

conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

35. Plaintiff Dave Davis is a citizen of Maryland. Since at least 2012 through the present, Mr. Davis has used a debit card issued by Navy Federal Credit Union that designates Visa as the front-of-card network to pay for goods and services. Mr. Davis has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

36. Plaintiff Heidi Elkins is a citizen of Michigan. For at least 18 years and to the present, Ms. Elkins has used a debit card issued by Chase which designates Visa as the front-of-card network to pay for goods and services. Ms. Elkins has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

37. Plaintiff Anita Smith is a citizen of Michigan. For approximately 10 years and to the present, Ms. Smith has used a debit card issued by River Valley Credit Union which designates Visa as the front-of-card network to pay for goods and services. Ms. Smith has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

38. Intentionally left blank.

39. Plaintiff Steve Lee is a citizen of Minnesota. Since at least 2021 through the present, Mr. Lee has used a debit card issued by US Bank that designates Visa as the front-of-card

network to pay for goods and services. Mr. Lee has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants

40. Plaintiff Jon Williams is a citizen if North Carolina. Since at least 2012 through the present, Mr. Williams has used a debit card issued by State Employees Credit union that designates Visa as the front-of-card network to pay for goods and services. Mr. Williams has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

41. Plaintiff Mojdeh Williams is a citizen of North Carolina. Since at least 2012 through the present, Ms. Williams has used a debit card issued by State Employees Credit Union that designates Visa as the front-of-card network to pay for goods and services. Ms. Williams has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

42. Plaintiff Lori Stark is a citizen of Nebraska. Since at least 2016 through the present, Ms. Stark has used a debit card issued by First National Bank that designates Visa as the front-of-card network to pay for goods and services. From at least 2012 through approximately 2025, Ms. Stark also used a debit card issued by Bank of America that designated Visa as the front-of-card network to pay for goods and services. Ms. Stark has

suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

43. Intentionally left blank.

44. Plaintiff Michael Kirby is a citizen of New Hampshire. Since at least 2006 through present, Mr. Kirby has used a debit card issued by Metro Credit Union that designates Visa as the front-of-card network to pay for goods and services. Mr. Kirby has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

45. Plaintiff Stephanie Podielsky is a citizen of New Hampshire. Since at least 2022 and through the present, Ms. Podielsky has used a debit card issued by Chime that designates Visa as the front-of-card network to pay for goods and services. Ms. Podielsky has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

46. Plaintiff John O'Brien is a citizen of New Jersey. Since at least 2015 through the present, Mr. O'Brien has used a debit card issued by JPMorgan Chase Bank, N.A. that designates Visa as the front-of-card network to pay for goods and services. Mr. O'Brien has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

47. Plaintiff William Wirth is a citizen of New Mexico. Since at least 2021 through the present, Mr. Wirth has used a debit card issued by Bank of America that designates Visa

as the front-of-card network to pay for goods and services. Mr. Wirth has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

48. Plaintiff Owen Simmons is a citizen of Nevada. Since at least 2020 through the present, Mr. Simmons has used a debit card issued by Bank of America that designates Visa as the front-of-card network to pay for goods and services. Mr. Simmons has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

49. Plaintiff Bill VanStone is a citizen of New York. Since at least 2007 and through the present, Mr. VanStone has used a debit card issued by Northwest Bank (originally issued by First Niagara Bank, which was acquired by Northwest Bank in 2016) that designates Visa as the front-of-card network to pay for goods and services. Mr. VanStone has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

50. Plaintiff Janel Lucas is a citizen of New York. Since at least 2007 and through the present, Ms. Lucas has used a debit card issued by Salt City Federal Credit Union (rebranded in 2025 from its former name of ACMG Federal Credit Union) that designates Visa as front-of-card network to pay for goods and services. Ms. Lucas has suffered as economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

51. Plaintiff Anne Wells is a citizen of New York. Since at least 2006 and through the present, Ms. Wells has used a debit card issued by JPMorgan Chase Bank that designates Visa as the front-of-card network to pay for goods and services. Ms. Wells has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

52. Plaintiff Tim Greshik is a citizen of North Dakota. Since at least 2023 through the present, Mr. Greshik has used a debit card issued by Wells Fargo that designates Visa as the front-of-card network to pay for goods and services. Mr. Greshik also uses a debit card with Square since approximately 2018 that designates Visa as the front-of-card network to pay for goods and services. Mr. Greshik has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

53. Plaintiff Marlin 'Mike' Sabinash is a citizen of North Dakota. Since at least 2016 through the present, Mr. Sabinash has used a debit card issued by Unison Bank that designates Visa as the front-of-card network to pay for goods and services. Mr. Sabinash has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

54. Plaintiff Joy Garrett-Sonney is a citizen of Oregon. For at least 7 years and to the present, Ms. Garrett-Sonney has used a debit card issued by Umqua, and prior to that for a number of years used a debit card issued by Southern Oregon Federal Credit Union,

each of which designates Visa as the front-of-card network to pay for goods and services. Ms. Garrett-Sonney has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants

55. Plaintiff Melinda Piette is a citizen of Oregon. For at least 27 years and to the present, Ms. Piette has used a debit card issued by Chase (prior to 2008, Washington Mutual) which designates Visa as the front-of-card network to pay for goods and services. Ms. Piette has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

56. Intentionally left blank.

57. Plaintiff Marlette Glanzer is a citizen of South Dakota. Since at least 2012 through the present, Ms. Glanzer has used a debit card issued by Wells Fargo that designates Visa as the front-of-card network to pay for goods and services. Ms. Glanzer has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

58. Plaintiff Amy Coulson is a citizen of Tennessee. For at least 10 years and to the present, Ms. Coulson has used two debit cards issued by Fidelity, and prior to that, for several years used a debit card issued by UMB, each of which designates Visa as the front-of-card network to pay for goods and services. Ms. Coulson has suffered an economic

injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

59. Plaintiff Andy Barnes is a citizen of Utah. Since at least 2016 through the present, Mr. Barnes has used a debit card issued by Chase Bank that designates Visa as the front-of-card network to pay for goods and services. Mr. Barnes has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

60. Plaintiff Derrick Koehn is a citizen of Wisconsin. Since at least 2018 and through the present, Mr. Koehn has used a debit card issued by U.S. Bank that designates Visa as the front-of-card network to pay for goods and services. Mr. Koehn has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

61. Plaintiff Michelle Lauletta is a citizen of Wisconsin. Since at least 2006 and through the present, Ms. Lauletta has used a debit card issued by Bank of America that designates Visa as the front-of-card network to pay for goods and services. Ms. Lauletta has suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services she bought at brick-and-mortar and online merchants.

62. Plaintiff James Hill, Jr. is a citizen of West Virginia. Since at least 2010 through present, Mr. Hill has used a debit card issued by Bank of America Corporation that designates Visa as the front-of-card network to pay for goods and services. Mr. Hill has

suffered an economic injury as a result of Visa's unlawful conduct by paying higher prices for goods and services he bought at brick-and-mortar and online merchants.

63. Defendant Visa is a Delaware company with its principal place of business in San Francisco, California. Visa owns and operates the Visa debit network, the largest debit network in the United States, which provides a two-sided transaction platform that processes debit transactions between merchants, consumers, and banks through authorization, clearance, and settlement. Visa's services are marketed, distributed, and offered throughout the United States, including across state lines and in this District.

## FACTUAL BACKGROUND FOR CLAIMS

### I. Debit Transactions

64. Merchants must accept Visa because it has been the largest debit network in the United States for decades, processing over 60% of all card-present, and over 65% of all card-not-present, debit transactions. The fact that merchants will lose sales if they do not accept Visa gives Visa significant leverage in negotiating contracts with merchants. Visa has exercised this leverage to generate over $7 billion in debit network processing fees each year from debit transactions, with a staggering 83% profit margin on these fees.

65. The next largest debit network, Mastercard, processes less than 25% of all debit transactions in the United States. The remaining debit network providers, primarily PIN networks, make up only a fraction of the remaining debit network transactions.

66. There are very high barriers to entry into the debit network market. An issuing bank will only place a network on its debit cards if many acquiring banks and merchants accept the network. Meanwhile, merchants and acquiring banks will only join a debit network if many issuing banks select the debit network on their debit cards. Simply put, an aspiring debit network provider faces a classic chicken-and-egg problem, where success is contingent on gaining massive scale on both sides of the transaction, a feat that is exceptionally difficult. This barrier to entry protects debit network providers like Visa, by far the largest, from competition, and its anticompetitive conduct thwarts efforts by would-be competitors to surmount these barriers.

67. Visa's dominant market share is the product of intentional and calculated anticompetitive steps to limit competition and maintain its monopoly power.

68. Following the Great Recession, Visa identified two threats to its monopoly power – and each time it took specific actions to counter those threats to retain its dominance in the debit network market. The Durbin Amendment was the first threat. The Durbin Amendment was passed as part of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 124 Stat. 1376 (2010), with the goal of promoting competition in the debit network industry and providing additional network choices to merchants and acquirers. Specifically, the Durbin Amendment requires issuing banks to include at least two unaffiliated debit networks on every debit card—one on the

front of the card and at least one on the back of the card. These networks are aptly referred to as **"front-of-card"** and **"back-of-card"** networks.

69. Unaffiliated networks on debit cards threaten Visa's dominance and monopoly power in the market. If more debit networks were available, Visa's competitors could gain the scale needed to compete, thereby causing Visa to lose volume and fees. Indeed, this was the initial impact of the Durbin Amendment; after it became effective in 2012, Visa initially lost volume to other debit networks that offered lower fees. If this trend had continued, Visa could have lost its market dominance. To counteract these effects of the Durbin Amendment that had promoted competition in the debit network market, Visa used its power in the market to limit competition and retain its dominance.

70. For nearly half of all debit transactions, Visa is the only network available to connect the consumer's issuing bank to the merchant and acquiring bank. For these transactions, known as **"non-contestable transactions,"** Visa faces no meaningful competition and is able to threaten merchants and acquiring banks with high rates they must accept if they wish to complete the transaction. Visa's central goal, and the aim of its anticompetitive conduct, is to keep as many transactions as possible non-contestable.

71. The rest of the transactions are known as **"contestable transactions,"** which is when there is more than one network available to complete the transaction between the parties. In a free and fair competitive market, contestable transactions would result in lower fees and innovation to win business. Visa, however, uses its market power over

non-contestable transactions to prevent competition in contestable transactions, and ultimately to render them non-contestable as well.

72. Visa's monopoly power in non-contestable transactions gives it leverage over merchants and acquirers, who depend on non-contestable transactions to complete sales, to enter into routing agreements. Absent a routing agreement, the merchant or acquirer pays list price (also known as a **"rack rate"**) on each transaction completed on Visa's debit network. With a routing agreement, though, the merchant or acquirer receives a discount on its transactions in exchange for committing a meaningful share of all transactions, contestable and non-contestable, to Visa's debit network. Simply put, Visa offers relatively favorable terms for merchants who cooperate and threatens punitive rack rates if merchants or acquirers route too many of their contestable transactions to Visa's competition. The offered discounts serve as predation to deny rivals sufficient scale to be viable and a sharing of rents with would-be competitors.

73. As a result, merchants and acquirers must choose between signing routing deals or suffering punitive rack rates, thereby stunting Visa's competition from growing in scale and meaningfully competing.

74. Visa's routing agreements ensure it is protected from facing meaningful competition. Visa's routing contracts cover more than 180 of its largest merchants and acquirers, insulating at least 75% of Visa's debit card transactions from meaningful competition and foreclosing nearly half of total U.S. debit card volume. Indeed, Visa

internally touts how successful its routing agreements are at subverting competition. Moreover, Visa renewed many of its routing agreements in 2022, thereby ensuring it retains its market dominance for years to come, and continually seeks to renew its routing agreements across successive renewal terms.

75. The would-be competitors discussed thus far are rival debit card networks. The second threat to Visa's monopoly power was emerging technologies and innovations that do not rely on the debit card networks that Visa has monopolized. These could provide real competitive alternatives to the services Visa provides. In addition to frustrating the purpose of the Durbin Amendment, Visa took steps to ensure newer technologies cannot meaningfully compete for market power.

76. These technologies allow the transfer of money out of a customer's bank account by another method entirely, using Interbank Payment Networks instead of debit card networks. Interbank Payment Networks use credentials of the account itself (such as the account number) rather than the credentials of a debit card linked to the account. Several digital platforms, such as Apple Pay, PayPal, Cash App, and Square (which currently operate using debit card networks) have developed alternative payment products based on Interbank Payment Networks. The introduction of such networks, especially by such large and powerful companies, would be a disaster for Visa, as the debit card networks that it has monopolized would now face a major competitor.

77. Because Visa identified these companies and their technologies as a major threat to its business, Visa took steps directed at these companies to suppress competition before they had the chance to meaningfully compete. Visa has offered lucrative incentives, sometimes worth hundreds of millions of dollars annually, to potential competitors on the express agreement they will not develop a competing product or otherwise act in ways that could threaten Visa's dominance. These agreements also withdraw the incentives and specify additional fees should the companies decide to compete after all. These provisions are two sides of the same coin: favorable, mutually beneficial dealings as long as the companies refrain from competing, with those benefits held in place by the knowledge that actually competing would result in the withdrawal of those benefits and additional penalties as well.

78. Visa's anticompetitive conduct has harmed consumers in the relevant market in at least three ways. First, in conjunction with the high barriers to entry, Visa exercises its monopoly power in the debit market to harm competition by depriving would-be competing debit networks of the scale necessary to compete, by, for example, entering into agreements that punish merchants for using potential competitor debit networks to process their transactions. Because Visa-branded cards comprise a substantial portion of all U.S. debit cards and comprise a large portion of merchants' transactions, Visa can engage in the anticompetitive conduct of punishing merchants without losing business.

79. Second, Visa's conduct diminishes competition in a substantial portion of the relevant debit market, including at least 60% of all U.S. debit transactions and over 65% of card-not-present transactions. As a result, Visa's would-be competing debit card networks are handicapped and unable to gain the scale necessary to compete on price and quality because a network must be carried by both sides of the transaction for the network to own the transaction. Visa's agreements with issuers, merchants, and acquirers prevent competitors from gaining scale and competing.

80. Third, Visa secured agreements from several large, would-be competitors with technologies that could serve as an alternative to the debit card network technologies that Visa has monopolized, to not release products based on these technologies. These agreements, including with Apple, PayPal, Square, and Plaid, have turned potential competitors into partners - to the detriment of consumers.

81. This anticompetitive conduct has harmed consumers through higher prices for goods and services, limited choices, and stifled innovation.

82. Visa enjoys supracompetitive profits that it would not be able to maintain but for its anticompetitive and unlawful conduct. These high fees are one of the largest costs of doing business faced by merchants. To stay in business, merchants pass on these fees to consumers, by raising the price of their goods and services, and thus consumers ultimately bear the brunt of Visa's excessive fees and lack of competition.

83. Visa's U.S. debit business is its biggest revenue source, earning more than its credit network and any other debit network it runs across the globe. Visa's anticompetitive conduct ensures it continues to dominate the debit network market in the United States without having to meaningfully compete on the price of its fees, driving up costs for merchants, and in turn, consumers. Visa's anticompetitive conduct forces its debit network and fees on merchants who do not have a realistic alternative by (1) preventing merchants from diverting significant portions of their debit transactions to alternative, lower-cost networks, without paying substantially increased fees and penalties to Visa; (2) stifling innovation and competition by paying-off would-be competitors from developing additional or alternative debit networks; and (3) preventing actual or would-be competitors from gaining the scale or volume of transactions necessary to actually compete with Visa. As a result, merchants are forced to utilize Visa's debit network and pay its supracompetitive network fees.

84. In response, merchants pass on the supracompetitive network fees imposed by Visa to consumers by raising the prices of their goods and services.

85. Visa collects more from every debit transaction that is processed over its network than it would if there were actual free market competition. Internal documents obtained by the U.S. Department of Justice show that Visa feared a future involving competition and alternative networks where it would be forced to compete for business by offering lower fees or else be displaced. A future where Visa was dethroned from its status as

market leader and could no longer reap its supracompetitive profits was unacceptable, so Visa resorted to unlawful and anticompetitive means to maintain its market power and exorbitant profits.

**A. How Debit Card Payment Processing Works**

86. The mechanics of debit transactions are vital to facilitate Visa's anticompetitive conduct and its ability to retain dominance in the market. Debit transactions are a financial transaction whereby funds are drawn from a consumer's bank account and transferred to a merchant's bank account to pay for goods and services. Today, tens of millions of consumers prefer to use or rely on debit cards as their primary method of payment for goods and services online and in person.

87. General purpose debit cards, i.e., debit cards that merchants will generally accept, are the most used debit cards in the United States. Visa and other debit networks do not issue debit cards. Rather, consumers' bank, the "**issuing bank**" or "**issuer**"[1] provides the consumer with a debit card. Visa enters into agreements with issuing banks to create and issue debit cards that run on its network. Relatedly, merchants' banks, the "**acquiring**

[1] The issuing bank may work with an issuer processor to connect with the debit network. The processor may also provide services like managing card issuance, authorizing or declining transactions, and communicating with settlement entities. Here, "issuing bank" and "issuer" include the issuer processor.

**bank**" or "**acquirer**"[2], enter into agreements with Visa so that merchants can and will accept consumers' debit payments.

88. The transfer of funds from the issuing bank to the acquiring bank occurs over the debit network. The debit network assigns a debit credential or other unique identifier to consumers that can be accepted by all merchants who participate on the same network. The debit network also provides payment guarantees for merchants, a method to dispute and chargeback transactions for consumers, fraud protection for all parties, and a way for issuing banks and acquiring banks to communicate with one another (i.e., the "**rail**").

89. Banks, not debit networks, transfer money from the consumer's account to the merchant's account. Debit networks, like Visa's, provide the mechanism to achieve these transactions. Debit networks also establish rules for transactions occurring on the network. Visa, however, influences the rules for other debit networks by leveraging its market power and necessary role in completing the majority of debit transactions.

---

[2] Similar to issuers, acquiring banks may also work with acquiring processors to send transaction data to the network. Here, "acquiring bank" and "acquirer" includes the acquirer processor.

90. Consumers use their debit cards to make purchases in person or online. Debit card credentials link the consumer's account to the debit card and act as a security feature. Debit card credentials include, for example, a 16-digit card number ("**debit card number**"), card verification value ("**CVV**"), expiration date, pin number, and EMV security chip. The card will also graphically identify the "front-of-card" network. Some debit cards also identify the "back-of-card" network. As a result of the Durbin Amendment, debit cards can have numerous networks enabled but must have at least one unaffiliated back-of-card network. Generally, however, most cards are limited to a single front-of-card network and one or two back-of-card networks, one of which is unaffiliated with the front-of-card network. Figure 1 shows the debit card credentials and networks.

**Figure 1**



91. A debit transaction in its simplest form involves six steps: (1) a consumer buys goods or services from a merchant and presents a debit card for payment; (2) a merchant captures the consumer's account information via debit credentials and sends it to the acquiring bank; (3) the acquiring bank asks the debit network for an authorization from the issuing bank; (4) the debit network submits the transaction to the issuing bank for authorization; (5) the issuing bank authorizes the transaction and sends the response to the merchant; and (6) the issuing bank transfers the money, minus a fee ("**interchange fee**") from the consumer's bank account to the acquiring bank to be deposited into the merchant's bank account. Debit transactions are processed in a matter of seconds.

92. Figures 2 and 3 below provide a graphical representation of the transaction:

**Figure 2**[3]




[3] https://community.developer.visa.com/t5/Tutorials/A-Detailed-Look-at-the-Payments-Ecosystem-from-Visa-Payment/ba-p/7463.

**Figure 3**[4]




93. Card-not-present transactions require debit credentials, entered manually by the consumer or that have been saved in a digital wallet, such as Google Pay, Apple Pay, or PayPal. Card-not-present transactions rarely, if ever, require a PIN number, and instead rely on other security features, such as multi-factor authentication.

**B. Debit Networks**

94. Issuing banks decide the networks they will place on their debit cards, while merchants and acquiring banks decide the networks from whom they will accept debit card payments. For the transaction to work, that is, for consumers to be able to purchase goods or services with their debit cards, both the issuing bank and the merchant bank must be a part of or use the same network.

[4] https://www.mastercard.com.au/en-au/business/merchants/start-accepting/payment-process.html.

95. Debit cards must have at least two debit networks: one front-of-card network and at least one back-of-card network unaffiliated with the front-of-card network. Issuing banks select the front-of-card network and choose which and how many back-of-card networks to enable. The front-of-card network's logo is often displayed on the card; back-of-card networks often are not included.

96. Consumers rarely have a choice of debit networks to use. Rather, the choice is dictated by the issuing bank where the consumer decides to open a checking account. Visa is the dominant front-of-card network, Mastercard is a distant second, and two much smaller networks account for the remainder. Thus, regardless of where the consumer decides to bank, his front-of-card debit network will most likely be Visa.

97. Visa debit cards (i.e., debit cards including Visa as the front-of-card network) typically include Interlink as a back-of-card network. Interlink is a Visa-affiliated back-of-card network. Thus, most Visa debit cards include a total of three debit networks: Visa as the front-of-card network, Interlink as a back-of-card network, and one more back-of-card network unaffiliated with Visa, as required by law. These unaffiliated back-of-card networks are generally smaller, PIN networks. PIN networks are aptly named after their origin from ATM machines, which require entering a PIN number to withdraw cash.

98. Despite being included on most debit cards, PIN networks process a minimal number of debit transactions, largely because of Visa's unlawful and anticompetitive conduct.

99. Visa has secured long-term contracts with most issuing banks. Plus, changing front-of-card networks is very expensive, including the expense of re-issuing new debit cards to all debit card holders, and risks the possibility that debit card holders will not activate their new cards. Thus, Visa faces little competition from other debit networks for the banks with which it already has a relationship.

**C. Debit Network Fees**

100. Consumers do not pay debit networks like Visa directly to use their services. Rather, debit networks charge fees to both issuing banks and acquiring banks for every debit transaction.

101. Acquiring banks pay two types of fees: per-transaction fees and fixed fees. The acquiring bank pays Visa a "**network fee**" on every transaction processed through Visa's network. Network fees vary depending on the type of transaction, including whether the consumer pays in-person or online. Since 2012, Visa also charges acquiring banks a fixed monthly fee, or "**Fixed Acquirer Network Fee**" ("FANF"). The FANF can also vary depending on the size and number of transactions the merchant processes. The acquiring bank also an Interchange Fee, a per-transaction fee to the issuing bank for its services. For issuing banks with $10 billion or more in assets, the Federal Reserve caps the Interchange Fee. For smaller issuing banks, the debit network sets the Interchange Fee. PIN network fees are generally lower than the fees imposed by Visa.

102. The merchant is generally responsible for at least some of these fees and also pays an additional fee to the acquiring bank for its services. These fees, assessed on hundreds, thousands, or millions of transactions made by a merchant, add up to a significant cost for merchants. To offset these costs, merchants increase their prices for goods and services. Accordingly, consumers pay increased prices for goods and services to cover the cost of fees imposed on merchants. Thus, consumers are ultimately the party burdened with the costs of processing the debit transaction.

**D. How Visa Came to Dominate the Debit Network Market**

103. The late 1960s marked the beginning of modern ATM and point of sale ("POS") systems, which allowed consumers to enter a 4-digit PIN to withdraw money from their checking account. Visa, then referred to as BankAmericard, was a joint venture between Bank of America and BankAmericard licensee banks and controlled by Bank of America. In the 1970s, the name was changed to Visa and the first Visa debit cards were introduced. Around this time, POS systems began to see more widespread integration into merchants, which provided a faster way to transfer money than writing checks.

104. Visa quickly grew its debit business using its credit card relationships, infrastructure, and standing in the industry. Visa's network rules required merchants to accept Visa's credit and debit cards. Until the early 2000s, Visa had exclusive relationships with its issuing banks, which were not permitted to issue Visa's competitors' cards, like American Express or Discover.

105. In the 1990s, Visa began offering a debit card that let consumers access their checking account on the same network that processed Visa's credit cards. This network required a signature instead of a PIN. At this point, merchants were not charged fees for accepting debit payments; fees became mainstream, however, with the introduction of Visa's debit card being processed over its credit networks. While Visa's competitors promoted PIN networks, which included minimal fees, Visa pushed its signature network that charged merchants about $1.35 on a $100 purchase. Despite charging higher fees, Visa used this network to gain market dominance. While higher fees meant higher prices for the ultimate consumer, higher fees also meant higher profits for Visa, which turned over a portion of the profits to banks in exchange for issuing its debit cards.

106. Despite now allowing merchants to accept Visa debit cards without accepting their credit cards, and vice versa, Visa was already a dominant force in the market. Between 2006 and 2008, Visa and the second largest debit network provider, Mastercard, separated from their former banks and went public. While issuing banks technically had an option to issue both Visa and Mastercard branded cards, most chose to only issue one. Since this pre-dated the Durbin Amendment, featuring only one debit network per card was common practice. Visa and Mastercard fought for front-of-card placement; however, the significant costs of switching meant very few banks switched and other debit networks had little ability to compete. Thus, merchants had to use the network provided on their card, the majority of which were Visa or Mastercard.

107. The Durbin Amendment ended this practice in 2012, requiring issuers to enable at least one unaffiliated back-of-card network on their debit cards. The Durbin Amendment also capped the interchange fees that merchants and acquiring banks pay issuing banks with more than $10 billion in assets. Interchange fees for smaller issuing banks (i.e., with less than $10 billion in assets) are set by the debit network (e.g., Visa).

**E. Visa Faces No Meaningful Competition from PIN Networks**

108. Debit networks must have scale on both the issuing and acquiring side to gain scale and meaningfully compete. That is, an issuing bank is unlikely to enable a network that is not already accepted by many acquiring banks and merchants, and an acquiring bank or merchant is unlikely to accept a debit network that is not already enabled by many issuing banks. This feedback loop is known as "network effects."

109. A debit network will not be used for a transaction unless each party (i.e., issuing bank, acquiring bank, and merchant) has enabled it to process the transaction. Thus, even if a debit network is on a consumer's debit card, that debit network might not receive transactions.

110. Network effects are a non-issue for Visa, who gained massive scale early on because of its signature network and prior industry connections as a credit card network affiliated with Bank of America. Visa's stranglehold on the industry and long-term agreements with issuing banks makes entering the market nearly impossible for smaller, aspiring rival PIN debit networks.

111. Due to network innovations, PIN networks are now able to offer PIN-less transactions, which allow PIN networks to process card-not-present transactions and in-person transactions without requiring the consumer to enter a PIN.

112. To stifle the competitive impact of these innovations, Visa imposes rules and terms on merchants and acquirers that require them to route a majority of their transactions to Visa instead of an unaffiliated back-of-card network. Visa's practices subdue the amount of competition. In particular, smaller networks, such as PIN networks, can only compete for a fraction of debit transactions, thereby insulating Visa from facing any meaningful competition, thus artificially limiting routing options.

113. Visa's power to enforce its rules and terms stems from its dominance in the market, particularly in those transactions, such as transactions over a specified dollar limit or that require certain encryption criteria, that must always be routed through Visa because back-of-card networks cannot process them. These transactions are known as "non-contestable" transactions. For example, card-present transactions are non-contestable when (1) the issuing bank does not allow the network to process card-present PIN-less transactions and (2) the consumer does not enter a PIN, either because the merchant did not prompt the consumer to enter a PIN or because the consumer opted to

not enter a PIN. Card-not-present transactions can also be non-contestable if they are tokenized.[5]

114. In 2023, only a tiny fraction of card-not-present tokenized transactions were processed over an unaffiliated debit network.

115. Historically, issuing banks generally did not enable card-not-present PIN-less transactions—sometimes at Visa's request—which deterred merchants and acquiring banks from enabling card-not-present PIN-less transactions. Visa's central goal is to keep as many transactions as possible non-contestable.

116. Visa's prominence convinces merchants to accept Visa along with its terms and conditions, or otherwise lose out on a substantial amount of business. Thus, nearly all merchants route the non-contestable transactions to Visa instead of alternative, often more affordable, back-of-card networks.

### F. Alternative Debit Networks

117. In place of using a debit card that relies on a debit network, consumers can choose payment alternatives developed by fintech firms (hereafter, "**Fintech debit**").

118. Fintech debit can process transactions between consumers and merchants with end-to-end functionality similar to debit networks in the sense they also withdraw money from the customer's bank account, including authorizing payment from the issuing bank,

[5] Tokenization is the process of replacing the debit credentials, generally the 16-digit number on the debit card, with a unique alternate card number (i.e., a "token"). Visa-branded debit card transactions initiated online or through a mobile app or digital wallet will generally be tokenized.

facilitating communications with the issuing bank to authorize and clear the transaction, and providing settlement services by initiating a payment to the acquiring bank. These alternative debit networks, including Fintech debit, can complete the final transfer of funds with money transfer services available to banks, such as the Automated Clearing House ("ACH") or Real Time Payment ("RTP") networks, which are more affordable than Visa's debit network prices. Though the functionality is similar (including a credential to be used at merchants, payment guarantees, the ability to dispute charges, chargeback capabilities, and fraud protection), these networks are based on Interbank Payment Networks that use bank account credentials, not debit card credentials. That is, they do not use the network Visa has monopolized. They represent a true competitive alternative.

119. Visa knows and is concerned that it may lose its dominant position in the debit market to these alternative debit networks, and with it their supracompetitive profits.

## II. Visa Engages in Exclusionary, Anticompetitive, and Unlawful Conduct to Dominate Debit Transactions in the United States at the Expense of Consumers

120. Visa prevents would-be debit card network competitors from gaining the scale necessary to meaningfully compete. For example, Visa enters into de facto exclusive deals that require merchants and/or their acquiring banks to route available transactions through Visa. Visa simultaneously offers favorable terms to issuing banks to take action that limits merchants' and acquiring banks' ability to route payments to alternative networks, such as PIN networks, by getting them to agree not to enable certain networks or types of transactions. If an issuing bank, acquiring bank, or merchant refuses these

deals, Visa will withdraw these favorable terms and levy heightened fees. These deals ensure more transactions are non-contestable, thereby retaining Visa's dominance and leverage over the market and preventing transactions from being diverted to other, more affordable, networks.

121. Visa also pays off would-be competitors that are based on Interbank Payment Networks, giving them a share of the monopoly profits to not introduce innovations that would compete with Visa's debit network. Like the banks and merchants above, if the would-be competitors refuse to enter deals with terms favorable to Visa, Visa withdraws these shared profits from the mutually-beneficial dealings and punishes them with increased fees.

### A. Visa Contracts with Banks and Merchants to Squelch Competition

122. Visa's control of the relevant markets is not an accident. Visa intentionally and strategically has locked up the debit network business by enticing issuing banks, acquiring banks, and merchants into exclusivity deals that prevent competition.

123. After the Durbin Amendment, which required at least one unaffiliated back-of-card network in an attempt to foster competition, Visa took intentional steps to thwart the threat to its position, including leveraging its power over merchants and banks to enter into routing agreements and volume commitments.

124. For a significant portion of card-present and card-not-present transactions, the transactions are non-contestable and thus the front-of-card network must be used. Even

after the Durbin Amendment, approximately 45% of card-present transactions where Visa is the front-of-card network were non-contestable. This number is even higher for card-not-present transactions on Visa cards. The result is that most debit card transactions in the United States must be processed through Visa's debit network.

125. Visa has significant leverage over issuing banks, acquiring banks, and merchants because the majority of debit transactions must be run on its network. This leverage gives Visa the power to impose volume commitments, which obligate merchants and acquirers to process a significant majority of their transactions over Visa's debit network. If a bank or merchant fails to meet this volume commitment, they are subject to heightened fees. Visa uses two methods to obtain these volume commitments. First, Visa gives issuing banks, acquiring banks, and even some merchants relatively favorable terms in exchange for their exclusivity. Second, unless merchants and acquiring banks agree to these volume commitments, Visa penalizes them with increased rack rates (i.e., list prices), which are separate from the incremental costs for network and interchange fees.

### 1. Visa Imposes Anticompetitive Contracts on Merchants and Acquiring Banks

126. Under the promise of relatively favorable terms for compliance, and under the threat of penalties and fees for non-compliance, Visa induces volume commitments that require merchants and acquiring banks to route most of their transactions over Visa's debit network. In other words, merchants and acquiring banks will face severe penalties on transactions they must process over Visa's debit network if they attempt to route even

a tiny fraction of their transactions over more affordable networks. This prevents non-contestable transactions from becoming contestable and also helps to make contestable transactions non-contestable.

127. Visa has routing agreements with many large merchants and acquiring banks that control merchants' routing decisions that do not have a direct agreement with Visa. These contracts ensure Visa remains the primary debit network for debit transactions. In effect, Visa buys their loyalty, while simultaneously subjecting merchants and acquirers to substantially increased fees if they route too many transactions through more affordable debit networks.

128. For example, Visa structures contracts with merchants as a bid for the top position on the routing table, which is a ranked list that determines the network a transaction will be routed through if available. If Visa does not get the top position, or at least a very high position, it threatens the merchant with high rack rates on all transactions routed to Visa. This is effectively a cliff pricing structure. Cliff pricing, also known as "all unit" pricing, grants the merchant or acquiring bank a lower price for every transaction routed to Visa so long as its total volume satisfies the committed threshold. If the merchant fails to meet the threshold, all transactions are subject to higher penalties.

129. Numerous merchants, transacting hundreds of billions of dollars, have signed agreements with Visa to route 100% of their eligible transactions through Visa's debit network. In 2023, Visa paid one merchant over $20 million for exclusivity.

130. Indeed, many routing contracts include a provision allowing Visa to terminate the entire contract early and claw back prior incentives if the merchant or acquiring bank fails to meet its volume commitment.

131. Poignantly, and because of the number of transactions that must be processed through Visa's debit network, paying the supracompetitive rack rates offsets any potential savings a merchant might obtain from running transactions through more affordable debit networks. Indeed, to technically compete, many debit networks would have to offer their services completely free to make sense for a merchant to pay the supracompetitive prices associated with not accepting Visa's terms.

132. Moreover, some acquirer processors that operate would-be competitor PIN networks have entered into exclusive routing agreements with Visa. To entice these agreements, Visa offers monetary incentives in exchange for volume commitments. These payments also disincentivize the would-be competitor from even trying to compete for additional transactions.

133. As a result, PIN networks or other competitors can only meaningfully compete with Visa if they (1) offer a cheaper price than Visa, and (2) offset the penalties imposed on merchants and/or acquiring banks for not entering into volume commitments with Visa. In most cases, however, the services must be free, or even include the debit network paying the merchant, to offset the severe penalties Visa will impose.

134. These barriers to entry mean Visa faces minimal competition and can impose supracompetitive fees without recourse. In fact, if Visa lowered its fees, it would lose its leverage over the debit network market.

135. Further, Visa prices its other products, such as credit transactions, off a merchant's debit volume. For example, to secure a significant volume of business from Google and thwart any competition over the transaction, Visa offered Google credit incentives. Visa used similar credit incentives with a health food supermarket chain. Accordingly, even large merchants with more negotiating power are prevented from refusing Visa's anticompetitive deals because doing so will mean higher fees on non-contestable debit and credit transactions processed on Visa's network. Notably, many alternative networks, like PIN networks, have no credit businesses, thereby further limiting their ability to compete.

136. Visa has also introduced additional fees, which it will waive in exchange for volume commitments, to further pressure merchants and acquirers into accepting volume commitments by offering favorable terms in exchange for compliance. These include FANF, a fixed monthly fee imposed on merchants facilitated through acquiring banks that is charged on top of the per-transaction fees. Since the Durbin Amendment in 2010, Visa has increased the FANF twice.

137. Visa, through these contracts and practices, artificially increases the cost merchants will incur on Visa transactions if they route transactions to non-Visa debit

networks. At bottom, Visa does not compete for business but instead uses various mechanisms and threats to prevent competition, retain its market dominance, and impose supracompetitive fees without the fear of recourse or competition.

### 2. Visa Leverages Anticompetitive Contracts on Issuing Banks

138. The Durbin Amendment requires at least one unaffiliated back-of-card network to be enabled but does not place a ceiling on the number of additional networks so enabled. Rather, issuing banks could enable a number of additional networks, thereby giving merchants additional choices and increasing competition. Visa prevents such a result by leveraging its monopoly power over issuing banks.

139. For example, Visa's contract with JPMorgan Chase requires that 90% of Chase-issued Visa debit cards only enable one unaffiliated back-of-card network. Similarly, in 2023, Visa contracted with one of its largest Fintech debit customers to require that only one unaffiliated network be enabled on all debit cards from issuing banks. Visa's issuer contracts regularly require the issuing bank to maintain its annual growth of Visa debit transactions in proportion with Visa's overall debit growth in the United States. These provisions guarantee that Visa does not lose market share over debit transactions.

140. Visa enforces these contracts with promises of favorable terms for compliance, and threats of severe penalties for non-compliance, including cliff pricing, similar to its contracts with merchants and acquirers. For example, if an issuer fails to maintain proportional growth in accordance with the standardized volume requirement

provisions, it can be required to pay an early termination fee equal to a percentage of the benefits it has earned plus a multimillion-dollar fixed fee. Failure to satisfy Visa's volume commitments gives Visa the right to impose penalties across all Visa debit transactions.

141. These contracts incentivize issuing banks to limit the number of additional networks enabled on debit cards. Indeed, a 2020 contract between Visa and an issuing bank was specifically designed to prevent competition from PIN-less networks or Real Time Payment by forcing the issuer to dump the networks if too much volume was being diverted away from Visa.

142. Visa also uses incremental debit incentive deals to prevent large issuers from enabling PIN-less networks for face-to-face transactions. Smaller issuers rely on their issuer processors to make network selections, so Visa imposes agreements designed to discourage PIN-less networks from being enabled.

143. Visa's contracts with issuers protect its non-contestable transactions and reinforce the protections created by its contracts with merchants and acquiring banks. Because only enabled networks can be used to complete a transaction, Visa is able to maintain its dominance (processing over 70% of all debit transactions) by preventing issuers (and merchants or acquirers) from enabling additional networks. Indeed, less enabled networks means additional volume for Visa. This loop ensures Visa maintains and increases its leverage and market dominance.

144. Like the tactics Visa used to secure merchant routing volume, Visa will also leverage discounts on its other products, like its Debit Processing Servicers, to win additional issuer routing volume. Visa packages card-branded issuance contracts with its DPS processing services to win business from large banks.

**3. Visa Successfully Undermined the Purpose of the Durbin Amendment and Maintained its Monopoly Power**

145. The Durbin Amendment was intended to boost competition in the debit network space; thereby reducing the monopoly power of Visa. The Durbin Amendment initially made a small impact and reduced Visa's market share; however, the success of the amendment was short lived, and through its anticompetitive campaign Visa has actually increased its market share in the 14 years since the Durbin Amendment was passed. Indeed, Visa itself recognizes that it continues to dominate the market despite other networks offering better prices.

146. After the Durbin Amendment was passed, many debit networks attempted to challenge Visa's monopoly position. Visa fought back these attempts by leveraging its monopoly power and volume of non-contestable transactions against issuers, merchants, and acquirers, threatening them with punishment if they entertained an alternative debit network. This forced loyalty has hindered competition at the expense of consumers.

147. Visa also undertook a relentless campaign of locking up entities that control routing decisions and by entering into exclusivity agreements. Today, Visa has exclusive routing agreements with over 180 of its largest merchants and acquirers. These contracts

cover over 75% of Visa's debit volume, effectively 45% of all debit volume in the United States. These contracts foreclose meaningful competition because of the network effects; issuers, merchants, and acquirers are unlikely to enable or accept additional networks because they do not have the requisite scale.

148. Visa deployed similar strategies in response to Regulation II, the Federal Reserve's October 2022 rules clarifying the provisions of the Durbin Amendment. Ahead of Regulation II, Visa endeavored to obtain additional volume commitments and exclusivity deals, obtain more impactful early termination fees and penalties, and renew its agreements. In other words, Visa locked up as much volume as possible to reduce the impact of Regulation II and stifle any potential competition.

#### 4. Visa Forecloses Competition by Creating Artificial Barriers to Entry

149. Visa is already in control of both sides of a debit transaction (i.e., consumers and issuing banks on one side, and merchants and acquiring banks on the other). Locking up both sides with anticompetitive contracts prevents additional competitors from gaining scale—an already difficult task because of network effects. This ensures Visa faces no real competition for market share from would-be competing debit card networks.

150. On the issuing side, Visa incentivizes banks to provide the least amount of non-Visa networks and routing options. With fewer non-Visa networks available, merchants and acquiring banks are less likely to accept non-Visa debit card networks, because doing so would be more expensive and less beneficial. New networks thus cannot gain scale.

151. For smaller networks, such as PIN networks, to compete, they would have to provide services at a sufficiently below-market price to compensate for the penalties and punishment the merchants, acquirers, and issuers would face from Visa. Such prices would often require negative prices (i.e., the network paying the banks or merchants).

152. Accordingly, competing with Visa is a herculean, if not impossible, task for smaller networks. This is true despite PIN networks generally offering lower prices and innovative technologies and services that would, in a free and competitive environment, compete with Visa.

153. As a result, 14 years after the Durbin Amendment, PIN networks collectively process only 11% of all debit transactions in the United States and only 5% of card-not-present transactions. Not a single PIN network has more than single-digit market share. Indeed, Visa's anticompetitive conduct has made any attempt at competition futile.

154. Smaller networks are further disadvantaged because they cannot offer comparable fraud protections, which require a critical mass of transaction data to reliably detect and/or prevent. This further solidifies Visa's dominance. To be sure, Visa itself recognizes that it continues to win market share despite not offering the lowest prices.

155. The impact of this is two-fold. Not only is Visa insulated from competition, but the lack of competition means Visa can keep most transactions non-contestable and also make previously contestable transactions non-contestable; thereby further increasing its leverage and preventing competition. For example, in 2023, less than half of total United

States debit volume was processed as card-present PIN-less transactions. As a result, many merchants didn't enable these transactions. However, Visa feared that widespread enablement was imminent if a large issuer enabled PIN-less transactions. Visa took affirmative steps to foreclose such a result.

156. JPMorgan Chase, which issues Visa-branded debit card with Mastercard's Maestro as its back of card network, requested relief from its contract with Visa to add Discover's Pulse network as a back-of-card network to comply with Regulation II. Pulse, unlike Maestro, offered card-present and card-not-present PIN-less transactions. Visa granted Chase a short-term waiver but required Chase to sign a new routing agreement.

## B. Visa Leverages its Monopoly Power to Foreclose Alternative Networks

157. Fintech debit networks allow consumers to purchase goods and services on debit using their bank account number, rather than their debit card. Fintech networks use Interbank Payment networks rather than debit card networks monopolized by Visa to process the transaction. These Fintech networks can take different forms, including for example the digital wallet, a software-based product that stores the consumer's debit

**Figure 3**




**Figure 4**

information. Apple Pay, PayPal, and Google Pay are well-known examples of digital wallets. Fintech networks have already seen success in other parts of the world. Figure 4 below demonstrates how these Fintech networks operate and can replace Visa.

158. Recognizing the threat Fintech networks have on its business, Visa has taken affirmative steps to squash their potential in the United States and thereby retain its market dominance and power.

159. Fintech networks' failure to gain a footing in the United States market is not the result of competition, and instead Visa's leveraging of market power. Anytime new or innovative technologies emerge, Visa buys the competition rather than competing.

160. Because monopoly profits greatly exceed the sum of competitors' profits, Visa can profitably share its monopoly profits in exchange for protections against disintermediation, to the mutual benefit of Visa and the would-be competitor, and to the detriment of merchants and consumers. The contracts with Fintech firms that specify the shared profits gained by these mutually beneficial dealings also specify the withdrawal of those profits if competition actually occurs, and specifies additional penalties as well. This is the flip side of the same coin: withdrawal of benefits and penalties for non-compliance ensures compliance and keeps the dealings mutually beneficial. For Visa's largest and powerful merchants, Visa exchanges its monopoly profits in exchange for disintermediation and non-discrimination protections, non-disparagement, and future

commitments. By Visa's own admission, these contracts are unrelated to routing and are often uneconomical.

**1. Fintech Networks Threaten to Disintermediate Visa's Debit Network**

161. Fintech networks can effectively provide every service Visa's networks provide, including authorizing payments, clearing and settling transactions, providing payment guarantees, protecting against fraud, and offering chargeback services. Accordingly, Fintech networks are viable alternatives to Visa's business, and recent innovations only exacerbate this threat.

162. Indeed, alternative payment rails that provide real-time money transfers and that do not rely at all on Visa's debit card network are becoming increasingly available, and Fintech networks have built on the rails such that they are now viable, would-be, competitors of Visa. Specifically, Fintech networks are a threat to Visa's lucrative dominance of card-not-present transactions because they can offer direct mobile transfers.

163. These Fintech networks can be integrated and used by banks, payment processors, and other firms who can build connections between issuing banks and merchants. Visa is concerned these Fintech networks will become a viable debit substitute and develop into widespread alternatives that allow consumers to transfer funds directly from their bank accounts and thereby entirely displace Visa's debit network services. This

has not happened because Visa has shared its monopoly profits with these would-be competitors to thwart that competition.

164. Bank transfers via ACH have been in use for decades. These services typically take several days to process, and even longer for the funds to become available for consumers to spend. However, recent innovations building on ACH have developed RTP as a more efficient payment transfer. For example, The Clearing House launched RTP network, a payment network that allows for immediate clearance and settlement of transactions. Similarly, the Federal Reserve recently, in 2023, launched FedNow, which provides instant payment services between depository institutions. While few digital wallets have incorporated RTP or similar networks, as these technologies continue to improve, and more banks begin to integrate them, the opportunity for more efficient payment networks than Visa's debit network becomes a reality.

165. Digital wallets come in two primary forms: staged wallets (also called "stored value wallets") and pass-through wallets. Staged wallets allow consumers to make purchases from funds stored in the wallet. Consumers can preload their staged wallet with funds, or transfer funds into the wallet through a linked bank account. PayPal and Cash App are well-known examples of staged wallets. Pass-through wallets, on the other hand, transmit the consumer's payment information directly to the merchant's acquiring bank. The acquiring bank then processes the transaction similar to a traditional debit card

transaction. Apple Pay and Google Pay are well-known examples of pass-through wallets.

166. Like debit networks, digital wallets require scale on both sides of the market to be successful. However, digital wallets can achieve this scale, and thus pose a particular threat to Visa.

167. Visa is well aware of the risk digital wallets pose to its business. Indeed, Visa knew Apple had engaged in discussions with a large issuing bank about creating a new debit network without Visa or Mastercard.

### 2. Visa Leveraged its Monopoly Power to Prevent Disintermediation with Staged Digital Wallets

168. Since at least 2016, Visa has used the carrot and stick method—threatening exorbitant staged wallet fees—to convince other entities into signing deals. Visa views these fees as, essentially, a loyalty fee. If the entity behaves, Visa waives the fee. If the entity gets out of line (i.e., potentially disintermediate Visa), Visa imposes substantial fees that make business less profitable.

169. For example, a Visa executive identified PayPal as the only major entity to successfully disintermediate Visa in the United States. This success was short lived, however, as Visa imposed a massive deal with PayPal in 2016 with its routine carrot or stick offer: threatening high fees or a share of the monopoly profits if PayPal diverted its transaction volume back to Visa's network.

170. In the 2000's and into the early 2010's, PayPal began to see success as a form of online payment. In fact, Visa initially welcomed PayPal's success because PayPal customers were using Visa debit cards to pay for their online transactions.

171. Visa's outlook on PayPal changed in 2015, however, after PayPal split from its former owner eBay and began encouraging consumers to pay through their bank accounts rather than with debit or credit cards.

172. PayPal is a staged wallet, and thus consumers preload or transfer funds into their wallets from a linked account. Transactions are then processed using ACH, which offers many of the same benefits of debit networks. These transactions thus threatened Visa's market dominance because they could be processed without Visa's involvement.

173. While PayPal was encouraging more staged wallet use, many consumers still used their debit cards to process transactions. Visa accordingly threatened to penalize PayPal with high transaction fees unless PayPal agreed to an expansive routing contract. PayPal ultimately agreed in order to avoid absorbing the increased fees and potentially lose a vast number of customers (and their resultant revenue) who were using Visa branded cards.

174. Visa simultaneously thwarted PayPal's attempts to partner with brick-and-mortar merchants by restricting ACH transactions for all consumers who had Visa-branded cards in their PayPal wallets.

175. While Visa reeled back these restrictions in 2021, it continued to require information sharing, which it uses to monitor PayPal's product performance. Further, Visa restricts consumers' ability to use PayPal's in-store ACH option by requiring them to first scan a merchant's QR code and then connect to PayPal to approve the transaction. These additional steps deter consumers from utilizing PayPal as an in-store Visa alternative.

176. Indeed, Visa has been successful in deterring consumers from utilizing PayPal as an alternative to Visa. Visa was successful in locking PayPal in to a new 10-year contract in 2022 that requires PayPal to route 100% of its Visa-eligible volume to Visa from years four to ten, and includes penalties for failing to convert its co-branded debit cards to Visa, requirements to participate in Visa's programs and services, and preservation of most of Visa's "customer choice" provisions, which give Visa preference over other competitors.

177. Similarly, Visa has entered several contracts with Square that prevent Square from meaningfully competing with Visa, including preventing Square from innovating alternative networks that would threaten Visa's dominance.

178. For example, in 2013, Square launched Square Cash (now known as Cash App) that allows for person-to-person payments. Square wished to avoid additional Visa fees so that it could facilitate these payments with debit cards, but Visa was concerned Square was going to build an ACH option that would threaten Visa's debit volume. To squash this threat, Visa offered to waive its high rack rates in exchange for the right to terminate

should Square get out of line (i.e., compete and threaten Visa's dominance). In effect, the contract gave Visa a debit routing commitment and protection from ACH's threat of disintermediation.

179. In 2016, after Square innovated and announced its new product "Cash Drawer," which allowed users to store funds in their Square Cash account, Visa acted quickly to nullify the threat. Specifically, Visa threatened to terminate its agreement with Square, claiming the new product was antithetical to their collective goals. Faced with the threat of substantial fees and penalties, and likely the loss of its profit from the new product, Square rescinded its product and removed the feature. In exchange, Visa did not terminate its contract.

180. In 2021, Square launched Cash App Pay, which allows consumers to purchase directly from merchants with Cash App. Square requested Visa waive the staged wallet fees, but Visa saw the threat Cash App Pay posed towards its business. Following suit, Visa leveraged high fees to nullify the threat, and in 2023 Square agreed to send 97% of Cash App Pay transactions over Visa's network in order to preserve its profits from Cash App Pay. The agreement also required Cash App Pay to prefer Visa in the signup process and not encourage ACH.

181. All of these agreements with Fintech firms share a key feature: Visa has an enormous incentive to prevent the emergence of a real alternative to the debit card network that it has monopolized, and it has the incentive and ability to pay off would-be

competitors to prevent them from competing, and to withdraw those payments and add penalties if they do try to compete.

### 3. Visa Pays-Off Potential Competitors with Monopoly Profits to Prevent Competition

182. Visa's dominance allows it to prevent competition from other potential competitors who do not operate staged wallets. Many potential competitors, such as Google and Apple, are Visa customers. Accordingly, Visa can use its typical anticompetitive playbook of either high rack rates, fees, and penalties or sharing its monopoly profits to prevent competition and protect its supracompetitive profits.

183. For the most powerful players, Visa creates custom packages that exchange incentive arrangements on Visa-eligible debit transactions non-disintermediation and agreements not to compete. These are effectively horizontal product market agreements. In fact, Visa knows that these arrangements are often not focused on routing, such as with Amazon and Apple. These agreements may result in Visa making less money, but Visa is happy to enter them because they protect Visa's ability to continuously reap supracompetitive profits. As a result, Visa retains dominance of Big Tech companies', such as Google and Apple, debit acceptance and online transactions.

184. Visa's deals with Apple are a prime example. Apple has agreed to neither innovate nor launch any payment product with the intent of competing with Visa. This includes developing a functionality that utilizes non-Visa processes or products. The agreement also provides that Apple will not incentivize the use of non-Visa cards or

disintermediate Visa. In exchange, Visa shares its monopoly profits with Apple: in 2023 alone, Visa paid Apple hundreds of millions of dollars. Visa also reduces Apple's merchant fees in exchange for Apple's promise to not steer customers to alternative payment methods like ACH or introduce other alternatives that will disintermediate Visa. This arrangement ensures Visa's retention of Apple's debit volume and keeps Apple as a non-competitor.

185. In 2022, Visa became concerned its relationship was going to reach a tipping point as Apple was creating new inroads into the traditional debit network market. Due to Apple's, and specifically Apple Pay's, existential threat to Visa's dominance, Visa opted to align its strategies with Apple and offer massive payments and financial incentives to ensure Apple does not become a true competitor.

**4. Visa Prevents Competition from Next-Generation Fintech Competitors**

186. In addition to digital wallets and other transactions, Visa has sought to stymie and thwart competition from next-generation competitors who might otherwise fundamentally alter debit transactions in the United States.

187. For example, Plaid emerged as a potential competitor to Visa in the online segment of the domestic debit network market through its innovative "pay-by-bank" debit transaction-facilitating service. Through this service, Plaid was poised to overcome some of the barriers to entry of the debit card network by allowing Fintech apps to directly interface with consumers' financial accounts. Although Plaid provides a number

of applications, including, but not limited to, fraud prevention through personal financial information identification and verification, critically, Plaid provides a direct connection between consumers and their bank accounts. Through this connection, Plaid could facilitate an "end-to-end" or "pay-by-bank" debit transaction that would not require Visa's debit transaction services. In other words, Plaid was a true existential threat to Visa. Indeed, Plaid reaches tens of thousands of U.S. financial institutions and millions of consumer bank accounts.

188. The introduction of Plaid's "pay-by-bank" system would have provided an alternative debit transaction network and led to increased competition and cost savings to merchants and consumers.

189. Rather than working to, for example, develop its own "pay-by-bank" system to potentially compete with Plaid or otherwise change its offerings, Visa sought to stop Plaid in its tracks by acquiring Plaid for $5.3 billion. Visa became so concerned about this competitive threat that it attempted to buy Plaid for "an unprecedented revenue multiple of over 50X" despite the fact that Visa's leadership believed that it the company "does not hunt on financial grounds."

190. In 2020, the Department of Justice sued to block this proposed transaction and alleged Visa wanted to acquire Plaid as an "insurance policy" as part of a "strategic, not financial" move to protect its United States monopoly.

191. When government opposition forced Visa to drop its planned acquisition, Visa resorted to a "partnership" with Plaid to sideline the threat from its new technology.

### III. Anticompetitive Effects

192. Visa has maintained its monopoly power through years of anticompetitive and unlawful behavior, including imposing exclusionary and anticompetitive contracts on issuers, acquirers, merchants, would-be competitors, and other industry participants by leveraging its non-contestable transactions, high rack rates, penalties, and fees. Visa's conduct prevents competition for transactions that would otherwise be contested and stymies competition for non-contestable transactions before it can arise.

193. But for Visa's conduct, PIN debit card networks, Fintech networks, and other entities would have the opportunity to gain the necessary scale to meaningfully compete for transactions on the merits. This would mean more choices, superior features, and better prices. Visa's conduct, however, has stifled competition from current and would-be competitors, thereby causing higher fees and inferior services.

194. Visa's stranglehold entrenches its monopoly power by creating more non-contestable transactions. Visa's volume commitments restrict competitors from attaining the necessary scale. Without the necessary scale, potential competitors are unable to compete on price or quality. Further, Visa's commitments severely punish disloyalty, which effectively prevents merchants from ever using another network. Indeed, rival networks receive less volume if they reduce prices or develop new features or services.

As a result, actual and potential competitors are artificially capped by Visa, thereby protecting Visa's power and solidifying otherwise contestable transactions as its own.

195. Visa's leverage also punishes innovation, restricting the volume that rival networks receive or outright punishing them if they attempt to develop networks or network alternatives that could threaten Visa's dominance. As a result, innovation that would have otherwise benefitted consumers is hindered, and Visa has no motivation to innovate. Indeed, Visa itself admits that it has not significantly invested in innovation over the past decade aside from tokenization.

196. The success of Visa's anticompetitive conduct is reflected in its control of the market. By the end of 2022, Visa calculated that at least 75% of all its debit volume, and 80% of its card-not-present debit volume, were insulated from competition. Moreover, Visa's routing agreements with merchants and acquirers alone foreclose 45% of all United States debit volume; this figure is even higher for card-not-present transactions.

197. At the expense of consumers, Visa has taken affirmative, intentional efforts to constrain the vigorous competition that would act as a check on its prices and stimulate innovation. Competition, not Visa, should control how consumers, merchants, and their respective banks interact. Competition, not Visa, should govern innovation in the debit network marketplace. Most importantly, competition, not Visa, should set the fees charged for network services, of which consumers bear the highest burden.

198. Network fees are one of the highest costs of doing business for merchants. Oftentimes, network fees are a merchants' third biggest expenses behind only labor and rent. Swipe fees, thus, must be passed onto consumers.

199. For many merchants, such as gas stations, convenience stores, grocers, and other food retailers, margins are in the single digits. These margins are around or below the level of debit network fees the businesses must pay; thus, merchants must pass on their debit network fees to consumers or else go out of business.

200. Consumers are unable to avoid this pass-through. Every time a consumer makes a purchase, whether by debit, credit, or cash, they are subsidizing the supracompetitive network fees imposed by Visa.

**IV. No Countervailing Factors**

201. Visa's exclusionary, unlawful, and anticompetitive behavior lacks any legitimate, procompetitive advantages that could outweigh the harm it inflicts on competition. Nor are there benefits that could not be realized through less restrictive means. The anticompetitive clauses in Visa's contracts and related actions are not essential to safeguard its technology, promote customer expansion, deter free-riding, or accomplish any other purported advantage. Visa could pursue any valid procompetitive goals without resorting to the restrictive terms being contested in this case; in fact, less restrictive methods are available to Visa to achieve those goals. Further, Visa's agreements with existing and potential direct competitors do not function as mere

adjuncts to its vertical relationships; instead, they act as clear divisions within the relevant markets among direct competitors.

## V. Relevant U.S. Debit Markets

202. Courts define a relevant market, which has both a geographic and product market dimension, to help identify the lines of commerce and areas of competition impacted by alleged anticompetitive conduct. There can be multiple relevant markets covering the same or similar products and services, and markets need not have strict boundaries.

203. Here, there are two relevant markets: (1) the market for general purpose debit network services within the United States, and (2) the narrower sub-market for card-not-present debit network services.

### A. The United States is a Relevant Geographic Market

204. The United States is a relevant geographic market. Federal laws and regulations governing debit transactions, including card-not-present transactions, apply nationwide. Visa structures its U.S. debit network services market accordingly, as seen in its distinct rules for merchant acceptance in the U.S. and its unique pricing for debit services, including card-not-present transactions, tailored for merchants, acquirers, and issuers in the country. Network services outside the United States are not viable alternatives to the primary market participants, including consumers, issuers, acquirers, and merchants. As a result, a company serving as the sole provider of general purpose debit network

services or card-not-present debit network services within the United States would have the power to sustain prices above those typical in a competitive market.

### B. Relevant Product Markets

205. To determine which products are sufficiently substitutable for each other to merit inclusion in the product market, the logic of the Hypothetical Monopolist Test is applied. Specifically, the question is whether a hypothetical monopolist that controlled all of the products in a putative market would be able to increase prices by some pre-specified amount beyond what would have prevailed under competition.

#### 1. General Purpose Debit Network Services Market

206. General purpose debit network services are products and services that facilitate the debit and transfer of consumers' bank account funds, typically using a credential or other account number to identify the consumer. Visa and other debit card network competitors provide products and services that are inputs to and that enable debit transactions. They compete to provide debit network services for general purposes, meaning that their debit credentials are accepted at numerous, unrelated merchants. Debit network providers, such as Visa, sell their services to both issuers and acquirers, or in the case of some alternative debit networks, to consumers and merchants. Debit network providers operate two-sided transaction platforms that facilitate the transactions between consumers and merchants, and their respective banks. These services represent a relevant product market.

207. Debit networks, like Visa, provide a host of services that enable debit transactions; collectively, these services constitute a market that is jointly used by consumers and merchants, and their respective banks, to engage in commerce. These services include the ability for the consumer to dispute and chargeback a transaction; payment guarantees for merchants; fraud protection; as well as the "rail" or methods the parties to a transaction use to communicate and facilitate the debit and transfer of a consumer's funds to the merchant. These minimum attributes of debit are important to consumers, merchants, and their respective banks alike and distinguish debit transactions from other methods of payment. While consumers do not contract directly with Visa, consumers (and their respective banks) rely on Visa and other networks to make it possible for them to purchase goods and services.

208. Debit networks are a two-sided platform that exhibit a high degree of interdependency between consumers (and the issuing banks) on one side, and merchants (and the acquiring banks) on the other. Consumers get more value from a network that connects to more merchants because that increases whom and where they may purchase goods and services from. Likewise, merchants get more value from a network that connects to more consumers because that increases the number of persons they may sell their goods and services to.

209. General purpose debit network services are a relevant product market under the antitrust laws. Consumers do not treat other payment services as a viable alternative to

debit. Likewise, interbank payment networks provide a means of transferring funds between banks but are not used for routine consumer purchases, and pose no existing threat of being so used, and thus are not a reasonable substitute for general purpose debit networks. As a result, issuing banks do not consider alternative payment services to be a viable alternative to debit because consumers value debit; merchants do not consider alternative payment services to be a viable alternative because they do not want to lose sales by not accepting consumers' preferred payment methods; and acquiring banks do not consider alternative payment services to be a viable alternative because they do not want to lose their business with merchants. Thus, there are not reasonable substitutes for general purpose debit network services, and a firm that was the only seller of general purpose debit network services would be able to maintain prices above the level that would prevail in a competitive market.

210. The general purpose debit network services market includes the services sold by debit networks other than traditional debit card networks. For example, Fintech debit networks can be accepted by all merchants that participate in the network and provide payment guarantees, chargeback and dispute services, and fraud protection. While debit transactions facilitated by Fintech networks do not include a debit card issued to a consumer, the services provided by Fintech debit networks are functionally equivalent to consumers and merchants and further present an existing threat as a payment network that can be used for routine consumer purchases.

211. General purpose credit card network services are not a reasonable alternative or interchangeable with debit network services because debit transactions withdraw funds directly from the consumer's account, unlike credit transactions that draw from a line of credit. Visa described debit as a "pay now" product, and credit as a "pay later" product. The distinction between the two forms of payment is widely recognized and accepted in the industry. Indeed, Visa and other debit/credit networks offer different pricing for debit and credit transactions. Further, regulations, such as the Durbin Amendment's limitations of issuer transaction fees do not apply to credit. Many consumers either do not qualify for credit cards or strongly prefer using their existing funds over incurring debt, making issuers unlikely to substitute credit for debit.

212. Interbank Payment Networks are not included in the market. It is true that these networks, like a debit card (or an e-wallet loaded with a debit card), can be used to transfer funds from one bank account to another. The reason why these networks are not close substitutes for a debit card network is that they are not usable for routine purchases; one can not go into the supermarket and pay via an Interbank Payment Network.

213. While Interbank Payment Networks are not included in the market, Fintech payment networks that are based on them are included. The reason is that even though Interbank Payment Networks cannot be used for routine purchases today, a Fintech product based on that network could be used for routine purchases, which would make it a close substitute for debit card networks. Such alternative networks exist in other

countries, and if they were to become widespread in the U.S., they would be a huge competitive threat to Visa, and attempts to thwart that development are at the heart of Visa's anticompetitive conduct. Conceptually, these products merit inclusion in the market, but they have minimal share because of Visa's largely successful anticompetitive efforts to prevent their emergence.

### 2. General Purposes Card-Not-Present Network Services Market

214. While general purpose debit network services cover all debit transactions, narrow submarkets within this category exist. One such submarket, recognized by Visa itself, is the general purpose card-not-present debit network services market, which primarily relates to e-commerce.

215. This market includes both traditional debit card and Fintech debit transactions, enabling consumers to pay various merchants for goods and services directly from their bank account.

216. General purpose card-not-present debit network services is a relevant product market under the antitrust laws. Market participants do not find other payment services to be a reasonable substitute for card-not-present debit. To be sure, there are particularly few potential alternatives to card-not-present debit transactions, given that cash is not an option for online, e-commerce, or other card-not-present situations. There are not reasonable substitutes for card-not-present debit transactions. A firm that was the only

provider of general purpose card-not-present debit network services could raise and maintain prices above the level that would apply in a competitive market.

## VI. Visa Has Monopoly Power in the U.S. Debit Markets

217. Visa holds monopoly power in the general purpose debit network services market and the general purpose card-not-present network services market in the United States, with market shares exceeding 60% and 65%, respectively, based on payment volume. The next largest debit provider, Mastercard, pales in comparison with less than 25% of the payment volume in either market. No other network services provider for either market captures more than a single-digit percentage of debit volume.

218. Visa has maintained its monopoly profits through its ability to manipulate prices and suppress competition. Visa's operating margins in North America are a whopping 83%, which is driven primarily by its United States debit business. Visa's profit margins substantially exceed most other publicly traded companies and are growing.

219. Visa has effectively blocked competition in both debit markets, as evidenced by its consistently high market shares. While Visa saw a brief market share reduction in 2011 (to 63%) and 2012 (to 56%) immediately following the Durbin Amendment, Visa's countermeasures ensured it quickly rebounded, and Visa has consistently grown its market share over the past decade. For example, in preparing for the Durbin Amendment to go into effect, Visa signed contracts with merchants and acquirers, ensuring that almost all of their Visa-eligible volume would be routed to Visa. Since the Durbin Amendment,

Visa has used similar tactics, as well as other strategies like leveraging its market share and threatening fees and penalties to maintain, protect, and build its empire.

220. Despite recent clarifications from the Federal Reserve under Regulation II requiring issuing banks to enable at least one back-of-card network unaffiliated with the front-of-card network for card-not-present transactions, Visa's market share was unaffected.

221. In addition to high profit margins and sustained market share, other factors confirm Visa's monopoly power in the relevant debit markets.

222. In contrast with smaller PIN networks, Visa is accepted by nearly every U.S. merchant that processes debit payments, regardless of whether the majority of their revenue comes from card-present or card-not-present transactions. No matter which debit cards consumers use, merchants consider Visa indispensable and accept its network to maximize their sales opportunities. Visa accordingly has significant leverage over merchants; merchants cannot simply abandon Visa when faced with price hikes or unfavorable terms. Instead, they must accept them and cover the additional costs by raising the prices consumers pay for their goods and services. Additionally, debit networks face barriers to entering and growing their business in the market, including regulation and brand recognition.

223. Merchants and acquiring banks are more inclined to absorb and pass-on the costs of enabling and complying with networks that handle a large enough volume to justify

the costs. Losing some potential sales because of price hikes is preferred over losing an entire population of consumers who rely on Visa-branded debit cards to make their purchases. Likewise, issuers prefer to enable networks widely accepted by merchants because that increases consumers' options and makes their bank more appealing. Visa knows that smaller, rival networks lack the necessary scale on both sides of the market. The market's two-sided structure makes it difficult to gain widespread enablement without already having broad acceptance, creating the network effects feedback loop outlined above, which is a significant barrier to entry and growth in the market.

224. Issuing banks typically offer only one front-of-card network, which usually includes a long-term contract with the network provider (most commonly Visa, but also Mastercard). Issuing banks rarely switch front-of-card networks because the process is costly, difficult, and can cause a negative consumer experience. This further solidifies Visa's dominance, limiting Mastercard's and other potential front-of-card network competitors from entering, expanding, or competing in the market.

225. Visa recognizes and exploits these barriers, including switching costs and network effects, to retain its market dominance and stifle would-be competitors that could disrupt their monopolistic position. For example, in 2023, Visa threatened issuers with financial penalties if they enabled new features from competing PIN networks that led to a reduction in Visa's debit network volume. Around this time, Federal Reserve regulations required issuers to enable at least two unaffiliated networks for card-not-

present transactions. Previously, issuers had relied solely on the front-of-card network (e.g., Visa) to process these transactions. In response to the threat of merchants and acquiring banks adopting their rivals' PIN-less capabilities, Visa urged – with an accompanying clarification that the failure to listen would result in higher fees and penalties – issuing banks to disable PIN-less functions for card-present transactions. These penalties would act as an indirect price increase for issuers, one they could not easily avoid due to the costs associated with switching the front-of-card network. This tactic allows Visa to expand the volume of non-contestable transactions, furthering its leverage over market participants.

226. Visa has the power to set prices without concern over actual costs. Further, Visa engages in price discrimination across different industry sectors, offering pricing differences unrelated to the costs of providing services.

227. Visa has also been able to introduce new, less favorable pricing models without losing debit volume. For example, in 2012, Visa launched its monthly FANF across all merchants and acquirers. Similarly, in October 2023, Visa implemented a mandatory Digital Commerce Service fee, which combined several previously optional value-added service fees into one for card-not-present transactions. Visa projected roughly a five-times boost in network revenue from this mandatory fee in contrast to the revenue earned from the previously optional fees. Despite a major price increase on merchants and acquirers, Visa anticipated no impact on its debit volume. Merchants, and particularly those with

narrow margins, were resultantly forced to roll these new fees into their prices for goods and services. In other words, consumers ultimately paid the price of the fee hikes.

## VII. Equitable Tolling of the Statute of Limitations

228. Generally, consumers are unaware of how, or even that, their money is allocated among merchants, debit networks, processors, and the participating financial institutions. Consumers are equally unaware that as part of that process, and across tens of billions of debit transactions that occur annually, Visa collects a myriad of fees.

229. Plaintiffs had no actual or constructive knowledge of Visa's anticompetitive scheme until, at the earliest, September 24, 2024, when the complaint was filed in *United States of America v. Visa Inc.*, S.D.N.Y. 1:24-cv-07214. Before that, there was insufficient information available to Plaintiffs to suggest that Visa had engaged in anticompetitive conduct to enhance and maintain its debit network monopoly, and thus, they had no duty to inquire into the legality of Visa's conduct.

230. Moreover, even if Plaintiffs had a duty to inquire before September 24, 2024, Plaintiffs could not have discovered through the exercise of reasonable diligence the existence of Visa's competitive scheme as alleged herein before that date.

231. Visa's anticompetitive scheme was self-concealing in that, as alleged herein, Visa entered into and renewed confidential agreements with competitors.

232. Plaintiffs' and Class members' claims were tolled by the discovery rule, the continuing violations doctrine, and fraudulent concealment. Each transaction across a

debit network in which Visa imposed supracompetitive network fees and its renewed agreements with third parties are new overt acts causing injury to Plaintiffs and the Class.

## VIII. Class Allegations

233. Plaintiffs bring Count I individually and on behalf of similarly situated persons under Federal Rule of Civil Procedure 23(a) and (b)(2), as representatives of a Class of cardholders seeking injunctive relief ("**Nationwide Injunctive Relief Class**") defined as:

> Any cardholder in the United States who purchased goods or services with a general purpose Visa-Branded Debit Card[6] during the period from January 1, 2012 through the present and indirectly paid Visa network fees.[7]

234. Plaintiffs bring Counts II-IV individually and on behalf of similarly situated persons under Federal Rule of Civil Procedure 23(a), (b)(3), and/or (c)(5) as

---

[6] "**Visa-Branded Debit Card**" means a Debit Card that bears or uses the name Visa, Plus, Interlink, or any other brand name or mark owned or licensed for use by Visa, or that is issued under any such brand or mark. "**Debit Card**" means any card, plate, or other payment code, device, credential, account, or service, even when no physical card is issued that is used for one or multiple transactions – including, without limitation, a plastic card, a mobile phone or other mobile communications device, a fob, a home assistant or other internet-connected device, or any other current or future code, device, credential, account, or service by which a person can pay for goods or services – that is issued or approved for use through a payment network to debit an asset or deposit account, or that otherwise is not a Credit Card, regardless of whether authentication is based on signature, PIN, or other such means (or no means at all), and regardless of whether or not the issuer holds the account (such as decoupled debit).

[7] Excluded from each of the Classes is Visa Inc., its subsidiaries and affiliates, officers, executives, and employes; Visa's attorneys in this case; federal government entities and instrumentalities, states or other subdivisions; counsel for Plaintiffs and any of their immediate family members; and all judges assigned to this case and any of their immediate family members or members of their respective staffs.

representatives of a Class seeking damages for violations of state antitrust laws ("**State Law Antitrust Damages Class**"), defined as:

> Any cardholder in the United States who purchased goods or services with a general purpose Visa-Branded Debit Card in Arizona, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin from January 1, 2012 through the present.

235. The Classes are so numerous that joinder of all members would be impracticable. While the exact number of Class members is unknown, given the commerce at issue, the prevalence of Visa debit cards, and Visa's significant market share, there are likely millions of Class members.

236. Plaintiffs' claims are typical of those of the Classes.

237. Plaintiffs will fairly and adequately protect and represent the interests of the Classes. The interests of the Plaintiffs are in accordance with those of the Classes.

238. Questions of law and fact common to the members of the Classes will prevail over questions, should they arise, that may be specific to individual Class members because Visa has acted on grounds generally applicable to the Classes.

239. Questions of law and fact common to the Classes include, but are not limited to:

a. Whether Visa intentionally and unlawfully impaired or impeded competition in the relevant market;

b. Whether Visa maintained or enhanced monopoly power in the relevant market;

c. Whether Visa engaged in anticompetitive conduct in order to disadvantage competitors and prevent competition to maintain monopoly power in the relevant market;

d. Whether Visa had monopoly power in the relevant market;

e. Whether Visa had procompetitive reasons for its conduct;

f. The effects of Visa's anticompetitive conduct on network fees, interchange fees, and retail prices;

g. Whether Plaintiffs and Class members have been overcharged and thus damaged as a result of Visa's unlawful behavior;

h. The appropriate declaratory and injunctive relief for the Classes; and

i. The proper measure of damages.

240. Class action treatment is superior to individual actions and the fair and efficient adjudication of the controversy because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the need for unnecessary duplicative efforts and expenses. The benefits of proceeding as a class action, including providing injured persons with a method for obtaining relief for claims that might not be practicable to pursue individually substantially outweighs any difficulties that may arise in connection with managing this class action.

241. Plaintiffs know of no difficulty to be encountered in the maintenance of this action as a class action.

## CAUSES OF ACTION

### COUNT I: VIOLATIONS OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 2
### (On Behalf of the Nationwide Injunctive Relief Class)

242. Plaintiffs incorporate each prior paragraph as if set forth herein.

243. With respect to the two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services, Visa has engaged in unlawful and anticompetitive conduct through entering into unlawful agreements not to compete and unlawful agreements that restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and in a continuing scheme with the purpose and effect of acquiring, enhancing, and maintaining monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and has entered into unlawful agreements in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

244. As a material and proximate result of Visa's unlawful conduct, Plaintiffs suffered injury to their property. These injuries include, but are not limited to, paying Visa's supracompetitive network fees that were passed through into the prices of goods and services. Plaintiffs were also deprived of the benefits of free and open competition.

245. Plaintiffs are threatened with future injury to their property unless Visa is enjoined from further unlawful conduct.

246. Plaintiffs accordingly seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive

market effects caused by Defendant's unlawful conduct and to assure that similar anticompetitive conduct and effects not continue or reoccur in the future.

247.

**COUNT II:
MONOPOLIZATION, ATTEMPTED MONOPOLIZATION, AND/OR CONSPIRACY TO MONOPOLIZE IN VIOLATION OF STATE ANTITRUST LAWS
(On Behalf of the State Law Antitrust Damages Class)**

248. Plaintiffs incorporate each prior paragraph as if set forth herein.

249. Plaintiffs, on behalf of themselves and members of the State Law Antitrust Damages Class, plead causes of action for monopolization, attempted monopolization, and/or conspiracy to monopolize under the below enumerated state laws.

250. Visa's monopolistic and anticompetitive conduct alleged herein substantially affected trade and commerce of the United States and of each State under which Plaintiffs bring a cause of action.

251. Visa intentionally and wrongfully maintained, attempted to maintain, and/or conspired to maintain monopoly power in the relevant markets.

252. Plaintiffs and the State Law Antitrust Damages Class members have been injured by Visa's unlawful conduct by, *inter alia*, paying higher fees than they would have absent Visa's anticompetitive and monopolistic actions, including, but not limited to, raising barriers to competition from actual and potential competitors, imposing supracompetitive prices, stabilizing those prices, limited price competition, restricting output, and limiting innovation.

253. Plaintiffs and the State Law Antitrust Damages Class members have been injured in each state under which Plaintiffs bring a cause of action.

254. Plaintiffs have provided contemporaneous notice to the attorneys general of the following states in filing this Complaint: Arizona, California, Connecticut, Hawaii, Kansas, Minnesota, Nevada, New York, Rhode Island, Utah, West Virginia, and Wisconsin.

255. By engaging in the foregoing conduct, Visa intentionally and wrongfully monopolized, attempted to monopolize, and/or conspired to monopolize the relevant markets in the violation of the following state antitrust laws:

a. Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases of goods and services in Arizona by Class members and/or Arizona residents.

b. Intentionally Left Blank.

c. Cal. Bus. & Prof. Code §§ 16700, *et seq.*, with respect to purchases of goods and services in California by Class members and/or California residents.

d. Colo. Rev. Stat. §§ 6-4-104, *et seq.*, with respect to purchases of goods and services in Colorado by Class members and/or Colorado residents.

e. Conn. Gen. Stat. §§ 35-24, *et seq.*, with respect to purchases of goods and services in Connecticut by Class members and/or Connecticut residents.

f. 6 DE Code §§ 2101, *et seq*., with respect to purchases of goods and services in Delaware for Class members and/or Delaware residents.

g. D.C. Code §§ 28-4501, *et seq.*, with respect to purchases of goods and services in the District of Columbia by Class members and/or District of Columbia residents.

h. Haw. Rev. Stat §§ 480-1, *et seq.*, with respect to purchases of goods and services in Hawaii by Class members and/or Hawaii residents.

i. Iowa Code §§ 553.1, *et seq.*, with respect to purchases of goods and services in Iowa by Class members and/or Iowa residents.

j. Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of goods and services in Kansas by Class members and/or Kansas residents.

k. Me. Rev. Stat. Ann. Tit. 10, §§ 1101, *et seq.*, with respect to purchases of goods and services in Maine by Class members and/or Maine residents.

l. Md. Code Com. Law §§ 11-201, *et seq.*, with respect to purchases of goods and services in Maryland by Class members and/or Maryland residents.

m. Mich. Comp. Laws §§ 445.772, *et seq.*, with respect to purchases of goods and services in Michigan by Class members and/or Michigan residents.

n. Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases of goods and services in Minnesota by Class members and/or Minnesota residents.

o. Neb. Rev. Stat. §§ 59-801, *et seq.*, with respect to purchases of goods and services in Nebraska by Class members and/or Nebraska residents.

p. Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, with respect to purchases of goods and services in Nevada by Class members and/or Nevada residents.

q. N.J. Stat. Ann. §§ 56:9, *et seq.*, with respect to purchases of goods and services in New Jersey by Class members and/or New Jersey residents.

r. N.H. Rev. Stat. Ann. Tit. XXXI, §§ 356, *et seq.*, with respect to purchases of goods and services in New Hampshire by Class members and/or New Hampshire residents.

s. N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of goods and services in New Mexico by Class members and/or New Mexico residents.

t. N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of goods and services in New York by Class members and/or New York residents.

u. N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of goods and services in North Carolina by Class members and/or North Carolina residents.

v. N.D. Cent. Code §§ 51-08.1, *et seq.*, with respect to purchases of goods and services in North Dakota by Class members and/or North Dakota residents.

w. Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of goods and services in Oregon by Class members and/or Oregon residents.

x. R.I. Gen Laws §§ 6-36-1, *et seq.*, with respect to purchases of goods and services in Rhode Island by Class members and/or Rhode Island residents.

y. S.D. Codified Laws §§ 37-1-3.1, *et seq.*, with respect to purchases of goods and services in South Dakota by Class members and/or South Dakota residents.

z. Tenn. Code §§ 47-25-101, *et seq.*, with respect to purchases of goods and services in Tennessee by Class members and/or Tennessee residents.

aa. Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of goods and services in Utah by Class members and/or Utah residents.

bb. W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of goods and services in West Virginia by Class members and/or West Virginia residents.

cc. Wis. Stat. Ann. §§ 133.01(1), *et seq.*, with respect to purchases of goods and services in Wisconsin by Class members and/or Wisconsin residents.

256. Plaintiffs and State Law Antitrust Damages Class members seek damages as permitted by law for their injuries caused by Visa's violations of the respective statutes.

## COUNT III:
## UNLAWFUL AGREEMENTS NOT TO COMPETE IN VIOLATION OF STATE ANTITRUST LAWS
## (On Behalf of the State Law Antitrust Damages Class)

257. Plaintiffs incorporate each prior paragraph as if set forth herein.

258. Plaintiffs, on behalf of themselves and members of the State Law Antitrust Damages Class, plead causes of action for unlawful agreements not to compete in violation of the below enumerated state laws.

259. Visa's anticompetitive conduct alleged herein substantially affected trade and commerce of the United States and of each State under which Plaintiffs bring a cause of action.

260. In addition to violating Section 1 of the Sherman Act, Visa agreed with competitors and potential competitors, including, but not limited to, Apple, PayPal, and Square, not to compete in the relevant markets. Those agreements unreasonably restrained competition in the relevant markets related to debit transactions in the United States.

261. Plaintiffs and the State Law Antitrust Damages Class members have been injured by Visa's unlawful conduct by, *inter alia*, paying higher fees than they would have absent Visa's anticompetitive actions.

262. Plaintiffs and the State Law Antitrust Damages Class members have been injured in each state under which Plaintiffs bring a cause of action.

263. Plaintiffs have provided contemporaneous notice to the attorneys general of the following states in filing this Complaint: Arizona, California, Connecticut, Hawaii, Kansas, Minnesota, Nevada, New York, Rhode Island, Utah, West Virginia, and Wisconsin.

264. By engaging in the foregoing conduct, Visa intentionally and wrongfully entered into unlawful agreements not to compete in the violation of the following state antitrust laws:

a. Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases of goods and services in Arizona by Class members and/or Arizona residents.

b. Intentionally Left Blank.

c. Cal. Bus. & Prof. Code §§ 16700, *et seq.*, with respect to purchases of goods and services in California by Class members and/or California residents.

d. Colo. Rev. Stat. §§ 6-4-104, *et seq.*, with respect to purchases of goods and services in Colorado by Class members and/or Colorado residents.

e. Conn. Gen. Stat. §§ 35-24, *et seq.*, with respect to purchases of goods and services in Connecticut by Class members and/or Connecticut residents.

f. 6 DE Code §§ 2101, *et seq.*, with respect to purchases of goods and services in Delaware for Class members and/or Delaware residents.

g. D.C. Code §§ 28-4501, *et seq.*, with respect to purchases of goods and services in the District of Columbia by Class members and/or District of Columbia residents.

h. Haw. Rev. Stat §§ 480-1, *et seq.*, with respect to purchases of goods and services in Hawaii by Class members and/or Hawaii residents.

i. Iowa Code §§ 553.1, *et seq.*, with respect to purchases of goods and services in Iowa by Class members and/or Iowa residents.

j. Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of goods and services in Kansas by Class members and/or Kansas residents.

k. Me. Rev. Stat. Ann. Tit. 10, §§ 1101, *et seq.*, with respect to purchases of goods and services in Maine by Class members and/or Maine residents.

l. Md. Code Com. Law §§ 11-201, *et seq.*, with respect to purchases of goods and services in Maryland by Class members and/or Maryland residents.

m. Mich. Comp. Laws §§ 445.772, *et seq.*, with respect to purchases of goods and services in Michigan by Class members and/or Michigan residents.

n. Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases of goods and services in Minnesota by Class members and/or Minnesota residents.

o. Neb. Rev. Stat. §§ 59-801, *et seq.*, with respect to purchases of goods and services in Nebraska by Class members and/or Nebraska residents.

p. Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, with respect to purchases of goods and services in Nevada by Class members and/or Nevada residents.

q. N.J. Stat. Ann. §§ 56:9, *et seq.*, with respect to purchases of goods and services in New Jersey by Class members and/or New Jersey residents.

r. N.H. Rev. Stat. Ann. Tit. XXXI, §§ 356, *et seq.*, with respect to purchases of goods and services in New Hampshire by Class members and/or New Hampshire residents.

s. N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of goods and services in New Mexico by Class members and/or New Mexico residents.

t. N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of goods and services in New York by Class members and/or New York residents.

u. N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of goods and services in North Carolina by Class members and/or North Carolina residents.

v. N.D. Cent. Code §§ 51-08.1, *et seq.*, with respect to purchases of goods and services in North Dakota by Class members and/or North Dakota residents.

w. Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of goods and services in Oregon by Class members and/or Oregon residents.

x. R.I. Gen Laws §§ 6-36-1, *et seq.*, with respect to purchases of goods and services in Rhode Island by Class members and/or Rhode Island residents.

y. S.D. Codified Laws §§ 37-1-3.1, *et seq.*, with respect to purchases of goods and services in South Dakota by Class members and/or South Dakota residents.

z. Tenn. Code §§ 47-25-101, *et seq.*, with respect to purchases of goods and services in Tennessee by Class members and/or Tennessee residents.

aa. Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of goods and services in Utah by Class members and/or Utah residents.

bb. W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of goods and services in West Virginia by Class members and/or West Virginia residents.

cc. Wis. Stat. Ann. §§ 133.01(1), *et seq.*, with respect to purchases of goods and services in Wisconsin by Class members and/or Wisconsin residents.

265. Plaintiffs and State Law Antitrust Damages Class members seek damages as permitted by law for their injuries caused by Visa's violations of the respective statutes.

**COUNT IV:**
**UNLAWFUL AGREEMENTS THAT RESTRAIN TRADE IN VIOLATION OF STATE ANTITRUST LAWS**
**(On Behalf of the State Law Antitrust Damages Class)**

266. Plaintiffs incorporate each prior paragraph as if set forth herein.

267. Plaintiffs, on behalf of themselves and members of the State Law Antitrust Damages Class, plead causes of action for unlawful agreements that restrain trade in violation of the below enumerated state laws.

268. Visa's anticompetitive conduct alleged herein substantially affected trade and commerce of the United States and of each State under which Plaintiffs bring a cause of action.

269. In addition to violating Section 1 of the Sherman Act, Visa agreed with merchants, issuers, and acquirers to unreasonably restrain trade in the relevant markets.

270. Plaintiffs and the State Law Antitrust Damages Class members have been injured by Visa's unlawful conduct by, *inter alia*, paying higher fees than they would have absent Visa's anticompetitive actions.

271. Plaintiffs and the State Law Antitrust Damages Class members have been injured in each state under which Plaintiffs bring a cause of action.

272. Plaintiffs have provided contemporaneous notice to the attorneys general of the following states in filing this Complaint: Arizona, California, Connecticut, Hawaii, Kansas, Minnesota, Nevada, New York, Rhode Island, Utah, West Virginia, and Wisconsin.

273. Be engaging in the foregoing conduct, Visa intentionally and wrongfully entered into unlawful agreements to restrain trade in violation of the following state antitrust laws:

a. Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases of goods and services in Arizona by Class members and/or Arizona residents.

b. Intentionally Left Blank.

c. Cal. Bus. & Prof. Code §§ 16700, *et seq.*, with respect to purchases of goods and services in California by Class members and/or California residents.

d. Colo. Rev. Stat. §§ 6-4-104, *et seq*., with respect to purchases of goods and services in Colorado by Class members and/or Colorado residents.

e. Conn. Gen. Stat. §§ 35-24, *et seq.*, with respect to purchases of goods and services in Connecticut by Class members and/or Connecticut residents.

f. 6 DE Code §§ 2101, *et seq*., with respect to purchases of goods and services in Delaware for Class members and/or Delaware residents.

g. D.C. Code §§ 28-4501, *et seq.*, with respect to purchases of goods and services in the District of Columbia by Class members and/or District of Columbia residents.

h. Haw. Rev. Stat §§ 480-1, *et seq.*, with respect to purchases of goods and services in Hawaii by Class members and/or Hawaii residents.

i. Iowa Code §§ 553.1, *et seq.*, with respect to purchases of goods and services in Iowa by Class members and/or Iowa residents.

j. Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of goods and services in Kansas by Class members and/or Kansas residents.

k. Me. Rev. Stat. Ann. Tit. 10, §§ 1101, *et seq.*, with respect to purchases of goods and services in Maine by Class members and/or Maine residents.

l. Md. Code Com. Law §§ 11-201, *et seq.*, with respect to purchases of goods and services in Maryland by Class members and/or Maryland residents.

m. Mich. Comp. Laws §§ 445.772, *et seq.*, with respect to purchases of goods and services in Michigan by Class members and/or Michigan residents.

n. Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases of goods and services in Minnesota by Class members and/or Minnesota residents.

o. Neb. Rev. Stat. §§ 59-801, *et seq.*, with respect to purchases of goods and services in Nebraska by Class members and/or Nebraska residents.

p. Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, with respect to purchases of goods and services in Nevada by Class members and/or Nevada residents.

q. N.J. Stat. Ann. §§ 56:9, *et seq.*, with respect to purchases of goods and services in New Jersey by Class members and/or New Jersey residents.

r. N.H. Rev. Stat. Ann. Tit. XXXI, §§ 356, *et seq.*, with respect to purchases of goods and services in New Hampshire by Class members and/or New Hampshire residents.

s. N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of goods and services in New Mexico by Class members and/or New Mexico residents.

t. N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of goods and services in New York by Class members and/or New York residents.

u. N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of goods and services in North Carolina by Class members and/or North Carolina residents.

v. N.D. Cent. Code §§ 51-08.1, *et seq.*, with respect to purchases of goods and services in North Dakota by Class members and/or North Dakota residents.

w. Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of goods and services in Oregon by Class members and/or Oregon residents.

x. R.I. Gen Laws §§ 6-36-1, *et seq.*, with respect to purchases of goods and services in Rhode Island by Class members and/or Rhode Island residents.

y. S.D. Codified Laws §§ 37-1-3.1, *et seq.*, with respect to purchases of goods and services in South Dakota by Class members and/or South Dakota residents.

z. Tenn. Code §§ 47-25-101, *et seq.*, with respect to purchases of goods and services in Tennessee by Class members and/or Tennessee residents.

aa. Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of goods and services in Utah by Class members and/or Utah residents.

bb. W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of goods and services in West Virginia by Class members and/or West Virginia residents.

cc. Wis. Stat. Ann. §§ 133.01(1), *et seq.*, with respect to purchases of goods and services in Wisconsin by Class members and/or Wisconsin residents.

274. Plaintiffs and State Law Antitrust Damages Class members seek damages as permitted by law for their injuries caused by Visa's violations of the respective statutes.

**RELIEF SOUGHT**

275. Plaintiffs request judgment including the following relief:

a. A determination that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel of record as Class Counsel.

b. Permanent injunctive relief invalidating Visa's unlawful agreements not to compete with its competitors and potential competitors and its unlawful agreements that restrain trade in violation of federal and/or state antitrust law.

c. Damages under the relevant state antitrust statutes for Visa's wrongful conduct as alleged herein.

d. Plaintiffs and the Classes' costs, expenses, and reasonable attorneys' fees.

e. Such other relief in equity or at law as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs request a trial by jury of all issues so triable.

Dated: October 16, 2026

Respectfully Submitted,

Jason S. Hartley *(Pro Hac Vice)*
Jason M. Lindner (*Pro Hac Vice*)
Maureen Forsyth (*Pro Hac Vice*)
**HARTLEY LLP**
101 W. Broadway, Suite 820
San Diego, California 92101
Telephone: (619) 400-5822
hartley@hartleyllp.com
lindner@hartleyllp.com
forsyth@hartleyllp.com

Joseph R. Saveri *(Pro Hac Vice)*
Cadio Zirpoli *(Pro Hac Vice)*
David H. Seidel *(Pro Hac Vice)*
T. Brent Jordan (*Pro Hac Vice*)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Fransico, California 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
dseidel@saverilawfirm.com
tbjordan@saverilawfirm.com

*/s/ Richard M. Paul III*
Richard M. Paul III *(Pro Hac Vice)*
Mary Jane Fait (SBN #1669019)
Laura C. Fellows *(Pro Hac Vice)*
David W. Bodenheimer *(Pro Hac Vice)*
Katherine L. Miles *(Pro Hac Vice)*
**PAUL LLP**
600 Broadway, Suite 600
Kansas City, Missouri 64105
Telephone: (816) 984-8100
Rick@PaulLLP.com
MaryJane@PaulLLP.com
Laura@PaulLLP.com
David@PaulLLP.com
Katie@PaulLLP.com

Christopher J. Hydal (SBN #5670492)
**JOSEPH SAVERI LAW FIRM, LLP**
40 Worth Street, Suite 602
New York, New York 10013
Telephone: (646) 527-7310
chydal@saverilawfirm.com

**INTERIM CO-LEAD COUNSEL FOR CARDHOLDER PLAINTIFFS AND THE CARDHOLDER CLASS**

**CERTIFICATE OF SERVICE**

I, Richard M. Paul III, hereby certify that on October 16, 2026, a true and correct copy of the foregoing was served upon all counsel of record via the CM/ECF system.

*/s/ Richard M. Paul III*